# 21-3127(L)
## 21-3136(Con)

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔉𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

**Kyros Law P.C., Konstantine W. Kyros**
*Appellants-Cross Appellees*,

**Michelle James, as mother and next friend of M.O., a Minor Child and T.O., a Minor Child, Jimmy Snuka, "Superfly", by and through his guardian, Carole Snuka,**
*Consolidated–Plaintiffs (continued on inside cover)*

**v.**

**WORLD WRESTLING ENTERTAINMENT, INCORPORATED,**
*Consolidated Plaintiff-Defendant-Appellee-Cross Appellant*,

**Vincent K. McMahon, Individually and as The Trustee of the Vincent K. McMahon Irrevocable Trust U/T/A dtd. June 24, 2004, as the Trustee of the Vincent K. McMahon 2008, and as Special Trustee of the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013 and as Trust,**
*Consolidated Defendant-Appellee-Cross Appellant*,

**Robert Windham, Thomas Billington, James Ware, Oreal Perras, John Doe's, Various,**
*Consolidated Defendants*.

**On Appeal from the United States District Court
for the District of Connecticut**

**SUPPLEMENTAL APPENDIX OF APPELLEES-CROSS-APPELLANTS WORLD WRESTING ENTERTAINMENT, INC. AND VINCENT K. MCMAHON
VOLUME I**

Jerry S. McDevitt
Curtis B. Krasik
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500

Jeffrey P. Mueller
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
(860) 275-0164

Salvador Guerrero, IV, AKA Chavo Guerrero, Jr., Chavo Guerrero, Sr., AKA Chavo
Classic, Bryan Emmett Clark, Jr., AKA Adam Bomb, Dave Hebner, Earl Hebner, Carlene
B. Moore-Begnaud, AKA Jazz, Mark Jindrak, Jon Heidenreich, Larry Oliver, AKA
Crippler Bobbi Billard, Lou Marconi, Bernard Knighton, Kelli Fujiwara Sloan, on behalf
of estate of Harry Masayoshi Fujiwara, William Albert Haynes, III, Rodney Begnaud,
AKA Rodney Mack, William Albert Haynes, III, Rodney Begnaud, AKA Rodney Mack,
Russ McCullough, individually and on behalf of all others similarly situated, AKA Big
Russ McCullough, Ryan Sakoda, individually and on behalf of all others similarly situated,
Matthew Robert Wiese, individually and on behalf of all others similarly situated, AKA
Luther Reigns, Evan Singleton, Vito Lograsso, Cassandra Frazier, Individually and as next
of kin to her deceased husband, Nelson Lee Frazier, Jr. a/k/a Mabel a/k/a Viscera a/k/a Big
Daddy V a/k/a King Mabel and as personal representative of The Estate of Nelson Lee
Frazier, Jr., Deceased, Shirley Fellows, on behalf of Estate of Timothy Alan Smith a/k/a
Rex King, Joseph M. Laurinaitis, AKA Road Warrior Animal, Paul Orndorff, AKA Mr.
Wonderful, Chris Pallies, AKA King Kong Bundy, Anthony Norris, AKA Ahmed Johnson,
James Harris, AKA Kamala, Ken Patera, Barbara Marie Leydig, Bernard Knighton, as
Personal Representative of Estate of Brian Knighton, a.k.a. Axl Rotten, Marty Jannetty,
Terry Szopinski, AKA Warlord, Sione Havia Vailahi, AKA Barbarian, Terry Brunk, AKA
Sabu, Barry Darsow, AKA Smash, Bill Eadie, AKA Ax, John Nord, Jonathan Hugger,
AKA Johnny the Bull, James Brunzell, Susan Green, Angelo Mosca, AKA King Kong
Mosca, James Manley, AKA Jim Powers, Michael Enos, AKA Mike, AKA Blake Beverly,
Bruce Reed, AKA Butch, Sylain Grenier, Omar Mijares, AKA Omar Atlas, Don Leo
Heaton, AKA Don Leo Jonathan, Troy Martin, AKA Shane Douglas, Marc Copani, AKA
Muhammad Hassan, Mark Canterbury, AKA Henry Godwin, Victoria Otis, AKA Princess
Victoria, Judy Hardee, Judy Martin, Timothy Smith, AKA Rex King, Tracy Smothers,
AKA Freddie Joe Floyd, Michael R. Halac, AKA Mantaur, Rick Jones, AKA Black Bart,
Ken Johnson, AKA Slick, George Gray, AKA One Man Gang, Ferrin Jesse Barr, AKA J.J.
Funk, Rod Price, Donald Driggers, Ronald Scott Heard, on behalf of estate of Ronald
Heard also known as Outlaw Ron Bass, Boris Zhukov, David Silva, John Jeter, AKA
Johnny Jeter, Gayle Schecter, as Personal Representative of Estate Jon Rechner a.k.a.
Balls Mahoney, Ashley Massaro, AKA Ashley, Charles Wicks, AKA Chad Wicks, Perry
Satullo, AKA Perry Saturn, Charles Bernard Scaggs, AKA Flash Funk, Carole M. Snuka,
on behalf of Estate of James W. Snuka,

*Consolidated-Plaintiffs*

# TABLE OF CONTENTS

**DOCUMENT**                                                                 **PAGE NO.**

### VOLUME I

Second Amended Complaint in *Singleton* Case (*Singleton et al. v.
World Wrestling Entertainment, Inc.,* Case No. 3:15-CV-00425-VLB,
ECF No.72) .......................................................................................................... SA-0001

Transcript of Proceedings Before Judge Bryant on June 8, 2015
*(Singleton et al. v. World Wrestling Entertainment, Inc.,*
Case No. 3:15-CV-00425-VLB, ECF No. 73) ................................................... SA-0068

First Amended Complaint in *Frazier* Case (*McCullough et al. v.
World Wrestling, Entertainment, Inc.,* Case No. 3:15-CV-01704-JAM,
ECF No. 98) ...................................................................................................... SA-0136

Order Regarding Motion to Compel in *Singleton* Case
*(McCullough et al. v. World Wrestling Entertainment, Inc.,*
Case No. 3:15-CV-01704-JAM, ECF No. 144) ................................................. SA-0248

-i-

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **EVAN SINGLETON** and<br>**VITO LOGRASSO**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**WORLD WRESTLING<br>ENTERTAINMENT, INC.,**<br><br>       **Defendants.** | **CIVIL ACTION NO.**<br><br>**3:15-cv-00425-VLB**<br><br><br><br>**June 15, 2015** |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Evan Singleton and Vito LoGrasso ("Plaintiffs") allege the following upon personal knowledge as to their own experiences, transactions and upon information and belief as to all other matters.

### INTRODUCTION

1.      This lawsuit concerns World Wrestling Entertainment, Inc.'s ("WWE")[1] negligent and fraudulent mistreatment of the Plaintiffs who sustained long-term occupational post-concussion injuries as professional wrestlers.  The Plaintiffs allege the WWE's concealment, omission, and denial of medical information pertaining to traumatic brain injuries has caused their harm, tolls the statute of limitations and violates a continuous duty that the WWE owes and has voluntarily undertaken to these Plaintiffs.

---

[1] "World Wrestling Entertainment, Inc." and "WWE", as used in this Complaint, refer to the company in its current incarnation, along with all predecessor companies, including, but not limited to, Titan Sports, Inc., World Wrestling Federation, Inc., and World Wrestling Federation Entertainment, Inc.

1

2.     Plaintiffs have developed symptoms and been diagnosed with permanent, degenerative post-concussion brain injuries from their wrestling performances with WWE.  Additionally, Plaintiffs believe they are at greater risk for developing long-term brain diseases such as dementia, Alzheimer's disease, ALS, and CTE. Plaintiffs believe they are substantially more likely than the general population to develop such diseases in the future as a result of WWE's misconduct.

3.     WWE has known or should have known for decades that repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler will develop a permanent, degenerative brain disease. The plaintiffs argue the WWE's knowledge of these injuries stem from the large body of medical and scientific studies that date as far back to the 1920's that link head trauma to long term neurological problems. The WWE chose to hide this necessary information from the Plaintiffs to preserve the huge profits made from the violent culture created by the WWE.

4.     WWE took affirmative steps to mislead Plaintiffs into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time.  The accumulation of head trauma is exponentially more dangerous than isolated blows, a fact WWE knew or should have known.  Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

5.     WWE's representations, actions, and inactions have caused Plaintiffs to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein.

2

6.     WWE failed to disclose in a timely manner the true risks of repeated head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate repeated traumatic head impacts (including sub-concussive blows and concussions) and latent brain injury. Indeed, by refusing to acknowledge the risks it was creating – and by attempting to conceal those risks from its wrestlers – WWE effectively guaranteed that they would not seek the help they needed to avoid latent brain injury.

7.     When forced to acknowledge the risks to which it subjects its wrestlers – by script, on a daily basis – WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light. Indeed, WWE continues a course of conduct designed to mislead Plaintiffs about the injuries they have sustained by failing to disclose pertinent facts or offering misleading half-truths.

8.     The Plaintiffs had a special relationship with the WWE. Not only did they rely on the WWE to script and direct the wrestling performances in a safe manner, the Plaintiffs also relied on WWE to communicate medical and safety information to them. When the WWE communicated medical and safety information to the Plaintiffs the WWE had superior information about the long-term risks of repeated head trauma and had an ongoing duty to disclose accurate information to the Plaintiffs. According to the Plaintiffs the WWE breached its duty to disclose accurate information to them during and after their wrestling careers, specifically the WWE breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in the WWE and cognition

3

impairing conditions. The Plaintiffs with only high school educations justifiably and reasonably relied to their detriment on these negligent representations by omission.

9.  WWE's medical personnel are subject to the standards of the profession at the time that the medical care was provided. Concussion research during the years Plaintiffs wrestled for WWE was such that the WWE had actual notice of the causal connection between head trauma suffered while wrestling for WWE and long-term neurological injury. Plaintiffs would not reasonably be expected to research medical literature during their employment with WWE, nor would they be expected to know the sophisticated medical jargon and language of the medical profession. Plaintiffs reasonably relied on WWE's superior knowledge and position of authority, evidenced by the special relationship between Plaintiffs and WWE, which resulted in Plaintiffs' reliance to their detriment on WWE's fraudulent concealment and omissions regarding Plaintiffs' health and safety.

10. Plaintiffs seek a declaration of liability, injunctive relief, medical monitoring, and financial compensation for the long-term chronic injuries, financial losses, expenses, and intangible losses suffered by the Plaintiffs as a result of WWE's conduct, which resulted in Plaintiffs suffering brain trauma, concussions, and other related injuries.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs are residents of a different state from Defendant and because the value of the matter in controversy exceeds $75,000.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

13.   **Plaintiff Evan Singleton is a citizen of Pennsylvania.  He wrestled for WWE under the name Adam Mercer from 2012 to 2013.**

14.   **Plaintiff Vito LoGrasso is a citizen of Pennsylvania.  He wrestled with WWE from 1991 to 1998 and from 2005 to 2007.**

15.   **Defendant World Wrestling Entertainment, Inc. is a company existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut and it conducts business in this jurisdiction.**

16.   **Although WWE is a public company, it is controlled by a small group of related executives who manage both polices and the conduct of wrestlers during matches. Vincent K. McMahon has been Chairman of WWE since the retirement of his father, Vincent McMahon Sr., in 1980. Vincent K. McMahon has served as CEO from 1980 to 1993, and from 2009 to the present.  McMahon controls over 80 percent of WWE's voting power. McMahon's wife, Linda McMahon, served as WWE President from 1993 to 2009, and as CEO from 1997 to 2009. Their daughter, Stephanie McMahon Levesque, is WWE's Chief Brand Officer. Her husband, Paul Levesque is Executive Vice President, Talent, Live Events & Creative.**

## FACTUAL ALLEGATIONS

I.   **Background: WWE and Its Wrestlers**

17.   **WWE is the largest wrestling entertainment organization in the world. Since purchasing its main competitor, World Championship Wrestling, in 2001, WWE has had no serious competitors in the field of wrestling entertainment. The company generates approximately $500 million in revenue annually.**

5

18.     The majority of WWE's revenues stem from its televised wrestling events. WWE programs consistently rank among the most popular in weekly television ratings. WWE programming is broadcast in more than 170 countries and 35 languages and reaches more than 650 million homes worldwide.

19.     For nearly three decades, WWE has been the world's pre-eminent provider of pay-per-view programming, consistently ranking among the highest-selling live event programs in the world.

20.     WWE calls itself an "action soap opera."[2]  Its events are scripted, with preordained winners and losers, and it has a carefully written, ongoing plot. WWE predetermines much of the dialogue between the wrestlers and the winners of the events, as well as many of the violent acts perpetrated by the wrestlers on each other.

21.     Many WWE wrestlers fight hundreds of times per year. And unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

22.     Despite WWE's enormous revenues, WWE does not provide its wrestlers, past or current, with health insurance, disability insurance, or unemployment insurance. Wrestlers are effectively on their own.

23.     WWE scripts events and matches, including some moves.  The trainers, bookers, and other WWE employees, organize and oversee the action that takes place in each performance, effectuating WWE's scripts.

---

[2] Examiner.com, "WWE to be called an 'action soap opera' not pro-wresting, Bans more terms" (Apr. 13, 2011), available at http://www.examiner.com/article/wwe-to-be-called-an-action-soap-opera-not-pro-wrestling-bans-more-terms.

6

24.     Throughout the history of WWE, wrestlers, including Plaintiffs, look to and rely on their trainers, bookers, and WWE staff, both to provide specific direction from WWE, and to ensure their safety during performances.

II.     The Science of Head Trauma

25.     The primary classification of head injuries relevant to WWE are traumatic brain injuries ("TBIs," or colloquially, "concussions") and chronic traumatic encephalopathy ("CTE"). Concussions can cause CTE, but are not the only cause: repeated sub-concussive head trauma also causes CTE. Over their career, WWE wrestlers suffer repeated concussions and countless sub-concussive blows.

26.     Concussions have no standard definition, and require complex diagnosis based on clinical signs, observed symptoms, neuroimaging, medical records and personal interviews.[3] The Centers for Disease Control and Prevention ("CDC") define concussions as a type of TBI caused by a "bump, blow, or jolt to the head or body."[4] A blow to the head that does not cause a concussion, or that has not been diagnosed to cause a concussion, is commonly referred to as a sub-concussive blow.

---

[3] National Center for Injury Prevention and Control, "Report to Congress on Mild Traumatic Brain Injury in the United States: Steps to Prevent a Serious Health Problem" 1 (2003), available at http://www.cdc.gov/ncipc/pubres/mtbi/report.htm.

[4] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), *available at* http://www.cdc.gov/concussion/signs_symptoms.html.

7

27.    Many concussions go undiagnosed and untreated. Though concussions are often associated with a loss of consciousness, the majority of concussions are not so obviously recognized.

28.    Even absent a loss of consciousness, each concussion alters the way the brain functions.    Symptoms can include headaches and problems with concentration, memory, balance coordination, loss of consciousness, confusion, disorientation, nausea, vomiting, fatigue or drowsiness, difficulty sleeping, sleeping more than usual, and seizures.[5]    Although concussion research continues to grow, WWE had actual notice of these symptoms during Plaintiffs wrestling careers as concussion research had already established these symptoms as evidencing concussions.[6]

29.    Post-concussion syndrome remains with a person for days, weeks or even months.   Indeed, while, "[s]ome of these symptoms may appear right away. . . others may not be noticed for days or months after the injury."[7] In some cases, concussions can cause bleeding in the brain, which can be fatal.[8]  This also has been evident to the medical community since Plaintiffs were employed by WWE,

---

[5] Mayo Clinic, "Post-Concussion Syndrome: Definition," (Aug. 19, 2014), *available at* http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-20032705.

[6] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=2.

[7] Centers for Disease Control and Prevention, "What are the Signs and Symptoms of Concussion?" (Oct. 20, 2012), http://www.cdc.gov/concussion/signs_symptoms.html.

[8] Mayo Clinic, "Concussions: Causes" (Apr 2, 2014), available at http://www.mayoclinic.org/diseasesconditions/concussion/basics/causes/con-20019272.

8

providing WWE's medical personnel with the necessary information to diagnose and treat Plaintiffs' concussion and sub-concussive symptoms and injuries.[9]

30. Repeated blows sustained without sufficient recovery time are exponentially more dangerous. Sometimes called "second impact syndrome," multiple blows can amplify the original injury. According to the Mayo Clinic, "[e]xperiencing a second concussion before signs and symptoms of a first concussion have resolved may result in rapid and usually fatal brain swelling." Even in 2005, the Mayo Clinic recognized "a violent blow to your head can cause your brain to slide forcefully against the inner wall of your skull...A concussion causes at least a temporary loss in brain function. Although losing consciousness is a common sign of a concussion, it's possible to suffer a concussion without being completely knocked out."[10]

31. The WWE and WWE's medical personnel were in a unique position to have the wealth of medical literature on concussion and sub-concussive injuries in their possession, and in fact, were responsible to have such information available to them in order to practice to the standards of the medical profession during the years Plaintiffs were wrestling. Therefore, it can be imputed that WWE was knowledgeable about the likelihood head trauma would cause concussions and sub-concussive injuries and the resulting long-term neurological injuries, and

---

[9] Mayo Clinic, "Concussion: Signs and symptoms", (February 17, 2005), *available at* https://web.archive.org/web/20060816052646/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=2.

[10] Mayo Clinic, "Concussion: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=3.

9

had actual notice and knowledge as to the signs and symptoms associated with concussion and sub-concussive injuries when Plaintiffs were wrestling for the WWE.

32.   CTE is a disorder caused by neurodegeneration including cognitive and neuropsychiatric symptoms. Long-known as dementia pugilistica or punch-drunk syndrome, an increasing consensus has emerged that mild and infrequent trauma can cause similar long term neurological effects to those experienced by boxers.

33.   CTE is a permanent change to brain structure caused by repeated blows. CTE's accompanying symptoms include depression, dementia, cognitive impairment, Parkinsonism, personality change, speech and gait abnormalities. Unlike concussions, CTE can only be diagnosed with direct tissue examination, which can detect an elevated level of Tau protein in brain tissue.[11]

34.   CTE can be caused by a single traumatic brain injury, but is much more often the result of repeated minor traumas. According to an NIH study, "[t]here is overwhelming evidence that the condition is the result of repeated sublethal brain trauma that often occurs well before the development of clinical manifestations."[12]

35.   As dangerous as individual concussions and sub-concussive blows can be in the short term, the long-term effects are more debilitating and insidious.

---

[11] Bennet I. Omalu et al., "Chronic Traumatic Encephalopathy, Suicides and Parasuicides in Professional American Athletes," 31 AM. J. FORENSIC MED. PATHOLOGY 130, 132 (2010).

[12] Ann C. McKee et al., "Chronic Traumatic Encephalopathy in Athletes: Progressive Tauopathy following Repetitive Head Injury," J. NEUROPATHOL EXP NEUROL. 2009 July; 68(7): 709–735.

Because CTE is difficult to detect, manifests years later, and includes chronic mental issues, many sufferers do not understand their illness. Whereas a concussion's symptoms are often sensory and manifest immediately, CTE manifests years later, and can be caused by blows which have no accompanying symptoms.

36.    Many sufferers of CTE spend years with no idea—and no way of knowing—that they suffer from this disorder.

37.    Depression—including depression caused by CTE—is destructive, often leading to substance abuse and suicide. If caused by a physical trauma that happened years ago, with no reason or warning to suspect the true cause, these symptoms can be bewildering as well as debilitating.

38.    Research into the effects on professional athletes shows grim disparities based on head trauma: professional football players who had at least three concussive incidents over their careers were three times more likely to be diagnosed with clinical depression and five times more likely to be diagnosed with dementia than were players who had limited history of concussions.[13]

39.    As discussed below, at least one former WWE wrestler's autopsy revealed he suffered from CTE.

    III.    WWE Created a Culture of Violence Putting Profits Over Plaintiffs' Safety

---

[13] Kevin M. Guskiewicz et al., "Recurrent Concussion and Risk of Depression in Retired Professional Football Players," 39 MED. & SCI. SPORTS & EXERCISE 903, 906 (2007)

SA-0011

40.     During WWE matches, wrestlers including Plaintiffs performed activities that are exceedingly dangerous to themselves and to their adversaries. They are particularly dangerous when performers make mistakes in executing the stunts.

41.     For wrestlers directed to perform complicated and dangerous stunts day after day, including Plaintiffs, such mistakes are not only inevitable, but frequent. This is so because (a) wrestlers are not properly trained to execute their "moves" in a safe—or at least, safer—manner; and (b) wrestlers have a grueling schedule, meaning they are often tired during their matches and more prone to inflict and suffer traumatic injury.

42.     It is commonplace for WWE wrestlers to experience numerous concussions over their careers, during which many fight hundreds of times each year.  A wrestler such as Plaintiff LoGrasso, wrestling on average five times a week, sustained repeated concussions day after day over many years, resulting in a greatly increased chance of CTE and related illnesses.

43.     Even where no mistakes occur, these stunts can result in detrimental blows to the head. Over the span of a career, these blows greatly increase the chance of CTE and related illnesses.

44.     WWE intentionally and willfully adds what it calls "heat" to its scripts in order to ensure that there is "extra physicality" in its matches. In her testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives in 2007, WWE executive Stephanie McMahon Levesque defined "heat" as "when you are really beating someone down in order to elicit a reaction

12

SA-0012

from the crowd of, 'Oh, my God, please get up, get up, get up,' and the guy can't."[14] She provided an example of "heat," stating:

> For example, if there are a number of guys in the ring, like say there is five guys attacking one guy, and I am a good guy going to come out, if I come out by myself, I am going to get beat down just as bad as the other guy. But if I come out with a chair, I might have a better chance. Logically, so that is how the chairs are used. You might have seen -- or I don't know if you have seen any of our scripts -- but there might be chair shots written in at some point.[15]

45.     To elicit "heat" in events, WWE directs its wrestlers to use various weapons.  As Ms. Levesque's testimony suggests, WWE instructs its wrestlers to use metal chairs to batter each other.  In countless WWE matches, fighters have slammed chairs over the heads of their opponents.  Even where WWE wrestlers use chairs or other dangerous weapons without WWE's explicit direction, they do so with WWE's encouragement and tacit approval.  In many instances, these chair shots have delivered dangerous levels of force to the recipient's skull including to Plaintiffs.

46.     The chair shot itself, though supposedly banned in 2010, is an iconic image of concussion-causing destruction which WWE utilizes to its fullest in

---

[14] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 119 (Dec. 14, 2007), *available at* http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.
[15] *Id.* at 120.

advertisements and promotions.[16]  Even Paul Levesque, a WWE executive and
son-in-law to Vincent K. McMahon, has used chair shots since 2010 in
performances, as a wrestler under the name "Triple H."[17]

47.    WWE's announcers commonly revel in the ability of wrestlers to fight
through injuries, downplaying concussions as mere "wooziness."

48.    These beatings, though nominally "fake," greatly increase the chance of
wrestler injuries, particularly when a wrestler administering the "heat" commits
an error. But even where no error is committed, the "heat" administered by
wrestlers results in blows to the head.

49.    Some of these moves involve acrobatic feats that involve lifting opponents
more than six feet in the air.

50.    During WWE practice and WWE matches, Plaintiffs sustained thousands of
hits to their heads as part of scripted and choreographed moves.

51.    Instead of stopping events when Plaintiffs sustained injuries, WWE allowed
such events to continue, requiring that Plaintiffs fight through the pain, and
subjecting them to the long-term consequences of cumulative brain injury.

52.    Even the most basic wrestling move, the "bump," involves the risk of injury
to the head and spine.  A bump involves falling to the mat backwards so the

---

[16] See Geno Mrosko, "WWE uses unprotected chair shot to the head to promote
its Network" (July 12, 2014), available at
http://www.cagesideseats.com/wwe/2014/7/12/5893661/wwe-uses-unprotected-
chair-shot-to-the-headto-promote-its-network.
[17] David Bixenspan, "After Wrestlemania, it looks like WWE has unbanned chair
shots to the head" (Apr. 4, 2011), available at
http://www.cagesideseats.com/2011/4/4/2090779/after-wrestlemania-it-looks-like-
wwe-had-unbannedchairs-to-the-head.

wrestler lands on his back. Wrestlers are taught to and are directed by WWE to fall so that the top of their back hits the mat, and to avoid hitting their heads. However, depending on the speed at which they are taking the bump, wrestlers hit their heads or necks resulting in head injuries. Plaintiffs conducted this move multiple times over their careers.

53.     Over time, these blows greatly increase the chance of CTE.

IV.     **WWE Was Aware of and Covered Up the Dangers to Plaintiffs**

   A. **Through Medical Literature, WWE Knew or Should Have Known the Risks Associated With Its Activities**

54.     As previously alleged, WWE knew or should have known during Plaintiffs' WWE careers of the growing body of scientific evidence and its conclusions that persons such as Plaintiffs who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their wrestling careers, or especially, later in life.

55.     WWE was and is aware of the risks of repeated head trauma and multiple concussive events caused by wrestling in their matches. In 2007, a WWE executive admitted that "WWE wrestlers are at risk for concussions because of the nature of their work." And yet, WWE continues to understate the risks and dangers of CTE, as evidenced by Dr. Joseph Maroon's statements to the NFL Network, Total Access in March 2015, "The problem of CTE, although real, is its

15

being over-exaggerated".[18]  WWE and its medical personnel use their unique positions of authority and superior knowledge to quell their wrestlers', including Plaintiffs', fears regarding injuries and convince them it is safe to continue wrestling through concealment of necessary information, omission of pertinent medical information, and failures to properly assess, diagnose, and treat their wrestlers', including Plaintiffs' injuries, leading to Plaintiffs reliance to their detriment on WWE's allowance of Plaintiffs continuing to wrestle and perform after suffering symptoms of concussions and sub-concussive injuries and being allowed and encouraged to fight through the pain and continue wrestling despite having suffered concussions and sub-concussive injuries.

56.  For decades spanning back to the 1920s WWE has known, or should have known, that wrestlers have been subjected to extremely dangerous conditions and blows at its direction.[19] Specifically, WWE was aware in 2005 and beyond that wrestling for the WWE and suffering head trauma would result in long-term injuries.[20]  And it therefore should have, but never did, warn Plaintiffs of the risks of concussions and other brain injuries associated with wrestling with WWE.

57.  The risks associated with sports in which athletes suffer concussive and sub-concussive blows have been known for decades to the medical community. Below is a selection of mounting medical literature concerning head trauma:

---

[18] NFL Network, NFL Total Access, "Dr. Maroon: The NFL Has Never Been Safer", (March 2015), *available at* http://www.nfl.com/videos/nfl-network-total-access/0ap3000000479597/Dr-Maroon-The-NFL-has-never-been-safer
[19] *See* http://concussioninc.net/?p=3286
[20] *See* Mayo Clinic, "Concussions: Causes", (February 17, 2005), *available at* https://web.archive.org/web/20060706220359/http://www.mayoclinic.com/health/concussion/DS00320/DSECTION=3.

16

- **During the 1950s, 60s, 70, 80s and 90s, studies were authored by the Journal of the American Medical Association ("JAMA") and the New England Journal of Medicine, concerning head trauma and concussions. In particular, many of the studies focused on sports-related head trauma and concussions and the long term implications of such injuries (which include loss of brain function and dementia).**

- **In 1973, Drs. Corsellis, Bruton, & Freeman-Browne reported as to the physical neurological impact of boxing. The study outlined the neuropathological characteristics of dementia, loss of brain cells and cerebral atrophy.**

- **In 1986, Dr. Robert Cantu of the American College of Sports Medicine published Concussion Grading Guidelines (updated in 2001).**

- **In 2001 and 2004, conventions of neurological experts met in Prague and Vienna with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out." These two conventions were attended by predominately American doctors who were experts and leaders in the neurological field.**

- **A 2006 publication stated that "[a]ll standard U.S. guidelines, such as those first set by the American Academy of Neurology and the Colorado**

17

Medical Society, agree that athletes who lose consciousness should
never return to play in the same game."

- In 2007, scientists concluded that a former WWE wrestler had suffered
from CTE. Scientists concluded in 2009 that a second former WWE
wrestler had suffered from the same affliction.

58.     WWE knew, or should have known, about this and other research
demonstrating the dangers of receiving concussive and sub-concussive blows to
the head.   Moreover, WWE knew or should have known that the research
associated with boxing, hockey, and football also reflected dangers associated
with WWE wrestling. Indeed, for the reasons set forth above, wrestlers have a
greater risk of receiving frequent concussive and sub-concussive blows to the
head than athletes in those sports.

### WWE Has Attempted to Cover Up the Dangers of Head Trauma Associated with Wrestling

59.     WWE has engaged in a campaign of misinformation and deception to
prevent Plaintiffs from understanding the true nature and consequences of the
injuries they have sustained.

60.     WWE concealed important medical information, including the effects of
multiple head traumas, and prematurely allowed Plaintiffs to return to the ring or
to practice, even when injured. As a result, wrestlers, including Plaintiffs, suffered
serious permanent and debilitating injuries and damages.

61.     WWE has continually represented directly to Plaintiffs, and indirectly to
them through the public, that the safety of its wrestlers is a top priority. To take
but one example, Vincent K. McMahon told the Committee on Oversight and

18

Government Reform of the U.S. House of Representatives, "Let me just say, [WWE] is always concerned about safety of our talent, absolutely. We were the first people to do any number of things to make things safe for our talent, if that's the direction in which you're going."[21]

62.    The NFL had created the Mild Traumatic Brain Injury Committee in 1994. The NHL introduced a Concussion Policy in 1997 requiring NHL team doctors to document all concussions and collected data on standardized injury report forms.  In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions.  Yet WWE waited nearly a decade before adopting similar policies.

63.    Indeed, WWE has systematically denied to Plaintiffs and their co-wrestlers that its wrestlers routinely suffer from concussions, or that its wrestlers suffer from long term brain damage.  No one at WWE ever warned Plaintiffs about the risk of sustaining numerous sub-concussive and concussive blows.

64.    For example, in 2007, WWE Executive Stephanie McMahon Levesque testified to the Committee on Oversight and Government Reform of the U.S. House of Representatives that there were no documented concussions in WWE's history.[22]

---

[21] Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of Vince Kennedy McMahon (Dec. 14, 2007), available at https://www.scribd.com/doc/33253381/Vince-McMahons-Testimony-to-Waxman-committee.

[22] *See* Committee on Oversight and Government Reform, U.S. House of Representatives, Washington, D.C., Interview of: Stephanie McMahon Levesque 117 available at http://oversightarchive.waxman.house.gov/documents/20081231140942.pdf.

19

65.    At the time of Levesque's testimony, WWE wrestlers likely had cumulatively experienced hundreds—if not thousands—of concussions. To deny that these concussions were documented amounts to an admission that WWE refused to acknowledge the extreme risks it was subjecting its wrestlers to.

66.    Dr. Bennett Omalu, who pioneered the research into CTE, studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in July 2005.  A month previously, Terry Long, a 45 year old Pittsburgh Steelers player committed suicide.  Dr Omalu opined that the cause may have been brain damage in line with his studies.

67.    In a pattern that echoes that of the NFL's original response to the discovery of CTE, WWE attempted to discredit these studies.

68.    Dr. Joseph Maroon, NFL Pittsburgh Steelers team doctor for twenty-five years and now WWE's chief doctor, attacked this conclusion.  Dr. Maroon reportedly told the Pittsburgh Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon stated "to go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative…"

69.    WWE responded on ESPN, stating, "[w]hile this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for [professional wrestlers] Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been

20

able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[23]

70. WWE's request to examine the research and tests was feigned, as Dr. Omalu reported that "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[24]

71. In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He linked Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

72. He further commented to ESPN after studying WWE former wrestler Andrew Martin's brain: "People wondered if Mike Webster was an isolated event . . . and then came Terry Long and Andre Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[25]

---

[23] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.
[24] Irwin, Muchnick, Concussion, Inc., p. 67 (ECW Press, 2015).
[25] See ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, last accessed February 13, 2015.

73.     In a joint interview for the 2007 CNN documentary Death Grip: Inside Pro Wrestling, WWE CEO Vincent K. McMahon and former WWE CEO Linda McMahon attacked Dr. Omalu and Dr. Bailes's finding that Benoit had suffered from CTE. This was part of a larger plan to deny that Benoit had suffered from CTE and to discredit the research suggesting he had.

74.     The NFL engaged in a protracted debate about the mounting evidence linking head trauma to CTE and the severe, long-term resulting injuries.  After attempting to discredit the research of doctors examining brain tissue of deceased NFL players, the NFL acknowledged its mistake in July of 2010 and began noticing players that concussions "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever."

75.     Through its actions of failing to properly assess, diagnose, and treat wrestlers such as Plaintiffs who suffered concussion and sub-concussive injuries during their scripted performances and who showed clear signs of concussion, sub-concussive injury and CTE symptoms, evidence WWE's refusal and ongoing, continued refusal to properly inform and provide necessary medical care to the Plaintiffs throughout their WWE careers despite this wealth of information uniquely at WWE's disposal.

76.     WWE created its "Wellness Program" in 2006, and selected Dr. Maroon as its architect, despite his involvement in public efforts to discredit Dr. Omalu's research. An attorney for WWE has been publicly credited with establishing the

"medical-testing program to protect wrestlers' health."[26]  That attorney has stated that the untimely death of popular wrestler Eddie Guerrero in November of 2005 "was the catalyst to the program that [WWE] now ha[s] in place."[27] That attorney retained by WWE recommended that WWE employ Dr. Joseph Maroon to set the program up.[28]

77.    WWE's chief doctor, Dr. Joseph Maroon, has been involved in prior concussion and head trauma related cover ups, including attempts to discredit research related to CTE.[29]

78.    The WWE Wellness policy advised; "WWE implemented its Talent Wellness Program on February 27, 2006… Since its implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[30]

79.    The Wellness Program uses a concussion diagnostic system which a "study of studies" in 2012 revealed may increase the risk of long term damage because of its error rate.[31]

---

[26] Deitch, "Heavyweight Champions." Pittsburgh City Paper (December 2, 2010) available at http://www.pghcitypaper.com/gyrobase/Content?oid=oid%3A88609.
[27] *Id.*
[28] *Id.*
[29] *See* http://concussioninc.net/?p=9617.
[30] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, last accessed February 13, 2015.
[31] *See* http://m.espn.go.com/general/story?storyId=8297794&src=desktop&wjb.

SA-0023

80.    The Wellness Program also reaches out to former wrestlers to offer support for drug and alcohol abuse, but these contacts fail to advise former wrestlers, including Plaintiffs, about head injuries.

81.    WWE has stated that it has "the finest monitoring program in American Sports," thereby admitting the undertaking by WWE to monitor its wrestler's health and safety, and establishing its duty to provide full and accurate information to its wrestlers.

82.    WWE's Wellness Program served to deceive Plaintiffs by providing a false sense of security and assurance that their health and safety were being adequately monitored, both in the ring and as former wrestlers.  The Wellness Program, by purporting to protect Plaintiffs, merely led them into not seeking adequate treatment or otherwise protecting their health.

83.    By concealing known risks and downplaying the injuries suffered during matches, and by prematurely clearing wrestlers who needed recuperation time, WWE denied Plaintiffs the opportunity to recover from head injuries, to seek appropriate medical treatment, and to monitor themselves for long term brain damage.

84.    In reliance on both misleading statements issued by WWE attempting to downplay the severity of concussion and sub-concussive injuries, as well as WWE's actions in failing to properly assess, diagnose, and treat concussion and sub-concussive injuries, Plaintiffs have failed to take actions which otherwise could have mitigated their injuries, both during and after their wrestling careers.

V.    WWE Had a Duty to Plaintiffs and Breached That Duty

85.     WWE, as organizer and purveyor of professional wrestling in which head trauma is a regular and repeated occurrence, had a duty to act in the best interest of its wrestlers' health and safety – including to keep wrestlers informed of the neurological risks associated with head injuries suffered while wrestling for WWE.  WWE had superior knowledge and access to information, and should have disclosed that information to Plaintiffs and not concealed such information.

86.     By virtue of its employment of medical staff and provision of treatment to Plaintiffs, WWE assumed a duty to conduct itself reasonably and to provide these services with reasonable care. WWE hired medical personnel whose stated purpose was to monitor and assess the wrestlers inside and outside of the ring. Plaintiffs reasonably relied on these medical personnel in determining whether they should return to the ring and continue fighting or practicing or had suffered serious injury necessitating further medical treatment.

87.     WWE's doctors and medical personnel failed to properly monitor, diagnose, and treat Plaintiffs before, during, and after the wrestling matches, in some cases allowing them to return to the ring despite "wooziness"—a sign of brain trauma.

88.     WWE undertakes to train all wrestlers including those against whom Plaintiffs wrestled, and therefore WWE had a duty to do so with reasonable care. In fact, the training provided was inadequate and unreasonable, causing Plaintiffs harm.

89.     Upon information and belief, WWE regularly collected and continues to collect wrestler injury reports, including during Plaintiffs' careers with WWE,

becoming a repository of substantial concussion and other head injury information and conducting exclusive analysis. Plaintiffs, lacking this information, had to rely on WWE to inform them of their health and safety information relating to their wrestling careers with WWE.

90.    By issuing statements and engaging in programs to address Plaintiffs' health, WWE had a duty to ensure that these statements were complete and were not misleading or fraudulent. Instead, WWE provided incomplete information to Plaintiffs, who reasonably relied on it to their detriment.

91.    Contrary to its assertions concerning safety, WWE demanded Plaintiffs perform acts which it knew or should have known cannot be performed safely. For example, the use of dangerous weapons like steel chairs against the head by wrestlers cannot be done safely.

92.    Upon information and belief, WWE has as recently as 2015 implemented the use of helmets during training at WWE training facilities. Helmets had previously not been worn by wrestlers at the WWE training facilities and were not worn by the Plaintiffs when they trained and wrestled with WWE.



**Captured from embedded video on WWE's WWE Tough Enough Facebook page,**
*available at*
**https://www.facebook.com/WWEtoughenough/videos/vb.181273445231240/10120**
**37205488189/?type=2&theater, posted on June 11, 2015.**

**VI.      Facts Concerning the Named Plaintiffs**

   **A. Plaintiff Evan Singleton**

93.      **Plaintiff Evan Singleton who stands at 6 feet, 6 inches and 330 pounds, is a resident of Pennsylvania. Mr. Singleton has a high school education and attempted to "break in" to the wrestling world immediately after high school. Plaintiff signed with WWE in 2012 and wrestled for WWE from 2012 to 2013.  His stage name was "Adam Mercer." At the age of 19, he was among of the youngest professional wrestlers in WWE history.**

94.      **He states that WWE contract was provided on a "take it or leave it basis," and he did not have a lawyer to advise him of the contract terms nor did he negotiate any of the contracts he was told to sign.**

27

95.     During his time wrestling for WWE, Plaintiff often wrestled several times per week and did not have adequate time to rest between matches and was encouraged to wrestle while injured. As a wrestler for WWE, Plaintiff suffered numerous injuries to the upper body, neck and head during his career.

96.     As a new wrestler he was often matched in training with inexperienced opponents which due to lack of experience resulted in more injuries. He characterized his role as being that of a "crash test dummy."

97.     One of Singleton's trainers was former wrestler Bill Demott. After the events alleged by Mr. Singleton herein, Bill Demott resigned from the WWE on March 6, 2015 amid widespread allegations of misconduct and abuse.[32]  Several former wrestlers working within the WWE Developmental system of which plaintiff Evan Singleton was a part, have made public allegations of misconduct against Mr. Demott during his tenure as a WWE trainer.

98.     Specifically Mr. Demott was accused of making trainees perform dangerous drills. Austin Matelson whose ring name was Judas Devlin states he sent a letter to WWE Talent Relations in March 2013. In the letter posted online,[33] Matelson alleges a brutal culture fostered by Demott in which Demott physically assaulted students, used racial and sexually insulting names and forced them

---

[32] Marissa Payne, "WWE trainer Bill DeMott resigns amid allegations of racist, homophobic and abusive behavior", Washington Post.com (March 6, 2015), http://www.washingtonpost.com/blogs/early-lead/wp/2015/03/06/wwetrainer-bill-demott-resigns-amid-allegations-of-racist-homophobic-and-abusive-behavior/, last accessed May 19, 2015.

[33] Reddit.com, Squared Circle Sub-reddit, "Bullying/NEGLECT in WWE/NXT & Medical Staff; MUST READ & MUST HEAR Interview w/Former NXT Star!", (March 2015), *available at* https://www.reddit.com/r/SquaredCircle/comments/2xphrq/bullyingneglect_in_wwenxt_medical_staff_must_read/.

into dangerous drills that led to many injuries. Matelson allegedly suffered injuries during his training under Demott.

99.     Singleton alleges that Mr. Demott was one of the WWE staff that acted negligently in both his training and liaison with WWE medical staff.

100.    Specifically Mr. Singleton alleges he had only performed a choke slam once about five minutes previous to being told during a house show on or about September 27, 2012 in Tampa, Florida that he would be "choke slammed" as part of the conclusion of the performance. Mr. Singleton was knocked completely unconscious after being choke slammed by a more skilled, more experienced wrestler named Erick Rowan.

101.    Erick Rowan who stands at 6 feet 8 inches, 315 pounds is 33 year old wrestler with more than a decade of experience, having been a wrestler since 2003.

102.    A choke slam is considered by wrestlers themselves to be one of the more dangerous moves. The move involved grabbing Mr. Singleton by the neck, being lift up and slammed to the mat. Rowan lifted the Plaintiff by the throat/neck and slammed him to the mat. Singleton contends that he was thrown with extra force and was actually thrown to the mat.

103.    Mr. Singleton suffered a blow to the left side of his head and sustained a brain injury as a result. He passed out after the trauma and was pinned. He states he was "in a fog" and was able to walk back to the training room, he was having balance problems.

104.   Mr. Singleton was not treated immediately after the incident. He did see a trainer, who despite having believed Mr. Singleton sustained a concussion advised he rest over the weekend and was advised his roommate and dad "will keep an eye on him over weekend." During this time he was having daily headaches, dizziness, balance problems. His memory of the several months following the incident is poor.

105.   At some point, appears to be nearly one month (October 2, 2012) after the incident Singleton was finally seen by a Dr. Lovell, A WWE affiliated doctor in Pittsburg who administered an Impact test and recommended "rest." In subsequent reports Dr. Lovell seems to downplay the injury to Mr. Singleton.

106.   As Mr. Singleton's symptoms worsened he was finally seen by Dr. Amann who ordered an MRI on November 14, 2012 and by a neurologist Dr. Greenberg who ordered additional testing.

107.   On January 18, 2013 Singleton was "cleared by Dr. Greenberg to return to normal activity with no restrictions or limitations." On January 21, Singleton returned to watch practice where the notes indicate" "We will get a routine down to slowly integrate him into full practice within the next month." He was not medically cleared to wrestle, though he did "some in ring activity" on February 2, 2013 for 7 minutes, where he complained of dizziness and being "woozy." Mr. Demott and others allegedly encouraged him to return and criticized his inability to perform.

108.   During his convalescence and period following his injury, Singleton states that he received near daily phone calls from Bill Demott and another WWE

employee named Canyon Semen, threatening and harassing him to return to the ring leading up to the February 2 incident. In the dozens of calls placed by Demott to Singleton on his cell phone, Demott allegedly took issue with Singleton's inability to perform. Demott allegedly used abusive language, and curses in an apparent effort to coerce him to return to work.

109.   Singleton states these calls were very stressful, making him feel that he would be fired at any moment and contributed to his poor mental state.

110.   In February 2013 Singleton was seen by additional WWE Doctors including Dr. Amann who now diagnosed depression seemingly unrelated to his head injury.

111.   By July 2013 and EEG was performed and finally on August 30, 2013 did the WWE doctors conclude he may have had a traumatic brain injury.

112.   By November 2013 over one year after the incident, WWE doctors Maroon, Amann, Lovell finally advised Mr. Singleton be sent to an Inpatient traumatic Brain Injury facility.

113.   Upon information and belief, Plaintiff Singleton was diagnosed with a traumatic brain injury, including a possible intracranial hemorrhage.  Singleton's Primary Treating Physician Nancy Rogers-Neame in a letter to the WWE associated Doctor Christopher Amann dated February 3, 2014 which describing severe symptoms listed a "Chronic Conditions / Primary Diagnosis of Traumatic Brain Hem Nec -853." This diagnosis code is defined in the ICD as "unspecified intracranial hemorrhage following injury without mention of open intracranial wound." She writes "He presents for follow up of his condition following a

31

traumatic brain injury secondary to a "body slam" and subsequent intracranial hemorrhage".  Mr. Singleton now suffers from post-concussion symptoms including but not limited to headaches, severe migraines, memory loss, behavioral changes, amnesia, involuntary twitching, inability to concentrate, panic attacks, and severe depression.

114.  As a direct result of his participation in WWE events, Mr. Singleton has suffered physical changes placing him at a higher risk of future harm for neurological problems. Today Mr. Singleton suffers from post-concussion symptoms including but not limited to headaches, severe migraines, memory loss, and severe depression.

115.  He was further seen for psychiatric & emotional issues related to the brain injury by Dr. Darren Rothschild. Per medical records Mr. Singleton suffers from migraines, severe depression, behavioral changes, amnesia, involuntary twitching, inability to concentrate for more than 15 minutes, was not able to drive a car for years, was at risk for suicide, and needs long term mental health treatment. A WWE treating psychiatrist concluded his was "unfortunately a very difficult case."

116.  Additionally Mr. Singleton scored a Migraine Disability Assessment Test (MIDAS) grade of IV "severe disability". The MIDAS is a test used by doctors to determine how severely migraines affect a patient's life. The professional Journal Neurology found the test to be both reliable and valid.

117.  As a direct and proximate result of wrestling for the WWE, Plaintiff suffers from symptoms of severe and permanent brain damage. In fact Mr. Singleton at

32

the age of 22 now suffers from a permanent disability from his brief WWE career. He was diagnosed Dr. Nancy Rodgers-Neame, MD, who upon information and belief concluded Mr. Singleton is almost completely disabled, at the age of 22.

### B. Plaintiff Vito LoGrasso

118.   Plaintiff Vito LoGrasso, who fought under numerous ring names including Big Vito and Vito Cruz, began fighting for the WWE (then the WWF) in 1990 at the age of 25.  By 1991, Mr. LoGrasso's agent, Al Schaefer, alias Sunny Blaze, and Robert Remus, alias Sgt. Slaughter (who upon information and belief is currently employed in WWE's ambassador program), brought Mr. LoGrasso onto Monday Night Raw as an "extra".

119.   A prolific performer, Mr. LoGrasso would wrestle for the WWE up to five times a week.

120.   Agents such as Tony Garea and Renee Goulet, employees of the WWE, would call Mr. LoGrasso and tell him who we would fight and when the match would take place.  Howard Finkle, another agent for the WWE, would arrange Mr. LoGrasso's transportation and stays.

121.   Bookers were the creative for the performances and would write the scripts, deciding everything from what costumes the wrestlers should wear to who would win the match. Upon information and belief, even Vince McMahon himself participated in the writing of the scripts, which included the type and method of fighting engaged in by the wrestlers during the matches.

122.   Mr. LoGrasso was used whenever the WWE needed an extra fighter for a match and soon became a regular performer on the WWE networks.

33

123.    Mr. LoGrasso signed a full-time contract with the WWE in 2005 as an experienced wrestler whom could perform in wrestling games, bigger stages, and more choreographed matches set-up by the WWE bookers and agents.

124.    Mr. Lograsso was made to believe by WWE employees he could not admit he had been injured.  His trainers, including Bill Dumott, would continuously permeate an environment of humiliation and silence, encouraging the wrestlers to fight through serious injury which upon information and belief has led to Mr. LoGrasso's long-term and latent injuries.  Mr. LoGrasso attended the Deep South Championship Training Camp in Georgia, where Bill Dumott trained new recruits and current performers, and would force complaining injured wrestlers to sit in a corner as a form of "time-out" to prevent the wrestlers from admitting injury and to prevent the wrestlers from seeking and receiving necessary medical treatment.

125.    During his training and wrestling career with WWE, Mr. LoGrasso was told by WWE employees and at the time believed that injuries he suffered were part of "paying his dues", and believed that having "your bells rung", or receiving "black and blues" and bloody noses only resulted in the immediate pain and injury with no long-term ramifications or effects.

126.    Mr. LoGrasso had no reason to believe that suffering repeated injuries to his head, neck, and spine could result in long-term illnesses, diseases, and injuries and had no reason to believe that the injuries he was receiving while performing for the WWE would cause latent, long-term injuries.

127.    Mr. LoGrasso was never informed by the WWE that receiving head trauma could result in a concussion or sub-concussion.

128.    Mr. LoGrasso, even if he had been aware that receiving head trauma could result in a concussion or sub-concussion, would not have known that repeated concussions and sub-concussions would likely result in long-term, latent illnesses, diseases, and injuries.

129.    At the main television performances, usually Monday Night Raw and Pay-Per-View events, Dr. Rios, upon information and belief the primary doctor for in-ring events for the WWE until the end of 2006, was the primary contact for medical care and treatment for Mr. LoGrasso.  Dr. Rios would assess injuries and determine whether a performer required further medical care or could "just shower it off".  If Mr. LoGrasso was feeling "sluggish" Dr. Rios would provide Vitamin B-12 shots for increased performance.  Mr. LoGrasso relied on Dr. Rios' medical knowledge and information to properly assess, diagnose, and treat his injuries.

130.    Upon information and belief, Dr. Rios would on numerous occasions based upon his medical knowledge witness Mr. LoGrasso suffer head trauma extremely likely to cause concussions and sub-concussions and yet would not properly assess Mr. LoGrasso to determine his medical condition and would not provide necessary medical treatment, instead allowing Mr. LoGrasso to return to the ring before his head, neck, spine, and brain had been given the time necessary to heal from such sustained head trauma.  Mr. LoGrasso relied on Dr. Rios' assessments (or lack thereof) in his determination to return to the ring to fight after sustaining numerous and sustained blows to the head.

35

131.    Sports trainers hired by the WWE would be present at both television events and house matches.  These sports trainers would be equipped with sports tape, peroxide, and other equipment to aid in the wrestlers' performances.  These sports trainers would assess any injuries sustained at the matches and determine whether x-rays would be necessary in the event of a more serious injury.  The sports trainers would wrap sprains with sports tape and douse open wounds in peroxide.  Mr. LoGrasso relied on the sports trainers to properly assess his injuries and to prescribe the proper form of treatment necessary for a healthy recovery.

132.    Mr. LoGrasso reasonably relied on the WWE's medical personnel, trainers, agents, and documents when he continued to fight and receive sustained head trauma repeatedly over twenty years which resulted in repeated concussions and sub-concussions causing latent, neurological injuries only later beginning to manifest itself in severe headaches and neurological illness, which Mr. LoGrasso continues to suffer from.

133.    In 2006, Mr. LoGrasso went on a program with WWE performer Regal which choreographed storyline written by the WWE bookers and agents required Mr. LoGrasso to be overly beaten as a result of his cross-dressing gimmicks and persona, also created by the WWE.  As a result of the storylines and choreography designed and implemented by the WWE, Mr. LoGrasso was forced to endure and be beaten repeatedly and suffer sustained head trauma from Regal every match, causing Mr. LoGrasso to "have his bell rung" every match.  This

resulted in Mr. LoGrasso suffering symptoms of fogginess and requiring him to step away and shower to clear his head.

134.    In one of these matches with Regal in September, 2006, Mr. LoGrasso was kicked in the face outside the ring, knocking him to the ground where he struck his head against concrete steps.  Clearly having his "bell rung" from the impact, Mr. LoGrasso's ability to properly react to the beatings by Regal resulted in additional sustained head trauma without an ability to protect his head and so created a higher risk of sustaining concussions and sub-concussive injuries.

135.    Dr. Rios, or any other medical personnel employed by the WWE, never performed an adequate assessment on Mr. LoGrasso, never ordered any neurological testing, and never prescribed a hiatus from fighting to heal the repeated sustained head trauma highly likely to cause concussions and sub-concussions and which symptoms suffered by Mr. LoGrasso evidence the fact he received concussions and sub-concussions from such brutal and sustained beatings to the head designed and choreographed by the WWE.

136.    Mr. LoGrasso ended his long career with the WWE in 2007 after fighting in over one thousand matches, all similar to the above-described performances, having received no information on concussions and sub-concussions and being completely unaware of the connections between the head trauma sustained in the WWE with concussion and sub-concussive injuries.

137.    Mr. LoGrasso never knew that he could sustain a concussion while remaining awake.  He believed that even having his "bells rung" would not result in a concussion, and the medical personnel at the matches never corrected his

37

false belief or properly treated him when he inevitably did sustain concussions and sub-concussive injuries.

138.   Mr. LoGrasso was never educated about the ramifications of head trauma and injury and the likelihood of concussions and sub-concussions and the resulting latent neurological injuries suffered from sustaining concussions and sub-concussive injuries.

139.   Mr. LoGrasso never received any medical information regarding concussions or sub-concussive injuries while employed by the WWE.

140.   By 2008, Mr. LoGrasso was showing symptoms of neurological injury in the form of residual, pounding headaches.  At this time Mr. LoGrasso was not aware of any connection between the head trauma he had and continued to sustain in the WWE and the headaches, and so took aspirin to help with the pain and continued fighting.

141.   The severe results from the trauma sustained while fighting for the WWE continued to manifest itself through 2009 and 2010 when Mr. LoGrasso's headaches continued to worsen and become more frequent.  Mr. LoGrasso was diagnosed with TMJ of the jaw and was disabled near deaf in one ear and mostly deaf in the other.

142.   It was not until 2014 when Mr. LoGrasso's headaches became so unbearable that he saw Dr. Demarco, a primary care physician at Lancaster General Hospital's Urgent Care Facility, who sent him to Dr. Smith, an ENT Specialist who labeled Mr. LoGrasso disabled as deaf.

38

143.    On or around April 1, 2015, Mr. LoGrasso was diagnosed with traumatic brain injury, headache, and obstructive sleep apnea by Dr. Handler, a neurologist, after a CAT scan on Mr. LoGrasso's brain.

144.    On or around May 1, 2015, Dr. Robert Cavoto stated Mr. LoGrasso showed signs of post-concussion syndrome – cervical dysfunctia and T.M.J. as well as showing signs of depression.

145.    Additionally, Mr. LoGrasso sees a psychologist for depression, a recognized symptom of concussive syndrome, and continues to suffer recurring headaches.  As a result of the severity of the headaches and how much it has affected his daily living, he has been prescribed Amitriptyline in an attempt to relieve the headaches and help with sleep.

146.    Mr. LoGrasso is deaf, has suffered a severe impact to his quality of life, has to use hearing aids, suffers from TMJ, and traumatic brain injury (diagnosed on April 1, 2015).

147.    Mr. LoGrasso has been granted Medicaid and is labeled disabled by the State and is currently unemployed.

148.    Mr. LoGrasso continues to receive pamphlets and emails from the WWE from the WWE's Talent Wellness Program regarding the health and safety of retired WWE wrestlers.

### ESTOPPEL FROM PLEADING AND TOLLING OF
### APPLICABLE STATUTES OF LIMITATION

149.    Plaintiffs reasonably relied on WWE's statements to inform them about safety and health. As a direct result of statements and conduct (and omissions) outlined above, Plaintiffs were lulled into inaction by WWE.

39

150.   Plaintiffs reasonably acted on what WWE omitted – that concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestling before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head.

151.   WWE was obligated to disclose, but failed to disclose,  vital information to Plaintiffs based upon its special relationship with its wrestlers, assumed duty of care, voluntary undertaking of the Wellness Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma. WWE affirmatively concealed facts, and continues to conceal facts, which prevented Plaintiffs from discovering their claims.

152.   To the extent that it is applicable, the statute of limitations is tolled because of Defendants' fraudulent concealment of the dangers and adverse effects of head injuries, the risks associated with wrestling, the injuries suffered while wrestling, and the negligent medical care provided to Plaintiffs through WWE.

CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**EVAN SINGLETON V. WWE**
**(FRAUDULENT CONCEALMENT)**

153.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

40

154.    Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

155.    WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.

156.    WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Plaintiff, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

157.    WWE concealed material facts and information with the intent to deceive and defraud.  WWE's conduct left Plaintiff without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

158.    WWE knew that Plaintiff would rely on the inaccurate information provided by WWE.

159.    Plaintiff relied on this inaccurate information during and after his career with WWE.

160.    Defendant had a duty to disclose and warn Plaintiff about the actual knowledge it maintained about such injuries and the true nature of the risks

41

posed to wrestlers. Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of WWE wrestlers and Plaintiff, WWE routinely failed to inform Plaintiff of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries. In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Plaintiff from receiving necessary medical treatment and preventing Plaintiff from receiving necessary information to make an informed decision regarding his health and safety.

161.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

162.    WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

163.    The Plaintiff reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Plaintiff. Such reliance may also be imputed, based upon the materiality of WWE's

wrongful conduct. Accordingly, the Plaintiff justifiably relied to his detriment on WWE's less than candid conduct and guidance, such conduct intended to deter Plaintiff's inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.

164. As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff have been damaged, as alleged herein.

## SECOND CAUSE OF ACTION
## VITO LOGRASSO V. WWE
## (FRAUDULENT CONCEALMENT)

165. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

166. Defendant knowingly, fraudulently, and actively misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries, the risks associated with the participation in WWE events, and exposure to situations causing latent physical changes related to long-term neurological damage.

167. WWE took affirmative actions to conceal the dangers of concussions, sub-concussive impacts, and head trauma, in particular the heightened risk created by returning to the ring before making a proper recovery from head injuries.

168. WWE has voluntarily and repeatedly made material misrepresentations to its WWE wrestlers, former WWE wrestlers, including Plaintiff, and the public at large that there was no evidence linking, or insufficient evidence linking, multiple

43

concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

169. WWE concealed material facts and information with the intent to deceive and defraud. WWE's conduct left Plaintiff without the necessary knowledge to make informed decisions to plan for his own future and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

170. WWE knew that Plaintiff would rely on the inaccurate information provided by WWE.

171. Plaintiff relied on this inaccurate information during and after his career with WWE.

172. Defendant had a duty to disclose and warn Plaintiff about the actual knowledge it maintained about such injuries and the true nature of the risks posed to wrestlers. Despite the overwhelming medical literature available to WWE agents and personnel tasked with promoting the health and safety of WWE wrestlers and Plaintiff, WWE routinely failed to inform Plaintiff of the symptoms of concussions and the dangers of concussions and sub-concussive injuries, and the resulting long-term injuries. In part resulting from WWE's culture of silence regarding head trauma and concussion and sub-concussive injuries, WWE failed to properly assess and diagnose concussions and sub-concussive injuries in their wrestlers, preventing Plaintiff from receiving necessary medical treatment and preventing Plaintiff from receiving necessary information to make an informed decision regarding his health and safety.

173. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

174. WWE was silent when confronted with a duty to disclose such pertinent, material information, and the fact that some information is publicly available does not foreclose a finding of concealment.

175. The Plaintiff reasonably and actually relied on Defendant's representations, omissions and concealments given WWE's knowledge and expertise, and given the special relationship existing between WWE and its wrestlers, such as Plaintiff. Such reliance may also be imputed, based upon the materiality of WWE's wrongful conduct. Accordingly, the Plaintiff justifiably relied to his detriment on WWE's less than candid conduct and guidance, such conduct intended to deter Plaintiff's inquiry into the matter, in part by permeating a culture of silence with regard to injuries and head trauma.

176. As a direct and proximate result of these misrepresentations, omissions and concealments, Plaintiff have been damaged, as alleged herein.

SA-0045

## THIRD CAUSE OF ACTION
## EVAN SINGLETON V. WWE
## (FRAUD BY OMISSION / FAILURE TO WARN)

177.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

178.   WWE had a duty to Plaintiff to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

179.   WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

180.   Plaintiff justifiably relied on WWE's fraudulent omissions to their detriment.

181.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

182.   Had Plaintiff been aware of such information they would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

183.   As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiff suffered serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

**FOURTH CAUSE OF ACTION**
**VITO LOGRASSO V. WWE**
**(FRAUD BY OMISSION / FAILURE TO WARN)**

184.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

185.   WWE had a duty to Plaintiff to promptly disclose and speak the full truth regarding the health risks caused by concussions and sub-concussive blows to the head.  This duty arose because WWE had superior special knowledge of material medical information that WWE wrestlers did not have access to, nor was readily available to them, WWE communicated with WWE wrestlers and the

47

public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for WWE, resulting in incomplete, partial, or ambiguous—and therefore misleading— statements regarding safety and head injuries.

186.    WWE breached that duty by fraudulently failing to disclose material information to Plaintiff regarding the risks of head injuries suffered due to WWE's activities, including, the link between concussions and brain injury, resulting negative effects and cognition-impairing conditions, and their increased risk of CTE, the need for additional diagnostic testing, and the increased risk of other irreversible brain damage and neuro-cognitive impairment.

187.    Plaintiff justifiably relied on WWE's fraudulent omissions to their detriment.

188.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

189.    Had Plaintiff been aware of such information he would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

190.    As a direct and proximate result of WWE's fraud by omission and failure to warn, Plaintiff suffered serious injuries, including but not limited to long-term

neurological damage, and the serious symptoms and disorders resulting from that damage.

### FIFTH CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (NEGLIGENT MISREPRESENTATION)

191.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

192.   WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries.

193.   WWE materially misrepresented the risks faced by Plaintiff related to head, back, and spine injuries through misleading public statements, requiring Plaintiff to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

194.   WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

195.   WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiff faced serious health problems if they returned to the ring too soon after sustaining a concussion.

196.    WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

197.    WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

198.    WWE intended to induce Plaintiff's reliance on these misrepresentations.

199.    Plaintiff justifiably and reasonably relied on WWE's negligent misrepresentations to his detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

200.    Plaintiff acted and failed to act in reliance on these statements to his detriment.

201.    WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiff regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

202.    Defendant had a duty to disclose to Plaintiff any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

203.    As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiff has been damaged, as alleged herein.

50

204.   As a direct and proximate result of WWE's negligent misrepresentations, Plaintiff has suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiff seeks the full measure of damages allowed under applicable law.

205.   Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiff to an award of punitive damages to the extent allowed by law.

### SIXTH CAUSE OF ACTION
### VITO LOGRASSO V. WWE
### (NEGLIGENT MISREPRESENTATION)

206.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

207.   WWE negligently and/or recklessly misrepresented, omitted, and concealed from Plaintiff material facts concerning repetitive head impacts and related injuries.

208.   WWE materially misrepresented the risks faced by Plaintiff related to head, back, and spine injuries through misleading public statements, requiring Plaintiff to fight through the pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

209. WWE negligently failed to disclose material information to its wrestlers regarding the link between head injuries suffered while wrestling for WWE and the resulting negative effects and cognition-impairing conditions.

210. WWE actively omitted true information at a time when it knew, or should have known, because of its superior position of knowledge, that Plaintiff faced serious health problems if they returned to the ring too soon after sustaining a concussion.

211. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

212. WWE and/or the WWE's "Talent Wellness Program," had no reasonable ground for believing its statements to be true.

213. WWE intended to induce Plaintiff's reliance on these misrepresentations.

214. Plaintiff justifiably and reasonably relied on WWE's negligent misrepresentations to his detriment when wrestling for WWE, relying on what WWE said and failed to say to WWE wrestlers about concussions and other head injuries.

215. Plaintiff acted and failed to act in reliance on these statements to his detriment.

52

216. WWE failed to act with reasonable care by negligently failing to disclose material information to Plaintiff regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

217. Defendant had a duty to disclose to Plaintiff any actual knowledge is possessed conceding such injuries and any associated risks it was aware of.

218. As a direct and proximate result of these misrepresentations, omissions, and concealments, Plaintiff has been damaged, as alleged herein.

219. As a direct and proximate result of WWE's negligent misrepresentations, Plaintiff has suffered and continues to suffer serious personal injury, including neuro-cognitive brain disease and associated damages including mental disability, loss of income, pain and suffering, and emotional distress. Plaintiff seeks the full measure of damages allowed under applicable law.

220. Defendant's acts and misconduct, as alleged herein, constitute oppression, fraud, and/or malice entitling Plaintiff to an award of punitive damages to the extent allowed by law.

### SEVENTH CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (FRAUDULENT DECEIT)

221. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

222. WWE materially misrepresented the risks faced by Plaintiff related to head injuries. WWE, through misleading and deceptive public statements and

published articles, and downplayed known long-term health risks of concussions to Plaintiff.

223. WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiff faced serious health problems if he was forced to return to the ring too soon after suffering brain trauma.

224. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

225. WWE intended to induce Plaintiff's reliance on the misrepresentations and to induce him to alter his position related to injury and risk.

226. Plaintiff justifiably and reasonably relied on these misrepresentations when wrestling for WWE. Had he known the true risks to his health, he would have acted to protect his health.

227. WWE's misrepresentations were substantial factors leading to Plaintiff's injuries.

228. As a direct and proximate result of WWE's misrepresentations, Plaintiff experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused

54

and/or contributed to the injuries described above, as well as emotional distress, pain and suffering, and economic and noneconomic damages.

### EIGHTH CAUSE OF ACTION
### VITO LOGRASSO V. WWE
### (FRAUDULENT DECEIT)

229.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

230.   WWE materially misrepresented the risks faced by Plaintiff related to head injuries.   WWE, through misleading and deceptive public statements and published articles, downplayed known long-term health risks of concussions to Plaintiff.

231.   WWE made these misrepresentations and actively concealed adverse information at a time when it knew, or should have known, that Plaintiff faced serious health problems if they were forced to return to the ring too soon after suffering brain trauma.

232.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

233.   WWE intended to induce Plaintiff's reliance on the misrepresentations and to induce him to alter his position related to injury and risk.

55

234.   Plaintiff justifiably and reasonably relied on these misrepresentations when wrestling for WWE.  Had he known the true risks to his health, he would have acted to protect his health.

235.   WWE's misrepresentations were substantial factors leading to Plaintiff's injuries.

236.   As a direct and proximate result of WWE's misrepresentations, Plaintiff experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused and/or contributed to the injuries described above, as well as emotional distress, pain and suffering, and economic and noneconomic damages.

### NINTH CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (NEGLIGENCE)

237.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

238.    WWE has a duty to Plaintiff, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

239.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

240.   WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

241. Defendant owed a duty to Plaintiff to exercise reasonable care in the safety and quality control of its wrestling matches.

242. Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including Plaintiff.

243. WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

244. As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiff suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

245. As a direct and proximate cause of the foregoing, Plaintiff has suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

# TENTH CAUSE OF ACTION
## VITO LOGRASSO V. WWE
### (NEGLIGENCE)

246.   Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

247.   WWE has a duty to Plaintiff, based in part on voluntarily assumptions of duties, regarding safety and head trauma.

248.   Yet, as previously outlined throughout this Complaint, WWE has failed to discharge this duty non-negligently.

249.   WWE had and continues to have a duty to exercise reasonable care in training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances.

250.   Defendant owed a duty to Plaintiff to exercise reasonable care in the safety and quality control of its wrestling matches.

251.  Defendant was aware, or reasonably should have been aware, that concussion injuries were prevalent in its events and posed great risk to its wrestlers, including Plaintiff.

252.   WWE, based upon the growing medical and scientific information uniquely available to WWE and its agents, and the standards of the medical professionals responsible for Plaintiff's health and safety, showed and required WWE to adequately inform, disclose, and provide accurate assessments and diagnoses to

58

Plaintiff so he could take the necessary medical action and make informed decisions regarding his health and safety.

253. As a direct and proximate result of the Defendant's negligent acts and omissions as previously stated, Plaintiff suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, and have an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from their severe injuries.

254. As a direct and proximate cause of the foregoing, Plaintiff has suffered and will continue to suffer damages and economic loss described fully above, in an amount to be proven at trial.

### ELEVENTH CAUSE OF ACTION
### EVAN SINGLETON V. WWE
### (MEDICAL MONITORING)

255. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Vito LoGrasso alone.

256. Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the

59

gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

257. The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

258. Wrestling exposed Plaintiff to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiff have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiff's exposure to the risks of harm as described above would have been materially lower.

259. Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiff to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiff has sustained repetitive head impacts exposed them to substantive hazards.

260. Plaintiff suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

261. WWE wrestlers were and continue to be:

    a. Exposed to greater than normal background levels;

    b. Of a proven hazardous substance, condition, activity, or event;

    c. **Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,**

    d. **As a proximate result of the exposure, Plaintiff has significantly increased risk of contracting serious latent diseases.**

    e. **Further, a monitoring procedure exists that makes the early detection of the disease possible; and,**

    f. **Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;**

    g. **All of which is reasonably necessary according to contemporary scientific principles.**

262. **By monitoring and testing the affected brain and body of the Plaintiff, it can be determined whether he has suffered additional injuries.**

263. **By monitoring and testing Plaintiff, the risk that Plaintiff will suffer further long term injuries, disease, and losses will be significantly reduced.**

264. **The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiff suffered as a result of participating in WWE events.**

265. **Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:**

a. Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiff, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced; and

b. Provides information to treating physicians to aid them in detecting such injuries.

266. Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiff will continue to face unreasonable risks alleged herein.

267. Plaintiff is entitled to damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION
## VITO LOGRASSO V. WWE
## (MEDICAL MONITORING)

268. Plaintiffs re-allege and incorporate by reference each of the paragraphs above as if specifically stated herein, except such Counts relating to Evan Singleton alone.

269. Repetitive blows to the head during WWE events have a microscopic and latent effect on the brain. Repetitive exposure to accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the Tau protein. Among other things, the gradual build-up of Tau protein – sometimes over decades – causes CTE and related disorders.

62

270. The effects of WWE's negligence and the circumstances it subjected wrestlers to may lead to latent physical changes which ultimately cause significant neurological impairment.

271. Wrestling exposed Plaintiff to hazardous conditions and out-of-the ordinary risks of harm. Repetitive head traumas to which the Plaintiff have been exposed presented risks of latent but long-term debilitating chronic illnesses which are not presented to the normal population. Absent the Defendant's negligence, fraud, and misrepresentations, the Plaintiff's exposure to the risks of harm as described above would have been materially lower.

272. Accordingly, the repetitive head impacts sustained by wrestlers exposed Plaintiff to subtle and repetitive changes within the brain on the cellular level. For that reason, the environment within which Plaintiff has sustained repetitive head impacts exposed them to substantive hazards.

273. Plaintiff suffered latent injuries which develop over time and manifest later in life include but are not limited to varying forms of neuro-cognitive disability, decline, personality change, mood swings, rage, and related disorders. These are present injuries that increase the risk of future harm.

274. WWE wrestlers were and continue to be:

    a. Exposed to greater than normal background levels;

    b. Of a proven hazardous substance, condition, activity, or event;

    c. Which was caused by the Defendant's willful, wanton, reckless or negligent acts; and,

63

d. As a proximate result of the exposure, Plaintiff have significantly increased risk of contracting serious latent diseases.

e. Further, a monitoring procedure exists that makes the early detection of the disease possible; and,

f. Such a monitoring regime is different from that normally recommended in the absence of the exposure or activities at issue here;

g. All of which is reasonably necessary according to contemporary scientific principles.

275.   By monitoring and testing the affected brain and body of the Plaintiff, it can be determined whether he has suffered additional injuries.

276.   By monitoring and testing Plaintiff, the risk that Plaintiff will suffer additional long term injuries, disease, and losses will be significantly reduced.

277.   By monitoring and testing Plaintiff, the risk that Plaintiff will suffer long term injuries, disease, and losses without adequate treatment will be significantly reduced.

278.   The medical monitoring regime must include, but is not limited to, baseline tests and diagnostic examinations which will assist in diagnosing the adverse health effects associated with WWE wrestling. This diagnosis will facilitate the treatment and behavioral and/or pharmaceutical interventions that will prevent or mitigate various adverse consequences of the latent neurodegenerative disorders and diseases associated with the repetitive sub-concussive and concussive injuries that Plaintiff suffered as a result of participating in WWE events.

279. Accordingly, Defendant should be required to establish a medical monitoring program that, among other things:

    a. Establishes a trust fund, in an amount to be determined, to pay for the medical monitoring of Plaintiff, as frequently as determined to be medically necessary, as well as to pay to develop and research other methods by which the risk of those affected can be reduced; and

    b. Provides information to treating physicians to aid them in detecting such injuries.

280. Plaintiff has no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of concussions and repeated sub-concussive blows. Without a Court-approved medical monitoring program as described herein, Plaintiff will continue to face unreasonable risks alleged herein.

281. Plaintiff is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

    WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. Compensatory and punitive damages;

2. Costs;

3. Interest as allowed by law; and,

4. For such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

DATE:          June 15, 2015

By:_ /s/ William M. Bloss_____
**William M. Bloss**
**Federal Bar No: CT01008**
**Koskoff, Koskoff & Bieder**
**350 Fairfield Avenue**
**Bridgeport, CT 06604**
**Telephone: 203-336-4421**
**Facsimile: 203-368-3244**

**Charles J. LaDuca**
**Brendan Thompson**
**CUNEO GILBERT & LADUCA, LLP**
**8120 Woodmont Avenue, Suite 810**
**Bethesda, MD 20814**
**Telephone: (202) 789-3960**
**Facsimile: (202) 789-1813**
**charles@cuneolaw.com**
**brendant@cuneolaw.com**

**Robert K. Shelquist**
**Scott Moriarity**
**LOCKRIDGE GRINDAL NAUEN**
**P.L.L.P.**
**100 Washington Ave., S., Suite 2200**
**Minneapolis, MN 55401-2179**
**Telephone: (612) 339-6900**
**Facsimile: (612) 339-0981**
**rkshelquist@locklaw.com**
**samoriarity@locklaw.com**

**Harris L. Pogust, Esquire**
**Pogust Braslow & Millrood,LLC**
**Eight Tower Bridge**
**161 Washington Street**
**Suite 940**
**Conshohocken, PA 19428**
**Telephone: (610) 941-4204**
**Facsimile: (610) 941-4245**
**hpogust@pbmattorneys.com**

**Konstantine W. Kyros**
**KYROS LAW OFFICES**
**17 Miles Rd. Hingham, MA 02043**
**Telephone: (800) 934-2921**
**Facsimile: 617-583-1905**
**kon@kyroslaw.com**

66

**Erica Mirabella**
**CT Fed. Bar #: phv07432**
**MIRABELLA LAW LLC**
**132 Boylston Street, 5th Floor**
**Boston, MA 02116**
**Telephone: 617-580-8270**
**Facsimile: 617-580-8270**
**Erica@mirabellaLLC.com**

**Attorneys for Plaintiffs**

SA-0067

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                              :
SINGLETON, ET AL,            :
             Plaintiffs      : CRIMINAL NO.
v.                           : #3:15-CV-00425(VLB)
                              :
WORLD WRESTLING              : June 8, 2015
ENTERTAINMENT, INC.,         :
             Defendants      :
                              :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut


<u>HEARING</u>


(Transcription from Electronic Recording)


Held Before:


THE HON. VANESSA L. BRYANT
United States District Judge



Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258

A P P E A R A N C E S:

> ### For the Plaintiffs:
>
>> WILLIAM BLOSS, ESQ.
>> Koskoff, Koskoff & Bieder, P.C.
>> 350 Fairfield Avenue
>> Bridgeport, CT  06604
>
> and
>
>> KONSTANTINE KYROS, ESQ.
>> Kyros Law Offices
>> 17 Miles Road
>> Hingham, MA  02043
>
> ### For the Defendants, Admitted Pro Hac Vice:
>
>> THOMAS D. GOLDBERG, ESQ.
>> Day Pitney, LLP
>> One Canterbury Green
>> Stamford, CT  06901
>
> and
>
>> JEFFREY MUELLER, ESQ.
>> Day Pitney, LLP
>> 242 Trumbull Street
>> Hartford, CT  06103-1212
>
> and
>
>> JERRY S. McDEVITT, ESQ.
>> K & L Gates, LLP
>> K & L Gates Center
>> 210 Sixth Avenue
>> Pittsburgh, PA  15222-2613
>
> and
>
>> CURT KRASIK, ESQ.
>> K & L Gates, LLP
>> K & L Gates Center
>> 210 Sixth Avenue
>> Pittsburgh, PA  15222-2613
>
> ### Also Present:
>
>> ANTHONY NORRIS, ESQ.

1          COURT CLERK:  The Court is now open

2     after recess in the matter of -- in the matter of

3     Singleton v. WWE, case no. 3:15-cv-425-VLB.

4          THE COURT:  Good afternoon.

5          MULTIPLE VOICES:  Good afternoon, Your

6     Honor.

7          THE COURT:  Okay, can we have the

8     appearances of the parties for the record please.

9          MR. BLOSS:  William Bloss, Your Honor

10     of Koskoff, Koskoff & Bieder for the plaintiffs.

11     With me is Konstantine Kyros who has been

12     admitted by the Court as visiting counsel and

13     Anthony Norris (phonetic) of Mr. Kyros' firm is

14     here - is not expected to participate, but I did

15     want to note his attendance, Your Honor.

16          THE COURT:  And who will be

17     participating today?

18          MR. BLOSS:  I will be Your Honor,

19     William Bloss and Mr. Kyros may as needed,

20     depending on the Court's questions.

21          THE COURT:  Alrighty.  Yes.  And for

22     the defense?

23          MR. GOLDBERG:  Good afternoon, Your

24     Honor, Tom Goldberg.  And I'm here with Jeff

25     Mueller from Day Pitney for the defendants World

```
 1        Wrestling Entertainment, Inc.  And I'd also like
 2        to introduce to the Court Jerry McDevitt and Curt
 3        Krasik of K & L Gates who have been admitted pro
 4        hac vice.
 5              THE COURT:  Wonderful.  Welcome.
 6              UNIDENTIFIED MALE:  Good afternoon,
 7        Your Honor.
 8              THE COURT:  Please be seated.  The
 9        defense requests that a pre-filing conference in
10        this case or pre-scheduling conference before the
11        Court entered a scheduling order.  And we're
12        convened for the Court to hear the parties on the
13        issues preceded to that entry.
14              MR. BLOSS:  I believe it, Your Honor,
15        to the defense – it's the defense's request if
16        the Court please, I will present the position on
17        behalf of the plaintiffs, but it might be
18        fruitful to start with the defense – defendant.
19              THE COURT:  Yes.
20              MR. McDEVITT:  Good afternoon Your
21        Honor, Jerry McDevitt from K & L Gates in
22        Pittsburgh.
23              Thank you for having the conference
24        Your Honor.  We requested it because there's been
25        a lot of what I'll say is irregular things going
```

1    on in this case that has made it hard or did make

2    it hard time to frame an intelligent schedule.

3    They have continued since the date we submitted

4    our report and I'd just like to bring the Court

5    up to date if I could on the fact as we think

6    makes it hard to have a meaningful scheduling

7    conference or schedule at this time and leads to

8    our request that discovery be stayed until such

9    time as the Court decides from dispositive

10   motions that we're going to present.

11             THE COURT:  Yes.

12             MR. McDEVITT:  To update the Court on

13   some of the recent activities that have occurred.

14   This Court may know on May 22nd, the plaintiff

15   worked to amend the complaint.  Largely, frankly

16   the threat from false allegations that we pointed

17   out for them in January of this year came in

18   original complaint.  The day before they were to

19   file the amended complaint, one of the

20   plaintiffs, Vito Lograsso, posted on Facebook the

21   latest in a long line of frankless (sic)

22   solicitations looking for people to join this

23   class action case, soliciting people if you will,

24   telling them that there was benefits to be gained

25   by doing that.

```
 1              The very next day after Mr. Lograsso made
 2         that plea for more people to come in and join
 3         this class action case, the amended complaint was
 4         filed.  The amended complaint dropped all class
 5         action allegations inexplicably while Mr. Kyros,
 6         lead counsel here, continues two other class
 7         action cases that are identical: one in Oregon
 8         and one in California and refuses to explain why
 9         they were dropped here.  We contend it was to
10         circumvent this Court's jurisdiction.
11              They dropped other claims and to show
12         you, Your Honor, the kind of looseness in
13         allegations that we have been facing and this is
14         now the sixth version of a complaint that has
15         been filed against WWE by Mr. Kyros or his
16         affiliates, none of which have yet been sustained
17         by a Court of law.
18              But to give you an example, in the
19         amended complaint – the one that they filed to
20         correct errors – in paragraph 146 of a claim that
21         was added here, the allegation is made, "As a
22         direct and proximate result of WWE's
23         misrepresentations, plaintiffs experience pain
24         and suffering and suffered serious permanent and
25         debilitating injuries, including but not limited
```

1        to, neurological damage and CTE which caused

2        and/or contributed to his untimely death."  These

3        people are alive; the plaintiffs are alive in

4        this case, Your Honor.

5               I don't know what lawyer could have

6        written that passage in an amended complaint and

7        there are seven lawyers from five different law

8        firms whose name appears on this complaint

9        alleging that somebody's dead, when in fact

10       they're alive.  And that's just the most obvious

11       example of what we have been facing in this case.

12              We have had an inordinate amount of

13       expense the defense would incur, Your Honor.  The

14       first case was filed in Oregon was filed in

15       October of 2014 and the pattern began to emerge

16       there.  The original complaint was chock full of

17       frankly Rule 11 violations which we pointed out

18       to them, designed for immediate attention to get

19       people to join in this endeavor to bring a class

20       action case against the WWE brought on behalf of

21       a fellow who hadn't performed for the WWE since

22       1988, not even in this century.  Against the

23       statute repose in Oregon, it's ten years from the

24       date of the occurrence complained of, time barred

25       for decades this claim.

1    We – they amended the complaint there after

2  we went through the expense of drafting original

3  motions to dismiss and whatnot, amend the

4  complaint there, didn't fix anything, did drop

5  any of the claims.  That's currently scheduled

6  for oral argument before the Judge there on June

7  30th to dismiss it and if any claim survived, to

8  transfer it back here to Connecticut.

9    That case, Your Honor, is so old that

10  that particular plaintiff did not sign a contact

11  with a 'form of selection' clause.  So we

12  couldn't move to have it transferred back here on

13  the basis of a 'form of selection' clause, but

14  just did a traditional 1404 motion.

15    When they saw what was going on in

16  Oregon, with the class action case being time

17  barred, they brought this case.  They brought

18  this case originally in Philadelphia on behalf of

19  Mr. Lograsso and Mr. Singleton.  And in that

20  case, they flat out ignored 'form of selection'

21  clauses in a 9 – nothing Supreme Court Case,

22  *Atlantic Marine* that directs District Courts to

23  routinely enforce 'form of selection' clauses,

24  absent extraordinary circumstances unrelated to

25  the convenience of the party.  We raised that

1    issue with them there.  We had eventually

2    incurred the cost of filing a brief before the

3    Judge there.  They didn't oppose it; they didn't

4    file anything.  And the Judge eventually

5    transferred the case up here.

6             The same pattern repeated itself here

7    as in Oregon.  We advised them of problems in the

8    original complaint, specifically false

9    allegations about Mr. Singleton's medical

10   treatment after he sustained an injury.  We

11   advised them specifically why it was false in

12   January.  They only recently got around to

13   changing that and they changed it with more false

14   allegations which we've again had to point out to

15   them.  So we had to incur all that kind of cost.

16            And they realized I think after they

17   filed -- or after they aggrieved this Your Honor,

18   that Connecticut has some very strong repose

19   policies, statutes of limitations and repose

20   which prohibit claims that are brought more than

21   three per claim – that are brought more than

22   three years from the act or omission complained

23   of.  Mr. Lograsso's clearly time barred under

24   that.  Mr. Singleton's claim has some other

25   defects which we're going to point out to you.

```
 1                    Every other claim they have
 2      brought, whether here, Oregon, California, time
 3      barred under Connecticut law.  But whenever they
 4      saw that, so then after they agreed to the
 5      jurisdiction of this Court and the Judge in
 6      Philadelphia, Federal Judge Singleton,
 7      acknowledged that they had agreed to the
 8      jurisdiction of this Court.  Then the shenanigans
 9      really began.
10                    Then they brought out in California
11      with Mr. Kyros and he refused to acknowledge his
12      role in this; we've asked him several times to
13      confirm his involvement.  He refuses to admit it
14      or deny it.  Brings another lawsuit identical to
15      this one – same class allegations and everything
16      else – in California on behalf of three
17      particular plaintiffs who again would be time
18      barred, who had signed identical form selection
19      clauses for the ones that were involved in this
20      case, and yet now they're refusing to have that
21      transferred back.  So we've had to go through
22      time and expense there of moving to have it
23      transferred back.  We've filed our briefs.
24      Theirs are about to be filed pretty soon.  That's
25      scheduled for argument in California before the
```

1       Federal Judge out there on July 13th.

2               They also brought another case - same

3       kind of case on behalf of somebody who would be a

4       member of the class here, a fellow by the name of

5       Nelson Fraser in Tennessee.  We had to go through

6       the cost of removing that to Federal Court.  We

7       had to again - he had the same identical form of

8       selection clause as they agreed here, resulted in

9       transfer to this Court.  But for whatever reason

10      now, they refuse again in Tennessee to transfer

11      so we've had to brief that.  That's fully briefed

12      and we're awaiting the Federal Judge's decision

13      down here on a transfer motion.

14              THE COURT:  Did you say that the *Fraser*

15      case was transferred to this district?

16              MR. McDEVITT:  Not yet, Your Honor.

17              THE COURT:  Not yet.

18              MR. McDEVITT:  It's fully briefed and

19      we're waiting for the Judge to decide on that.

20      He's heard oral argument, got the briefing, he

21      could be deciding any moment, Your Honor.

22              THE COURT:  Okay.

23              MR. McDEVITT:  Based on the clarity of

24      the Supreme Court decision in *Atlantic Marine*

25      which is rare that the Supreme Court's unanimous

1    on anything -- 9 - nothing, I think it would be

2    extraordinary if it wasn't transferred frankly.

3    But they've done, like I say, everything they can

4    to make it as expensive as possible to litigate

5    this case here, even though they admit it that

6    this was the appropriate jurisdiction and had

7    consented essentially to the case coming here.

8    They've done everything since then to defeat Your

9    Honor's jurisdiction.

10          Now, then you come up from last week,

11   this act of now all of a sudden this is not a

12   class action case now.  It was done I suspect

13   because they don't want us to be able to go out

14   to California and indicate to the Federal Judge

15   out there that this case was already under way

16   and a class action case is already under way here

17   and that they had stipulated to it being done

18   here in Connecticut which is why Mr. Kyros is

19   concealing frankly, his role out in the

20   California case and won't reveal that he's

21   involved.

22          So for all those reasons, Your Honor,

23   what we want to submit to Your Honor is having

24   read their amended complaint, they have six

25   counts in it.  We are pretty close to finalizing

```
1      our brief.  It's due I think on the 23rd of this

2      month.

3                  As I indicated, Mr. Lograsso's claim

4      are all subject to the statute proposed; I think

5      he's time barred.  And there are multiple reasons

6      why the remaining claim of Mr. Singleton is

7      defective.

8                  What we would hope the Court would do

9      would be to take a brief on that, issue your

10     ruling on that and your guidance, if you will, on

11     the statute or repose.  By that time hopefully,

12     these other collateral proceedings that we

13     unfortunately have to engage in, will be

14     resolved. And of course guidance on what the

15     repose statute means will presumably then be

16     taken into account by then in deciding whether

17     they want to pursue claims that would be utterly

18     time barred under Connecticut law.

19                  For those reasons that we thought we

20     wanted to propose to Your Honor, that there be a

21     stay of discovery until you can decide the

22     motions to dismiss.

23                  THE COURT:  Are you --

24                  MR. McDEVITT:  Thank you.

25                  THE COURT:  Are you saying that there
```

```
1        are no claims that could be brought that would

2        not be time barred?

3               MR. McDEVITT:  The only – of all the

4        potential claims that they have Your Honor, the

5        ones in California are all well past – I think

6        the earliest one of them was early 2000.  They're

7        all time barred by the previous statute.

8               THE COURT:  What about Mr. Singleton?

9               MR. McDEVITT:  Mr. Singleton, as I

10       said, I think – he's the only one –

11              THE COURT:  He's not --

12              MR. McDEVITT:   -- of all the

13       plaintiffs whose claim's not time barred.  But

14       it's substantively defective for numerous reasons

15       that we're going to claim in our motions to

16       dismiss.

17              So –

18              THE COURT:  Well --

19              MR. McDEVITT:   -- of all the seven, I

20       think they have seven plaintiffs; six of them are

21       time barred with Mr. Singleton being the only one

22       that's not time barred, but his claim is

23       completely defective under Connecticut law Your

24       Honor and the law that this Court's applied.

25       There's a Connecticut Supreme Court case called
```

```
1        Daworski (phonetic) that talks about whether
2        negligence concepts even work and concepts of
3        injuries or - that occur by people involved in
4        sporting type activities.  And the Connecticut
5        Supreme Court in Daworski, ruled that negligence
6        concepts don't come into play when you're talking
7        about sporting type activities where injury is a
8        foreseeable consequence of it.  And they apply
9        that concept in soccer where if the injury was
10       from accidental contact.  There have been two
11       cases in Federal Court here before Judge Hall
12       where she's taken that opinion and applied it to
13       other cases, including one where a high school
14       girl got a concussion.
15                 THE COURT:  But weren't - weren't those
16       all accidental injuries?  The complaint alleges
17       that the wrestling matches are scripted.
18                 MR. McDEVITT:  They are, Your Honor,
19       but --
20                 THE COURT:  And part --
21                 MR. McDEVITT:  - I think --
22                 THE COURT:  They are?
23                 MR. McDEVITT:   Well, in large part.
24       It's not an athletic contest in the sense of the
25       outcome.  It's not a contest of who's the best
```

```
 1        fighter.  It's scripted entertainment.  But they
 2        all understand the inherent risk of what they're
 3        involved in.  And the essence of these cases that
 4        we're going to bring to Your Honor's attention is
 5        that you assume the inherent risk of the
 6        activities that you engage in.  And there's a
 7        gradient, if you will, under the duties
 8        Connecticut Supreme Court's talked about where if
 9        you're in – for example, if you're in a case
10        (inaudible) where contact is not an expected part
11        of the game, in those instances what the
12        Connecticut Supreme Court has said is negligence
13        is not going to get you anywhere.  We're going to
14        require there be something different than that, a
15        standard of recklessness, which Connecticut law
16        defines to be something more than negligence,
17        more than gross negligence, but intentional both
18        to the conduct and intentional as to the injury.
19        And at the same time as indicated, that when you
20        apply this rule, you look to the activity.  If
21        it's an activity for example, where contact is
22        not accidental but expected, for example in like
23        boxing, football, wrestling, that doesn't even
24        apply there because they know what they're
25        getting into.  All this complaint says and what
```

```
1        Mr. Singleton says is he went into a wrestling
2        ring and got injured by doing the very thing he
3        said he was going to do - wrestle.  He got a
4        concussion; that's what he claimed.  Nothing
5        else.  There's no allegation of any kind of
6        recklessness on the part of the WWE in the
7        complaint.  It's subject to dismissal on its face
8        because of that because it's not subject to
9        Connecticut law.
10              Beyond that, the other claims that they
11       have Your Honor, are these fraud claims which are
12       totally inadequate, which we pledge we're going
13       to demonstrate to you.  They don't comply with
14       any of the second circuit guidance that you have
15       to say who, what, when or where of any kind of
16       fraudulent misrepresentation.  They don't - they
17       don't even attempt to comply with any of those
18       kind of fraud standards in this complaint.
19              And again, we - our brief is pretty far
20       along 'cause it was pretty far along the first
21       time, Your Honor.  In fact, we might even be able
22       to accelerate when we file it.  But I think
23       you'll find it's a fairly persuasive brief that
24       they have no claim here; not Mr. Singleton and
25       certainly not Mr. Lograsso who's time barred.
```

```
 1              THE COURT:  Have you discussed these
 2        asserted defects with the plaintiff's counsel?
 3              MR. McDEVITT:  In this case, I sent
 4        them a long email after this second -- these type
 5        of complaints.
 6              For example Your Honor, the first
 7        complaint.  If you don't mind if I just have a
 8        drink real quick?
 9              THE COURT:  Sure.
10              MR. McDEVITT:  When Mr. Singleton - Mr.
11        Singleton got injured during the match Your
12        Honor, where he did a -- I don't know if Your
13        Honor ever watches professional wrestling or is
14        familiar with it, but he did a move called a
15        power slam or a choke slam, I'm sorry.  Where
16        when your opponent puts their hand on your neck -
17        think about - no man could lift another man up
18        against his will.  It requires Mr. Singleton to
19        jump up to simulate the move to be thrown on his
20        back.  That's the move he did.  It's a
21        conventional wrestling move.  And he was injured
22        - he claims he was injured.
23              Thereafter, the WWE sends him through
24        the next I don't know - year and a half to eight
25        different specialists, two different
```

```
1        neurologists, did everything they could to find
2        out what was wrong with this kid.
3                He filed a complaint - his original
4        complaint and he never went back in the ring -
5        never.
6                THE COURT:  And when did this happen?
7                MR. McDEVITT:  September -- September
8        27, 2012.  He never went back in the ring because
9        of this.
10               The original complaint, however,
11       alleges falsely that the WWE discouraged him and
12       wouldn't even send him to any neurologists, when
13       in fact they sent him to multiple neurologists.
14       And we told them about this in January of this
15       year.  We said, "That's just categorically
16       false."  We told them who he went to, the names
17       the doctors were, everything.  So they amended to
18       delete that.  But now what they do is now they
19       allege in the complaint against Mr. Singleton
20       that ten months after this event, he was
21       diagnosed with having intracranial hemorrhage.
22       Well again, that's categorically false, Your
23       Honor, and I've told him this.  I mean I've given
24       him the name of the place he went to where he was
25       diagnosed as not having an intracranial
```

1    hemorrhage.  And you know, I've told him this in

2    writing; I've sent him an email telling him a

3    couple of weeks ago.  No response.  None

4    whatsoever.  I've told him about other false

5    things that they've alleged in their complaint.

6    This has been a pattern Your Honor; it's not just

7    limited to this one.  And nothing gets done about

8    it.  They just substitute additional false

9    allegations.  For example here – footnote #1 on

10   the complaint Your Honor, just to give you

11   another example --

12           THE COURT:  I'm sorry, does Mr.

13   Singleton allege that he was diagnosed by one of

14   the doctors that the WWE sent him to?

15           MR. McDEVITT:  No, Your Honor.  All he

16   --

17           THE COURT:  Then why – then how can you

18   say that it's a false allegation?  Just because

19   the doctors WWE sent him to didn't diagnose him

20   with that condition, why would that preclude some

21   other doctor from diagnosing --

22           MR. McDEVITT:  He didn't go to any

23   other doctor.  He's talking about the time period

24   he was under treatment from the WWE – he remained

25   under treatment --

```
1                    THE COURT:  So --

2                    MR. McDEVITT:  - from WWE doctors until

3          he was recruited to be a plaintiff in this case,

4          at which point he dropped the workmens comp.

5          claim that he had completely and joined in this

6          lawsuit. But the time period he's talking about

7          Your Honor, I guarantee he didn't go to any other

8          doctor that told him he had intracranial

9          hemorrhaging.

10                   THE COURT:  How do you - how do you --

11                   MR. McDEVITT:  He had the medical

12         records that show you --

13                   THE COURT:  How do you guarantee he

14         didn't do that?

15                   MR. McDEVITT:  I just know he didn't

16         Your Honor, 'cause he was under treatment - well,

17         if I'm wrong, they'll tell me - they can tell me

18         that.

19                   THE COURT:  But you don't -- I mean how

20         do you know?  You assume it, but you don't know

21         it it sounds like.

22                   MR. McDEVITT:  Your Honor, I guess know

23         it in the sense that this is what they allege,

24         paragraph 96, "It was not until more than ten

25         months later that he was diagnosed with traumatic
```

```
 1        brain injury, including an intracranial
 2        hemorrhage."  We know that from the time he was
 3        injured for more than ten months, he remained
 4        under the WWE's medical supervision and care.  We
 5        know every doctor he went to in that time period.
 6        He didn't, to our knowledge, go to any other
 7        doctor, nor did he ever tell us he went to any
 8        other doctor.
 9                THE COURT:  Well, I can -- I can
10        appreciate that, but I mean he's not in
11        indentured servant.  I mean he's not a person
12        who's whereabouts you're in control of, are you?
13        Is he?
14                MR. McDEVITT:  Well if you're asking,
15        Your Honor, is it possible that he went to
16        another doctor somewhere?
17                THE COURT:  Yes, yes.
18                MR. McDEVITT:  It's certain – it's
19        certainly possible.  Do I think that that's what
20        he did?  No, because we have the medical records
21        ten months after that they're talking about that
22        show he had no intracranial hemorrhage.  It says
23        it right in the medical – I'll give you the exact
24        quote if you will, from the medical records that
25        I sent them.
```

```
1              THE COURT:  But you don't – you don't

2         contend that two different doctors examining a

3         person could come to different conclusions, do

4         you?

5              MR. McDEVITT:  Your Honor --

6              THE COURT:  You don't contest that --

7              MR. McDEVITT:  I guess I can answer --

8              THE COURT:  -- proposition?

9              MR. McDEVITT:  -- your question.  If

10        they – if they have another doctor that they say

11        told them that I am wrong -- I'll bet you they

12        don't.  All I have to do is stand up and say they

13        do.  I don't think they do.

14             THE COURT:  Well --

15             MR. McDEVITT:  What has happened is Mr.

16        – Mr. --

17             THE COURT:  But isn't that what

18        discovery is for?

19             MR. McDEVITT:  I think if there's a

20        legitimate fact issue, Your Honor, yes.  If

21        there's no – if they don't have -- if in fact

22        there is no other doctor that's looked at him and

23        said you have an intracranial hemorrhage than

24        there's a false allegation here.

25             THE COURT:  But it would be very easy
```

```
1        for you to find out, wouldn't it, through an
2        interrogatory or request to admit?
3               MR. McDEVITT:  Well sure, Your Honor,
4        and that's what we would do.  But what I hope to
5        - I think I'm right, but again they could stand
6        up and say what we did is wrong, we sent him to
7        another doctor, and this is Dr. so and so and he
8        diagnosed him as having intracranial hemorrhage -
9        - they do, they do.
10              THE COURT:  So - so --
11              MR. McDEVITT:  What the doctor said
12       Your Honor --
13              THE COURT:  - what are - what are the
14       legal basis upon which you would seek to have Mr.
15       Singleton's claims dismissed?
16              MR. McDEVITT:  Well the preview of the
17       allegations Your Honor, they have a couple of
18       negligence based counts which are subject to what
19       I indicated to you, the *Daworski* decision and the
20       Connecticut Supreme Court and *Trajilla* (phonetic)
21       decision and I think it's *Mercier Academy* that
22       Judge Hall here decided that are the principal
23       theory - or cases that indicate negligence-based
24       theory.
25              THE COURT:  And those cases are not
```

```
 1          distinguishable on the basis that those injuries
 2          were accidental or as this injury or the - these
 3          injuries were the result of defendant scripted
 4          and directed conduct --
 5                    MR. McDEVITT:  Your Honor --
 6                    THE COURT:  That was - even in your
 7          complaint - even in the complaint it alleges that
 8          the WWE taught the wrestlers how to fall --
 9          taught --
10                    MR. McDEVITT:  They're --
11                    THE COURT:  - taught them how to fall.
12          So I mean is - can those cases be distinguished
13          in that those case involve sporting activities
14          where the participants assume the risk that they
15          could be injured versus entertainment activities
16          where the participants are told or - or - it is
17          suggested that they cannot get hurt because of
18          the manner in which they are taught to perform
19          these feats?
20                    MR. McDEVITT:  Your Honor, they're
21          never told they can't get hurt.  And anybody who
22          watches professional wrestling or engages in it,
23          knows people can get hurt.  In fact, during the
24          pendency of this case, in Mexico a man was killed
25          in the middle of the ring - within the wrestling
```

```
 1        match - died.
 2                  THE COURT:  Well that really --
 3                  MR. McDEVITT:  But I --
 4                  THE COURT:  -- that really wasn't my
 5        question.  I mean in one case you're assuming the
 6        risk of being hurt and in another case you're
 7        being taught how not to get hurt, thereby
 8        mitigating the risk of injury.
 9                  MR. McDEVITT:  Well Your Honor, I'm
10        trying to answer your question.  I mean certainly
11        --
12                  THE COURT:  Are there any - are there
13        any cases involving scripted activity where --
14        wherein the participant is instructed how to
15        perform the moves so that they don't get injured?
16                  MR. McDEVITT:  One of the cases we're
17        going to cite to Your Honor is a professional
18        wrestling case.
19                  THE COURT:  Uh hm.
20                  MR. McDEVITT:  And numerous amateur
21        wrestling cases.  The Daworski decision goes off
22        on this idea Your Honor.  What's within the
23        normal expectation of the people who engage in
24        the activity?  If it's within the normal
25        expectations of the people who engage in the
```

1     activity, that there's an inherent risk of an

2     injury, then that's within the scope of the

3     duties that they assume.  And it's kind of – in

4     a certain kind of way Your Honor, I think a

5     certain kind of common sense if a boxer walks in

6     a ring, he can't sue the promoter getting a

7     concussion because he knows that's part of what's

8     going to happen.

9            The complaint in this case --

10           THE COURT:  But – but if you – if you

11     have some kind of head apparatus that is

12     advertised as protecting you against or

13     significantly mitigating the risk of a certain

14     type of injury and you have that injury, then

15     that's called "products liability", right?

16           MR. McDEVITT:  We don't – there's no

17     products claim in the case, Your Honor.

18           THE COURT:  Oh, I understand there's no

19     products case, but there's a parallel there in

20     the sense that the complaint alleges that the WWE

21     taught, instructed, trained, the wrestlers how to

22     hit, how to fall, so that they would not get

23     injured.

24           MR. McDEVITT:  Well they do, but that

25     doesn't mean that they will always execute the

```
1      move right.  It doesn't mean that mistakes aren't

2      made.  In fact, what they allege Your Honor, if

3      you read the complaint completely, they're -

4      they're constantly alleging that the risk of

5      concussion -- the theory is they take hundreds,

6      "thousands" I think is their term, of concussive

7      and sub concussive blows in the normal course of

8      performing what they do.  And if that allege -

9      that allegedly is something that they all know.

10            THE COURT:  So what happens if - if a

11     wrestler is injured in the - in the ring?  Who

12     treats them?  Under what contractual provision or

13     duty does the WWE provide medical treatment?

14            MR. McDEVITT:  Well there's -- WWE like

15     many companies Your Honor, has a history to it

16     too and its evolved.  Today -- I can answer your

17     question as of today what happens.  And it's

18     different today than what happened say 10, 15

19     years ago when they were --

20            THE COURT:  Well what did it do in 2012

21     and 2013?

22            MR. McDEVITT:  Well now we have what's

23     called "total wellness program".  We have Dr.

24     Chris Hamen (phonetic) who was an Olympic doctor.

25     It's one of the ringside positions he's present.
```

1    We have another doctor present.  We have a
2    medical director above all that -- a fellow by
3    the name of Dr. Joseph Maroon (phonetic), who's a
4    prominent neurologist in Pittsburgh who devised,
5    together with some other people at the University
6    of Pittsburgh Medical Center, the state of the
7    art test that everybody uses now in college and
8    NFL for concussion diagnostic testing and whatnot
9    – called "impact".  So we have now got a medical
10   staff that's there for most of our main event –
11   the main roster events.  Now Mr. Singleton I
12   should add, never made it main roster.  Mr.
13   Singleton was performing – for lack of a better
14   description – the minor leagues down in Florida
15   when he allegedly got injured.
16          But in terms of the main roster we have
17   these doctors.  Now  – so if something happens –
18   if there's an injury in the ring today, the WWE
19   takes care of it.  They basically try to -- it
20   only makes sense that they're talent – they want
21   them to be healthy 'cause they can't perform if
22   they're not healthy, so they want them to be
23   healthy and able to perform.  That's what we do
24   today.
25          Back in the long ago past Your Honor,

```
 1          back -- I started representing the WWE roughly
 2          1987.  They were a privately owned company at the
 3          time; they were not a public company.  They - you
 4          know, were subject to all the vagaries of
 5          competition at that point in time.  Back then in
 6          the early 80s when they had an event, the only
 7          doctors who were present at the time were the
 8          arena EMT people.  If something happened to
 9          somebody in the ring, if it was a serious injury
10          or something, they would take them to the
11          hospital for treatment.  That's essentially what
12          happened.
13                    So we've sort of evolved through the
14          years.
15                    THE COURT:  And then if - if someone is
16          - doesn't perceive themselves to have been
17          injured in the ring or you know, is treated at
18          the ring and subsequently has symptoms, does the
19          wellness program provide treatment for those
20          individuals?
21                    MR. McDEVITT:  When you say - it's not
22          so much the wellness program -- what the wellness
23          program does for individuals that are no longer
24          affiliated with us, if that's your --
25                    THE COURT:  Oh, no I - I was
```

```
1    questioning well why it was that Mr. Singleton
2    continued to receive treatment from doctors paid
3    for and directed by WWE after his fight injury.
4              MR. McDEVITT:  Well, he's under
5    contract with us first of all.  And so he's still
6    --
7              THE COURT:  So under the contract
8    you're obligated to provided ongoing medical
9    care, not just --
10             MR. McDEVITT:  No.
11             THE COURT:  -- ringside medical care?
12             MR. McDEVITT:  No.  He - the reason -
13   he's under contract with us, so our interest is
14   trying to get him better so he can perform.  So
15   he's -- his medical care is kind of supervised if
16   you will.  They sent him to neurologists to try
17   to figure out what was wrong with him.  They sent
18   him to sports psychologists --
19             THE COURT:  Pursuant --
20             MR. McDEVITT:  -- I mean there's a
21   different version frankly of whether Mr.
22   Singleton is injured or not as I'm sure you can -
23   Your Honor can imagine.
24             THE COURT:  But pursuant to what?  Is
25   there a contract that requires it?
```

```
1              MR. McDEVITT:  Well no, he's free - if
2       he wanted to go to another doctor and pay for it
3       himself, he's free to do that.
4              THE COURT:  Is there a contract that
5       requires that WWE do it?
6              MR. McDEVITT:  No, actually the
7       contracts are the other way around, Your Honor.
8       The contracts indicate that talent are
9       responsible for their own medical care.  If you
10      want to draw a line for it, it's probably the
11      best way to think of it is, for their medical
12      care, independent of whether they get hurt in the
13      ring or something like that, that's their
14      responsibility; they have to take care of that.
15      If they got hurt performing for us, the WWE takes
16      care of it.
17             THE COURT:  Okay.
18             MR. McDEVITT:  I mean that's basically
19      what we do.
20             Now, what's different about these cases
21      is their claiming - and these are people that are
22      coming in six, seven years after they left
23      performing for us.  I mean we haven't heard a
24      word from Mr. Lograsso since he last performed in
25      2007, coming in and making these claims now that
```

```
1          they - they claim that they have some residual

2          impact of alleged concussions that they claim

3          they had when they performed for the WWE.  That's

4          the essence of what they're claiming.

5                  Now the only other thing we do that may

6          be responsive to what Your Honor was asking is

7          years ago on its own volition, what the company

8          decided to do was for any performer -- former

9          performer who had a drug or alcohol problem and

10         was struggling with life because of that, the

11         company volunteers to help them and puts them

12         through rehab at company expense and has done so

13         frankly for some people more than one time and

14         has saved some lives in doing so.  And part of

15         the program I'm particularly proud of.  I mean if

16         you save one life, well that's a worthwhile

17         enterprise to do and they do that kind of stuff.

18                 But I should point out Your Honor,

19         wrestlers are independent contractors; they're

20         not employees and they sign contracts in which

21         they agree they're independent contractors, in

22         which they agree they assume certain risks - ones

23         that are inherent to their profession and there's

24         no claim here that they're not.  They're not

25         claiming they're employees here.  'Cause if they
```

1     did, they'd have to go to workmen's comp for

2     remedy.  So they're not claiming that.  No

3     dispute.  These are independent contractors.  Big

4     boys who sign big boy contracts, if you will.

5     They understand exactly what they're getting

6     into.  They know the risks that are involved in

7     this.  And nobody tells them that you're not

8     going to get injured and you're not going to get

9     hurt.  You can't do what these people do without

10    consent from the other people.  It would be an

11    intentional tort to do what they do to each

12    other, but for their consent to participate in

13    it.

14           In Mr. Singleton's case for example

15    Your Honor, once he climbs in the ring, we say

16    it's a dance in a sense because they're safety

17    really depends on each other taking care of it.

18    There's nothing anybody can do once you get in

19    the ring with another opponent.  If they don't

20    execute the move right or you don't execute the

21    move right, there's a risk you're going to get

22    hurt.  And nobody – nobody tries to hide that;

23    it's a reality of this business that they all

24    know about.

25           And so I think when Your Honor reads

```
 1            the brief - for example there's a famous New York
 2            case you'll read about involving the fate of
 3            Jockey Ron Turca; it went to the New York Supreme
 4            Court.  He was paralyzed in a race down in New
 5            York and brought a lawsuit alleging negligent
 6            concepts and whatnot.  In this case actually -
 7            the New York was relied upon by the Connecticut
 8            Supreme Court case and one we're going to point
 9            out to you.  And they went through the whole duty
10            analysis.  What kind of duty do you owe? And they
11            made a distinction between you know, amateurs and
12            professionals.  Professionals understand the risk
13            they're taking.  These are professionals.  These
14            people are compensated to do what they do.
15            Between amateurs and professionals I suppose -
16            and compensated people.  And the notion that -
17            the risk becomes more obvious, the lesser the
18            duty to the point where there is no duty in
19            certain circumstances.  I mean for example, Your
20            Honor, there would be no duty on the part of a
21            boxing promoter to prevent a boxer from getting a
22            concussion.  That's the whole point of the sport.
23            You know that the minute you walk in there.  So
24            you could never apply negligence concepts to
25            stuff like that.
```

1           So that's what I think you'll see in
2       these cases that we're going to point out to you
3       is the courts look at the activity that they're
4       person's engaged in, what were the normal
5       expectations of that person, did they know what
6       was going to happen, did they know what risk they
7       were taking?  And if they did, then it's the end
8       of the inquiry.

9           And that's the case here I think with –
10      with respect to the negligence counts of Mr.
11      Singleton and the fraud counts are just
12      inadequate -- they're like these kind of
13      allegations that people are dead when they're not
14      even dead.  They're that flimsy.

15          So it's for those reasons Your Honor,
16      we were hoping that you know, you would receive
17      our briefs.  Maybe we would have a further oral
18      argument on the point and get the benefit of your
19      rulings.

20          If, for example, you sustain the
21      Singleton case, I think those four -- rule out
22      the repose – on reposed matters, all the other
23      claims, then we're dealing with a very narrow
24      case about one wrestler, as opposed to all these
25      other claims that aren't even back there yet.

1       That's why we were suggesting to take the

2       briefing first, Your Honor, and make a decision

3       then.

4               THE COURT:  But now you're taking the

5       position that the complaint should be amended

6       again? Are you?

7               MR. McDEVITT:  I don't think they can

8       amend it again, now without leave Your Honor.  I

9       mean I don't know what they're going to do.  I

10      mean I sent them an email ten days ago with these

11      – whatever it was with the problems in this

12      complaint, other than that one.  I didn't even

13      mention that one to them.  There's other things I

14      mentioned to them.  I don't know what they're

15      going to do.  They haven't responded.  That's

16      part of the problem.  We bring these things up

17      and we get no response from them.

18              And I submit Your Honor, they won't --

19      well maybe they'll tell you, but we've asked them

20      repeatedly, "Are you involved in that California

21      class action or not?  Why are you bringing – why

22      are you bringing a parallel class action case in

23      California on behalf of the same class, same

24      claim, save everything as you have before the

25      Connecticut court?  What is your reason for doing

```
1      that?"  We've not been able to get an answer.
2                  THE COURT:  So --
3                  MR. McDEVITT:  They won't answer us, so
4      maybe they'll answer you, Your Honor.  I don't
5      know.
6                  THE COURT:  Are you saying that the
7      attorneys involved in this case and the law firms
8      involved in this case on behalf of the
9      plaintiffs, do not have appearances in those
10     other cases?
11                 MR. McDEVITT:  That's right.  Mr. Kyros
12     -- we think what happened is Mr. Kyros, not local
13     counsel, Mr. Kyros is the one that recruits all
14     these plaintiffs through the internet, eluding to
15     the NFL settlement and the notion that there's a
16     lot of money involved in these cases.  And we
17     think what he did - we know he was dealing with
18     those plaintiffs; we know that.  I've been in
19     this business for 30 years; I have a lot of
20     people talk to me.  I know what goes on usually.
21                 So to file the case out in California,
22     they knew the minute they filed the case out in
23     California, that would we point out to the
24     Federal Judge in California:  Wait a minute.
25     They just agreed to transfer a case in
```

```
 1        Pennsylvania to the Court in Connecticut for the
 2        same form of selection clause as these three guys
 3        have.  So I don't think he wanted to run into
 4        that.  So he didn't put his name on the
 5        complaint.  And asked California lawyers – he
 6        lined up to file the complaint – file the
 7        complaint without his name on it to give him
 8        deniability.  We then call on both the California
 9        lawyers and Mr. Kyros saying:  come on, that's
10        not going to work, we know you're involved in it.
11        Why are you doing this?  Why are you bringing the
12        second action out in California, it's identical
13        to the one you have in Connecticut that you just
14        consented to?  You're just trying to end run the
15        Connecticut Court's jurisdiction.  And I've asked
16        them that several times and they've refused to
17        answer.  Yes or no – they won't say 'yes' or 'no'
18        and we know they are.
19              So I mean that's the kind of stuff
20        we've been dealing with.  We're – we're doing
21        everything we can to get the claim brought before
22        Your Honor and keep them here.  They're doing
23        everything they can to make sure they've done
24        that.  And it's largely I think, driven by
25        Connecticut law not being to their liking.
```

```
 1                    THE COURT:  Thank you.

 2                    MR. McDEVITT:  Thank you, Your Honor.

 3                    MR. BLOSS:  May it please the Court,

 4      William Bloss, Your Honor, on behalf of the

 5      plaintiffs.

 6                    THE COURT:  Yes.

 7                    MR. BLOSS:  I would like to - I do

 8      think it would be prudent Your Honor and would be

 9      useful to actually talk for just a minute about

10      what the standard is that Your Honor is to apply

11      in deciding a motion for stay, that is after all

12      why we're here.

13                    The relief that the defendant is asking

14      for in this proceeding is an extraordinary

15      remedy. There has not been a scheduling order

16      entered, Your Honor, obviously.  There's not been

17      a Rule 26 report filed.  We've given Your Honor

18      some alternative proposals, some dates that we

19      think would be reasonable under the circumstances

20      and under the - under the allegations of the

21      amended complaint to set some deadlines and to

22      get - and to get some milestones moving and get

23      some - some schedule in place.

24                    The - we didn't hear in the last - the

25      last bit of time Your Honor, we didn't really
```

1    hear what the standard is for granting a stay of

2    discovery.  Fortunately, Your Honor has written

3    extensively on that and - and I would note that

4    Your Honor has written even a dispositive motion

5    which might obviate the need to conduct any

6    discovery altogether as ordinarily not a basis to

7    stay or refuse to produce discovery, absent

8    extraordinary circumstances and that's Your Honor

9    writing in *The Country Club of Fairfield* case,

10    Civil -- 13 CV509, Your Honor's decision was

11    August 8, 2014.

12         The defendant has the burden of showing

13    good cause Your Honor.  Filing a motion in itself

14    as Your Honor has written is not good cause.

15    Judge - Magistrate Judge Smith recently wrote in

16    the *Lithgow* case, 247 Federal Rules decision at

17    61, that where there is no motion pending, it's

18    very hard to establish good cause because you

19    really are forced to just take counsel at his or

20    her word that there is going to be a motion

21    coming that is going to be dispositive and has a

22    high level of likelihood of success.  You really

23    aren't in a position to make that finding today.

24    But yet, that's one of the findings that the

25    defense asks you to make.

1           Another factor Your Honor, is Your

2      Honor wrote in the *The Country Club of Fairfield*

3      case, was how reasonable is the discovery sought?

4      In other words, is this – is this burdensome?  Is

5      it moderate?  Is it sensible?  Is it limited?

6      What – how burdensome is the discovery?  We don't

7      know that either.  'Cause there's no Rule 26(f)

8      report in place.  We haven't served any

9      discovery.  We can't until the – until the report

10     is in place.

11          You're asked to – Your Honor, I think

12     you're asked to consider the possibility that

13     there may be other cases that are sent here I

14     guess.  I don't know how your – how you can

15     really weigh that either in the calculus.  You

16     don't know what the Judge in California is going

17     to do.  You don't know what the Judge in -- I

18     forget where the other – Tennessee or wherever

19     else it was.  If the -- if the Court enters a

20     scheduling order, it does happen from time to

21     time that scheduling orders get amended because

22     things change.  However, it is no basis to refuse

23     to enter a scheduling order at all or to

24     participate in no discovery whatsoever because of

25     the possibility that something else may happen

```
1          down the road.
2                    Your Honor, I'm not going to argue the
3          merits of this -- to the filed motion to dismiss.
4          I'm not going to argue the choice of law issues.
5          I'm not going to argue any of those.  That's not
6          why we're here Your Honor.  We're here because
7          they've asked for a complete stay of all
8          discovery which under - which under Rule 26(c) -
9          we agree that Your Honor has the power - no
10         question about that - Your Honor has the
11         discretion to order a complete stay of discovery.
12         But as Your Honor has written, it really is only
13         permitted in compelling circumstances -
14         extraordinary circumstances and they just - on
15         this record, they haven't established that.
16                    Now I'm going to suggest Your Honor
17         that this - this request that they've made should
18         have been filed after the discovery - the Rule 26
19         report was filed with deadlines when you could
20         have assessed the motion in the light of all of
21         the circumstances and you could have addressed
22         the discovery issue in light of the all of the
23         circumstances.
24                    A moderate position Your Honor, would
25         be to enter the dates that we have in our - in
```

```
 1        our Rule 26(f) report.  None of those dates

 2        require any activity at all I think before the

 3        end of July.  So if the Court entered that as -

 4        as the scheduling order, they file their motion,

 5        I'm not inviting them to come back and file

 6        another motion for stay, but that is a remedy

 7        that's available to them under the circumstances,

 8        Your Honor, and there's no - there's no

 9        prejudice.  There's no prejudice to anybody by

10        that.

11               But we think that Your Honor ought -

12        ought to just enter reasonable dates.  If the

13        dates in our report don't fit for Your Honor's -

14        if you don't think they're reasonable, fine.

15        We're flexible Your Honor.  We just want to get

16        an order entered so that - that at least the

17        deadlines are in place.  And then if something

18        changes, okay, then we'll revisit that with the

19        Court's cooperation or attention at the

20        appropriate time.

21               THE COURT:  Have the parties exchanged

22        initial discovery?

23               MR. BLOSS:  No.  Under the Rule 26

24        report Your Honor, the proposal was to exchange

25        the initial disclosures on July 31st.  That is
```

1  what's built into the request, Your Honor.  But

2  obviously this case has been pending for a fair

3  amount of time without any initial disclosures.

4  I think it was filed in Pennsylvania in January

5  and transferred up here in March.

6  So I think answering your – answering

7  Your Honor's question, no there has been no

8  initial disclosures.

9  THE COURT:  What is your response to

10  the asserted deficiencies in the complaint?

11  MR. BLOSS:  Well I don't –

12  substantively Your Honor, we haven't seen their

13  motion to dismiss.  So I don't know whether the

14  complaint is deficient at all.

15  THE COURT:  Well factually.  Do you

16  allege that the defendant – that the plaintiff

17  died?  Is the plaintiff still alive?

18  MR. BLOSS:  There may -- Your Honor,

19  there may have been a typo carrying over.

20  Neither Mr. Singleton, nor Mr. Lograsso are dead.

21  I absolutely agree with that.  But --

22  THE COURT:  Do you – do you –

23  MR. BLOSS:  – there is nothing --

24  THE COURT:  -- do you assert that --

25  MR. BLOSS:  --material to any of the –

1    I'm sorry, Your Honor.  There is nothing material

2    to any other causes of action that as they plead

3    that is effected by any kind of a pleading issue.

4           THE COURT:  Why do you think Mr.

5    Lograsso's claims are not barred by the statute

6    of limitations?

7           MR. BLOSS:  I can't really comment on

8    that standing here today, Your Honor.  I'm not

9    sure it is controlled by Connecticut law first of

10   all.  I'm not sure if it's controlled by

11   Pennsylvania law.  I'm – I'm – there is obviously

12   a well established principle in Connecticut law

13   relating to tolling of the statue of limitations

14   due to fraudulent concealment.  And that is as

15   the Connecticut courts apply on a substantive law

16   issue, as a matter of fact.  It is not something

17   that can be decided on a motion to dismiss.

18          THE COURT:  Well the complaint says

19   that Mr. Lograsso last fought for the defendant

20   in 2007 and it cites reports on traumatic brain

21   injuries prior to 2007.

22          MR. BLOSS:  Okay.

23          THE COURT:  So where – where would be

24   the fraudulent concealment?

25          MR. BLOSS:  With --

1           THE COURT:  I mean do you have – do you

2      have a legal theory for the maintenance of this –

3      this individual's claims?

4           MR. BLOSS:  Again Your Honor, I think

5      it depends on -- the assumption that the defense

6      is making is that this is controlled by Connecti

7      -- first of all, controlled substantively by

8      Connecticut law.  Second of all, the limitations

9      period is controlled by Connecticut law.  And

10      third of all, there's no way to plead a

11      fraudulent concealment tolling of the – of

12      whatever the applicable limitations period is

13      under either Connecticut law or whatever

14      substantive law applies.  So that –

15           THE COURT:  Well, but – I mean you've

16      got to have a good faith belief in the claim that

17      you file at the time you filed it --

18           MR. BLOSS:  I understand.

19           THE COURT:  -- not -- so what is your

20      good faith belief that this is a viable claim

21      since the last time you fought was in 2007 and

22      there was within the public domain considerable

23      literature at the very least, of the dangers of

24      this kind of activity?

25           MR. BLOSS:  I think it goes back to

```
1     what the information was that was conveyed by the
2     defendant to the plaintiff, Your Honor.
3              THE COURT:  And what information do you
4     contend was conveyed by the defendant to the
5     plaintiff?
6              MR. BLOSS:  Or was not conveyed in this
7     particular case.
8              THE COURT:  Or not -- not conveyed.
9              MR. BLOSS:  I defer to Mr. Kyros on
10    that specifically.  But I think that it goes to
11    whether -- what the risks were to Mr. Lograsso
12    and what actually the impact on his particular
13    health was by these moves.  That they had some
14    information relating to other wrestlers and - I'm
15    not personally as familiar with Mr. Lograsso's
16    medical records; I will defer to Mr. Kyros on
17    that.
18             THE COURT:  Mr. Kyros?
19             MR. KYROS:  Yes, Your Honor.  Thank
20    you.  There are a number of theories that the
21    plaintiffs have as to why the statute of
22    limitations is tolled or doesn't apply to their
23    claims.
24             I wasn't prepared to argue that, but
25    generally I've talked quite a bit about it.
```

```
 1              THE COURT:  Well, I mean you should
 2     have been.  The question is whether or not the
 3     Court should stay the case.  And if there are no
 4     viable claims, then – and it's --
 5              MR. KYROS:  I understand.
 6              THE COURT:  -- it's apparent on the
 7     face, then let's – you know, let's cut to the
 8     chase.
 9              MR. KYROS:  Yeah, well the theory --
10              THE COURT:  The defendant shouldn't
11     have to write a motion to dismiss, nor should the
12     Court have to read, research, and write a
13     decision on a motion to dismiss when it's
14     patently clear to the parties prior to the filing
15     of the motion, that the claim should be
16     dismissed.  This is – this is – you know, this
17     isn't a (inaudible) institution here; this is a
18     Court of law.
19              MR. KYROS:  Yes, Your Honor.  The – we
20     don't believe that the statute of limitations
21     applies to Mr. Lograsso –
22              THE COURT:  Because?
23              MR. KYROS:  Because we argue that the –
24     – the injury that he's sustaining right now is
25     due in fact to their continuing campaign of
```

```
1        misinformation to the wrestler.  He has currently
2        actually just received an email from the WWE.
3        They offer and continue to relate to all their
4        former talent, by sending them letters and
5        continuing to update them about their wellness
6        program and other programs that they have in
7        place.  And we believe that the WWE's voluntarily
8        assumed a duty to these folks to take care of
9        them and educate them about the nature of these
10       long term degenerative brain injuries that they
11       receive.
12                 The fundamental premise of the case --
13                 THE COURT:  Aren't you saying that Mr.
14       Lograsso is under the care of another physician
15       who's diagnosed him with this condition?
16                 MR. KYROS:  Yes, Your Honor.  He is
17       under the care of a physician that's diagnosed
18       him with neurological issues.
19                 THE COURT:  And is he being treated for
20       those neurological issues?
21                 MR. KYROS:  Yes, he is.  I believe he
22       is, Your Honor.
23                 THE COURT:  And when was he diagnosed?
24                 MR. KYROS:  He's currently seeing a
25       neurologist as -- as --
```

```
1              THE COURT:  When was he diagnosed is my
2       question?
3              MR. KYROS:  He was - actually I believe
4       he was diagnosed currently.  He's under the care
5       of a physician who's diagnosed him within the
6       past month.
7              THE COURT:  Mr. Kyros, I asked a very
8       simple question.  Let me try it again.  On what
9       date was Mr. Lograsso diagnosed with a traumatic
10      brain injury by his private physician, not the
11      WWE?  When did that occur?
12             MR. KYROS:  I believe within the past
13      month, Your Honor.  But I know he's under the
14      care of a doctor as --
15             THE COURT:  Within the past month.
16             MR. KYROS:  Yes, Your Honor.
17             THE COURT:  And when did you make the
18      allegation in the complaint?  Certainly before
19      April?
20             MR. KYROS:  Right, but he - Mr.
21      Lograsso has ongoing neurological issues.  So as
22      part of his ongoing medical care, he's seeing a
23      neurologist.
24             So the basic notion is that all of the
25      wrestlers --
```

Falzarano Court Reporters, LLC

SA-0118

```
 1              THE COURT:  So - so let me ask you a
 2    few more questions.  How did - how did this
 3    diagnosis come about?  How did he come to begin
 4    to see this physician?
 5              MR. KYROS:  I believe he's suffering
 6    from serious issues and he has had ongoing
 7    problems with his memory and -
 8              THE COURT:  When did he start seeing --
 9              MR. KYROS:  -- all sorts of other
10    neurological symptoms.
11              THE COURT:  When did he begin seeing
12    this physician?  Prior to 2015?
13              MR. KYROS:  Your Honor, I don't have
14    Mr. Lograsso's medical file with me.  So I you
15    know, I can answer the questions as a general
16    matter.
17              THE COURT:  Before you filed the case
18    in the first instance, yes or no?
19              MR. KYROS:  Well he - Mr. Lograsso
20    alleged symptoms obviously before we filed the
21    case.  And you know, he - he has been suffering
22    from these symptoms for some time.
23              THE COURT:  What are the symptoms?
24              MR. KYROS:  I believe that they are
25    memory loss, deafness, depression, and other
```

1    indicia of serious neurological problems that he

2    sustained while he was retired after he wrestled.

3            THE COURT:  And so if he was suffering

4    from – he started experiencing these conditions

5    after he retired or before he retired?

6            MR. KYROS:  Well, the basic notion for

7    Mr. Lograsso as well as most of the athle —— most

8    of the performers that are —— join these cases is

9    that after they retire, they begin to experience

10   these types of symptoms.

11           THE COURT:  Mr. Kyros, you think that

12   a good faith belief in the facts you include in a

13   complaint filed on behalf of two identified

14   individuals can be based upon a general notion?

15           MR. KYROS:  No, Your Honor.  I was —— I

16   was describing the – the basis of the case

17   generally.

18           THE COURT:  I'm asking about – well Mr.

19   Singleton, I mean first of all you don't have a

20   class action anymore, correct?

21           MR. KYROS:  That's correct.  This is

22   plead as an individual case.

23           THE COURT:  All right.  So and – and

24   then the question – I mean – I'm assuming that

25   Mr. Lograsso and Mr. Singleton's conditions are

```
 1        not identical?

 2              MR. KYROS:  That is correct.

 3              THE COURT:  And why - why do we not

 4        have misjoinder?

 5              MR. KYROS:  I'm sorry?

 6              THE COURT:  Why should these case be

 7        joined in a single action?

 8              MR. KYROS:  Well we have the same

 9        defendant.

10              THE COURT:  You think every case

11        against the defendant should be -- all cases

12        against the defendant should be in the single

13        case?  All claims of all parties against the

14        defendant that might be similar in some way

15        should be included in a single case?

16              MR. KYROS:  Well, not as a general

17        matter.

18              THE COURT:  I mean they fought at

19        different times with different people, different

20        number of times.  I'm assuming they have

21        different medical conditions.  They've been seen

22        by different doctors.  They have different

23        diagnosis. They have different prognosis.  Is

24        that true?

25              MR. KYROS:  Yes, that is.
```

```
1              THE COURT:  So they don't have the same
2      nucleus of fact.  The only thing they have in
3      common is that they both assert that their
4      injuries emanated from working for the defendant.
5              MR. KYROS:  That is correct.  But there
6      is a large body of commonality.
7              THE COURT:  What --
8              MR. KYROS:  In the nature of the
9      abusive culture that we allege.  In fact, Mr.
10     Singleton and Mr. Lograsso both had the same
11     trainer.  So they - you know, there are certain -
12     and I think that the over arching factual record
13     is the same because the theory that undergrids
14     the case --
15             THE COURT:  How - how could it be the
16     same?  I mean they were both injured at different
17     times in different places as a consequence of
18     different conduct, correct?
19             MR. KYROS:  Well the conduct forms a
20     pattern according to our theory of the case.
21             THE COURT:  Okay.  Well tell me how the
22     patterns for these two individuals are the same
23     and not in generalities, not on the basis of your
24     general notion of the case, but specifically
25     these two individuals.  Is the jury going to hear
```

```
1      the same evidence or are we basically going to
2      have two trials at the same time?  Are we going
3      to have you know, guilt by association?  I mean
4      what - why should these cases be tried together?
5      Typically cases would only be tried together if
6      they arise out of the same nucleus of fact.
7      These cases seem to be wholly factually distinct.
8      There may be a culture.  I mean on that theory,
9      every single person that alleges an employment
10     discrimination at Pitney Bowes for example, would
11     be able to file a single lawsuit.  That doesn't
12     happen.
13              MR. KYROS:  Well, that raises an
14     interesting question about separating two cases,
15     Your Honor.  The cases as you know, were
16     originally filed together as a class claim and
17     then they were transferred to this Court.  And
18     then --
19              THE COURT:  Right.  And even as a class
20     claim, I mean let's face it, where's the -
21     where's the typicality in Mr. Lograsso and Mr.
22     Singleton?  How could you allege that they're
23     representative of a whole class of people that
24     fought for the WWE?
25              MR. KYROS:  Well, that - that I would
```

1      argue that - we're arguing that the class
2      actually is all WWE wrestlers. Singleton does
3      present unique facts in the nature of how his
4      injury occurred and I do believe that you're
5      right Your Honor, that Singleton's case in some
6      ways is distinct because the injury alleged is -
7      is more in line with a single incident, single
8      event, but it does play into the negligent
9      discharge - negligent pattern of conduct we
10     allege where they are prayed.  If for example Mr.
11     Singleton's case, he was taught how to do a choke
12     slam six minutes according to him - he was taught
13     how to do it six minutes before he was put in one
14     and subsequently permanently injured.
15          So that type of conduct is, I think,
16     something that runs through the note - the cases,
17     including Mr. Lograsso's case.  And you know, the
18     notion that you know, Lograsso has this
19     degenerative disease, is distinct in a sense.
20     But it continues - his - the allegation that Mr.
21     Lograsso makes is that during his time at the WWE
22     when he was injured less severely in a single
23     incident, but he continued to space these
24     injuries throughout his tenure there.  And there
25     was no medical treatment, both at ringside or

```
1        outside the ring.  And in fact, the abusive
2        culture encouraged these folks to not speak up
3        about their injuries because if they did, they
4        would lose their spot on television or they
5        wouldn't be allowed to perform and earn a living.
6        So the WWE contrary to the representations that
7        they make even to this Court, wasn't very
8        concerned according to our theory of the case and
9        according to Mr. Lograsso and other wrestlers
10       that we've investigated and spoken to.
11               THE COURT:  But - okay.  Doesn't your
12       complaint say that WWE required them to fight,
13       even though they were injured?
14               MR. KYROS:  I believe it says
15       "encouraged".
16               THE COURT:  Now you're saying it's the
17       opposite.  Now you're saying that they couldn't
18       disclose that they were injured because if they
19       disclosed they were injured, the WWE wouldn't
20       allow them to fight.
21               MR. KYROS:  Well that's part of the
22       culture which is if you -
23               THE COURT:  Is part of the culture --
24               MR. KYROS:  - if they were being --
25               THE COURT:  -- you can't fight if
```

```
 1        you're injured --

 2               MR. KYROS:  -- if they said: hey, I'm

 3        injured --

 4               THE COURT:  -- or you must fight

 5        injured?  Which is it?  I don't think it could be

 6        both, right?

 7               MR. KYROS:  Well, it can be in a way.

 8        Because the exercise of power is more subtle

 9        sometimes.  And the power is exerted over these

10        folks when they're working for the organization

11        (inaudible) is manifest in different ways.  And

12        one of the ways is through the pressure of the

13        economic power that the WWE wields over them

14        because they don't have any good safety net or

15        ability to get insurance or health care or any of

16        things that are provided through an employer.

17        They don't have that.  So if they want to work,

18        they are told: perform.

19               So as an independent contractor goes

20        in, they were under a tremendous amount of

21        pressure to perform.  If they were injured, their

22        - one of their counterintuitive thing would be to

23        not talk about it because they wouldn't want to

24        say that they were injured.  And the culture

25        itself at this organization seems to promote
```

```
1         that.  I -

2                   THE COURT:  Well --

3                   MR. KYROS:  And to the broad question,

4         Your Honor, I just want to - just you know, I

5         know you didn't want me to talk in generalities,

6         but I represented a large number of NFL football

7         players --

8                   THE COURT:  No, I'm sorry.  I don't

9         want you to talk in generalities.  This isn't

10        football.  And you know, I'm going to give you a

11        week to amend this complaint and I want you to

12        read it this time.  And a complaint should be a

13        compilation of facts - facts.  I'd really, really

14        like you to read the Federal rule, give it some

15        close consideration, perhaps read some cases on

16        the pleadings standards, and then file this

17        complaint again in a week without any scrivener

18        errors, without a lot of superfluous, hyperbolic,

19        inflammatory opinions and references to things

20        that don't have any relevance such as -- I mean

21        you've got references to -- well, maybe not.

22        You've got references to some reports that - well

23        you've got references to one report I can think

24        of right off the bat that was - became - went

25        public in 2014.  What does that have to do with
```

1       either of your clients?  They had both stopped

2       wrestling before 2014.  I see no reason to

3       include that in the complaint, other than to

4       inflame.  It's argumentative.  A complaint should

5       be a clear and concise statement of the facts

6       that form the basis of your claim. So you need to

7       identify what claim you're asserting, do the

8       research to find out what facts have to be proven

9       in order to establish that claim and allege the

10      facts that are necessary to prove each claim.

11      Because the rest of that is just window dressing.

12      And that's where you get into the trouble that

13      you're in where you're asserting that someone's

14      dead who's not because the complaint is full of

15      hyperbolic stuff.  It's not clear; it's not

16      concise.  Well it may be clear, but it's neither

17      – it's not concise and it's not accurate.

18              MR. KYROS:  Yes, Your Honor.  I – I

19      understand some of the – some of the – some of

20      the material in the complaint is designed to

21      illustrate you know, the culture of abuse that we

22      believe exists.

23              THE COURT:  You illustrate the culture

24      to the jury through the introduction of evidence.

25              MR. KYROS:  On that – I do believe that

```
1          I was not aware of that – that scrivener error.
2          But my – my client Nelson Fraser is dead at the
3          age of 43.
4                    THE COURT:  Is Nelson Fraser a
5          plaintiff in this case?
6                    MR. KYROS:  He is not.
7                    THE COURT:  Well what difference does
8          it make?
9                    MR. KYROS:  Well that was –– you know,
10         that was –– I believe that the culture is so
11         abusive that it's causing folks to prematurely
12         you know, die.
13                   THE COURT:  Are you – okay, well.  Are
14         you a doctor also?
15                   MR. KYROS:  No, Your Honor.
16                   THE COURT:  Does the complaint
17         reference Mr. Fraser?  Are you going to reference
18         every wrestler that's dead in your complaint?  I
19         don't – I don't follow that.  You really need to
20         read and get a better grip on the pleading
21         standard in the next week and file an amended
22         complaint.  I'm going to give the defense an
23         additional week to file their motion to dismiss.
24                   But Mr. Kyros, neither the defense, nor
25         the Court has time to waste.  So you need to know
```

```
1          if you have facts, not general notions, not
2          impressions, not feelings, but facts to support a
3          claim and assert only those claims for which you
4          have factual support.  Only those claims that you
5          have a good faith belief based upon fact, not gut
6          emotion, but facts to support and then the
7          defense will have an opportunity to file their
8          motion to dismiss.
9               But until you have a complaint that's
10         worthy of discovery, it's pointless to order the
11         defense to conduct discovery because the defense
12         would be wasting their time conducting discovery
13         on Mr. Fraser.  And you've just admitted that
14         that's irrelevant here.
15              MR. KYROS:  Well, in order to get some
16         facts, we would - we would you know, request some
17         discovery.  For example in Singleton's case --
18              THE COURT:  Oh, you're --
19              MR. KYROS:  -- he was - he was
20         allegedly -- the match in which he was injured,
21         he was videotaped. So we would like to ask the
22         defense for the copy of that tape.
23              THE COURT:  Mr. who?  Mr. Singleton?
24              MR. KYROS:  Yes.
25              THE COURT:  He's your client.  He knows
```

```
1    what happened.  What do you mean?
2              MR. KYROS:  He certainly - we've
3    alleged it in the complaint, but we don't have a
4    copy of the video.
5              THE COURT:  I don't think you need the
6    video to - to file a compliant complaint.  And as
7    long as the complaint is riddled with irrelevant
8    and hyperbolic material, it is a waste of time --
9    a violation of Rule 1 in fact to have the
10   defendant proceed with discovery.  The complaint
11   needs to be clear and concise to the point to put
12   the defendant on notice of what they need to
13   discover.  And if they don't need to discovery
14   facts about Mr. Fraser and God only knows what
15   else is in there, then why should I order them to
16   proceed to try to do that?
17             I know what I've written.  And
18   generally that would be my position.  But that
19   would be in a case where the plaintiff has a good
20   faith belief in specific facts that form the
21   basis for the claim and they have filed a
22   complaint that puts the defendant on notice of
23   their claims and your complaint doesn't do that.
24   Your complaint puts the defendant on notice of
25   things that aren't claims, that are general
```

1    notions, that are irrelevant, like a 2014 report.

2    If you're going to say the 2014 report was

3    preceded by a 2002 report that the defendant had

4    it, that's -- that's one thing, but that's not

5    what the complaint says.  It's punctuated with a

6    lot of superfluous information.

7              MR. KYROS:  If - if - Your Honor --

8              THE COURT:  So --

9              MR. KYROS:  -- we will get a clear,

10    concise version of this to the Court.

11              THE COURT:  And I'll look at it week

12    after next and I'll decide the motion to stay at

13    that time.

14              But in the interim, you know, for the

15    next two weeks or so, I'm not going to order

16    discovery because it would be a waste of the

17    defendant's time.  It's going to generate

18    unnecessary work for the defense and unnecessary

19    work for the Court.

20              Is there anything else?

21              MR. McDEVITT:  Not from me, Your Honor.

22              MR. KYROS:  I mean Your Honor, I would

23    - I would - you know, I would just say that I do

24    believe that these are tremendously important

25    cases for these folks.  And you know, in terms of

1    barring any facts of both of these individuals, I

2    think both of the facts and the factual records

3    shows that they were mistreated and that there

4    was negligence and its ongoing negligence and

5    that's part of the basis of this case.

6              THE COURT:  That's a matter for the

7    trier of the fact; I'm the neutral Judge.  That's

8    an argument that you can make to the jury when

9    you get there.  And I assume that every case is

10   vitally important to both parties. And the only

11   reason people come to Court is because they feel

12   very strongly about their position, so strongly

13   that they're unable to resolve their dispute for

14   whatever reason.

15             So I don't diminish your client's

16   claims and I don't in any sense, believe that

17   your complaint lacks merit.  That certainly isn't

18   what I said, but it certainly bears serious

19   refinement.

20             MR. KYROS:  Thank you, Your Honor.

21             MR. McDEVITT:  Thank you for your time

22   today, Your Honor.

23             THE COURT:  You're welcome.

24             COURT CLERK:  All rise.  The Honorable

25   United States District Court for the District of

1          Connecticut now stands adjourned.

2   (Court adjourned at 3:24:09 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Falzarano Court Reporters, LLC

SA-0134

```
 1                        CERTIFICATE

 2

 3              I hereby certify that the foregoing 68

 4    pages are a complete and accurate transcription to the

 5    best of my ability of the electronic recording of the

 6    United States District Court Hearing, District of

 7    Connecticut in re:  Singleton, et al v. WWE, Inc,. on

 8    June 8, 2015.

 9

10    s/s_____        _____

11    MARY C. INDOMENICO, Transcriber          Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RUSS McCULLOUGH, a/k/a "Big Russ
McCullough", RYAN SAKODA, and
MATTHEW R. WEISE, a/k/a "Luther
Reigns," individually and on behalf of all
Others similarly situated,

                                                   **No. 3:15-cv-01074-VLB**

              **Plaintiffs,**

v.

**WORLD WRESTLING
ENTERTAINMENT, INC.,**

              **Defendant.**

## PLAINTIFF'S FIRST AMENDED COMPLAINT

      **COMES NOW** the Plaintiff, Cassandra Frazier, Individually and as Personal Representative of the Estate of Nelson Lee Frazier, Jr. and as successor in interest to her deceased husband, Nelson Lee Frazier, Jr., hereby complains of Defendant World Wrestling Entertainment, Inc. ("WWE" or "Defendant"), and alleges as follows:

### Summary

      1.    Plaintiff Cassandra Frazier is the wife and next of kin of the deceased, Nelson Frazier, Jr., a famous international professional wrestler better known by his ring names "Mabel," "King Mabel," "Viscera," and "Big Daddy V."

      2.    Plaintiff brings this suit for damages sounding in negligence, wrongful death, and other causes of action, predicated on the WWE's

1

wrongful conduct giving rise to the long-term consequences of multiple concussions and other serious, permanent, and disabling injuries suffered during Nelson Frazier, Jr.'s approximately fifteen-year WWE career.

3.      Plaintiff, as the sole surviving spouse and next of kin of Nelson Frazier, Jr., is the successor in interest to Nelson Frazier, Jr. and is the personal representative of the Estate of Nelson Frazier, Jr. Mr. Frazier died February 18, 2014 at the age of 43 as a result of injuries he sustained as a result of wrestling for the WWE.

4.      Plaintiff seeks compensation and such further relief as justice may require for accumulation of long-term chronic injuries, chronic traumatic encephalopathy (CTE), financial losses, pain and suffering, expenses, loss of enjoyment of life, and intangible human losses suffered by the Plaintiff as a result of WWE's willful, wanton, reckless, and grossly negligent and other conduct and omissions, which resulted in Mr. Frazier suffering repetitive serious head injuries, brain trauma, concussions, other serious injuries, and eventually the heart attack which took his life.

5.      The WWE undertook a duty to Nelson Frazier during and after his career with the WWE explicitly acknowledging a duty to Nelson Frazier as a former WWE performer to investigators in United States Congressional Hearings in 2007 and in public statements by WWE spokesman about their duty to former performers with medical issues.

2

6.    In fact, the WWE created a self-administered drug program for former talent, through which the WWE sent hundreds of letters annually offering drug rehab to former performers, including Nelson Frazier.

7.    WWE maintained an ongoing relationship with Frazier after his career, contradicting representations made in WWE's multiple sanctions motions filed in the consolidated cases.    Additionally, WWE currently continues to profit from Mr. Frazier's performances on its streaming platform WWE Network and upon the use of his likeness in myriad WWE promotional materials.

8.    The death of Nelson Frazier is not an isolated case of a former wrestler dying of a drug overdose. The death of Nelson Frazier is one apex of the ongoing health crisis WWE permeates and maintains through active fraudulent concealment and repeated denial of the overwhelming medically accepted connection between head trauma, repeated head trauma, and concussive and sub-concussive injuries, as well as the long-term ill-effects such latent injuries cause to its wrestlers.

9.    As will be described in detail below, despite the information WWE had available to it which WWE should have provided to its wrestlers who sustain significant injuries, head trauma, and repeated head trauma, WWE failed to inform them and in fact facilitated additional injuries by encouraging performances to continue after injury in contravention to accepted medical practice and generally accepted contact sport practice, increased the  number of serious injuries by promoting more dangerous

3

moves and maneuvers intended to increase the profits of the company, and routinely denied any connection between head trauma and long-term brain injury, including even the existence of concussions in WWE wrestlers.

10.     The information about this health crisis in wrestlers has been documented in medical journals, in public studies, with the deaths being an ongoing and widespread issue among WWE performers who have died at rate unprecedented in sports history- exceeding that of baseball, boxing, football or any other contact sport.

11.     This repeated fraudulent concealment and failure to warn continuing to this day has resulted in numerous wrestler deaths which additionally put WWE on notice of the deadly consequences its performances created and which WWE had not only a moral duty, but a legal duty, to inform its wrestlers of.  Despite dozens of wrestlers' deaths resulting from WWE's actions, WWE failed to take any action which would stifle additional deaths, and which did result in additional wrestlers' deaths, including Nelson Frazier.

12.     Indeed, on June 26, 2015, WWE made public statements through its Spokesman and defense counsel, Jerry McDevitt that "We (the WWE) never had anyone claim they had these kinds of injuries until these attorneys did it. They find destitute, people who have no money, and told them there's money to be made. That's what going on…".[1]  As shown throughout this

---

[1] Wilonsky, Robert, "Doink the Clown's Family Sues WWE, claiming brain trauma led to painkiller overdose in Plano", http://thescoopblog.dallasnews.com/2015/06/doink-the-clowns-family-sues-wwe-claiming-wrestling-and-head-injuries-led-to-2013-overdose.html/.

4

filing, and which WWE has explicit knowledge of, WWE and Jerry McDevitt were keenly aware of the consequences of concussions in WWE performances, yet concealed and continue to deny the existence of such events.

13.    In direct contravention to WWE and Jerry McDevitt's statements, in 2013 concussions were becoming such a real issue within the WWE community that Triple H, a WWE superstar and company executive, was used in a storyline wherein he suffered a concussion and was prevented by the company from continuing wrestling to prevent further injuries.[2]  This was on the heel of WWE's World Heavyweight Champion Dolph Ziggler suffering a concussion after being kicked in the head during a performance.

14.    Further, in a speech on why WWE was choosing to donate 1.2 million dollars to CTE research, Triple H, speaking for WWE, stated "We took out the things that… caused the most concussions and the most head impacts."[3]  "In 2011, we had 25 concussions of the 150 talent all year long. In 2012, we only had 11".  Despite the dubious statistics, Triple H on behalf of WWE fundamentally accepts Plaintiff's premise that WWE is aware of the severity of concussions and concussive injuries, and that WWE itself has a duty to its wrestlers and must take certain actions to prevent those injuries. The "things that… caused the most concussions and the most head

---

[2] Wood, Donald, "Triple H's Reported Concussion Storyline Is Smart Move for WWE", BleacherReport, http://bleacherreport.com/articles/1646745-triple-hs-reported-concussion-storyline-is-smart-move-for-wwe (May 21, 2013).

[3] Mihoces, Gary, "WWE funds research into treatment of chronic brain trauma", USA Today Sports, http://www.usatoday.com/story/sports/2013/05/16/wwe-concussions-chris-nowinski-research-sports-legacy-institute-cte/2178667/ (May 16, 2013).

SA-0140

impacts" were exactly the moves and maneuvers Nelson Frazier was subjected to daily while performing for WWE and which WWE chose to require Nelson Frazier to perform with no knowledge of the severe and life-threatening consequences such expected injuries would result in.

15.     The health crisis in WWE is not new.  WWE has been aware of the deadly nature of its performances for many years.  Indeed, two events alone such as the drug related death of Eddie Guerrero in 2005 and the Chris Benoit Murder-Suicide in 2007 forced the WWE to implement a Wellness policy. The WWE has now publicly acknowledged it has a duty to these performers and has acknowledged and affirmed an ongoing relationship and duty to them after their careers.

16.     In an apparent sleight of hand, WWE Spokesman Jerry McDevitt admits WWE has undertaken a duty to maintain its wrestlers' health and safety, yet clearly omits any mention of the underlying causes within WWE which necessitates such treatments, during an interview in 2015:

> Still, "Eddie's death was a shock to everyone," McDevitt says. "It was the catalyst to the program that we now have in place." That program "checks for drugs, we monitor head injuries and we monitor cardiac health. We are doing everything we possibly can to make sure these men and women are healthy."

Deitch, Charlie, "Heavyweight Champions", Pittsburgh City Paper, *available at* http://www.pghcitypaper.com/pittsburgh/heavyweight-champions/Content?oid=1380633.

No mention of the dozens of other former WWE wrestlers who perished as a result of WWE's actions were mentioned.

SA-0141

17.    Plaintiff brings this suit to recover for WWE's negligent and fraudulent mistreatment of Nelson Frazier which ultimately resulted in Nelson Frazier's wrongful death.  The Plaintiff alleges the WWE's knowing concealment, omission, and denial of medical information pertaining to traumatic brain injuries caused severe, long-term neurological and physiological harm to Nelson Frazier, including an increased risk for developing drug dependency, and suicidal depression as a consequence of repeated head trauma in a completely unregulated contact sport controlled and conduct by WWE.

18.    WWE repeatedly acted with reckless disregard for the health and safety of its performers by ignoring the medical literature linking head trauma to concussive and sub-concussive injuries, by requiring, either actively or passively, wrestlers to continue performing despite suffering head trauma, by failing to recognize the overwhelming number of dying wrestlers for years before Nelson Frazier's untimely death, and by routinely and continuously concealing and omitting any information that would have saved Nelson Frazier's life.

19.    Plaintiff believes Nelson Frazier was substantially more likely than the general population to develop such depression and drug dependency and related neurological disorders as a result of WWE's misconduct throughout his approximately 30 year association as a wrestler with WWE and continuing after his retirement until his untimely death.

7

20.     WWE was very aware of the medical research connecting head trauma like that suffered by its wrestlers, including Nelson Frazier, and the injuries Nelson Frazier suffered from after his career with WWE.

21.     WWE was also very aware of the high rate of deaths among its wrestlers and the connection between the head trauma sustained during WWE performances and the dire consequences of continuing wrestling after suffering head trauma, which resulted in neurological damage and injury, causing depression, drug dependency, and other neurological disorders.

22.     Despite knowing that WWE was directly causing long-term neurological injury to its wrestlers, WWE fraudulently concealed and failed to inform its wrestlers, both current and former, including Nelson Frazier, of the injuries sustained and likely to continue to sustain throughout their lives and failed to provide any medical treatment to prevent such injuries as Nelson Frazier suffered and died from and which WWE had undertaken a duty to provide.

23.     As a result of WWE's fraudulent and negligent concealment, misrepresentations, and acts and omissions, Nelson Frazier was never informed or warned about the risks associated with concussion and sub-concussive injuries, or the likelihood of receiving concussions and sub-concussive injuries from sustaining head trauma while wrestling for WWE. Through WWE's routine and systemic failure to assess, diagnose, and treat Nelson Frazier before, during, and after matches during his WWE career, and then by continuing to fail to inform Nelson Frazier of the associated long-

8

term and latent risks and dangers of neurological injury sustained as a result of WWE's conduct, Nelson Frazier never learned or knew of the injuries he suffered from despite WWE's Talent Wellness Program, and did not seek the necessary treatment for his injuries, which led to further illnesses and injuries, including depression and drug abuse, which ultimately resulted in his untimely death.

24.     The WWE was aware of the risks of brain trauma in its retired wrestlers, such as Nelson Frazier, but took no preventative action, conducted no studies and issued no warnings for the health crisis in the retired wrestling community. For decades while the science of head trauma dictated concussion protocols in contact sports, athletes and appropriate medical care for them during and after their careers, the WWE did nothing to warn, or treat Nelson Frazier for these health issues during his career at WWE.

25.     Long term brain damage of the type known in boxers since the 1920s, was starkly documented in two recent landmark studies of wrestlers who committed suicide. Characterized by mood and behavioral problems, and suicide, CTE is a neurodegenerative condition caused only by repeated head trauma. Although WWE holds itself out as the preeminent wrestler organization in the world and has a continuing relationship and special duty to its retired performers, and after definitive and unambiguous warnings from medical professionals about the health crisis in their own former

9

athletes, took no action to warn or treat Nelson Frazier who has now joined a long list of deceased WWE performers.

26. As a direct and proximate result of WWE's fraudulently concealing the risks and long-term consequences of sustaining repeated head trauma and suffering multiple concussions and sub-concussive injuries, and negligently assessing, diagnosing, and treating Nelson Frazier throughout his wrestling career, WWE caused Nelson Frazier to suffer long-term, latent, debilitating, and permanent injuries which ultimately resulted in his death. Nelson Frazier suffered from a greater risk of the accumulation of long-term chronic and latent injuries, chronic traumatic encephalopathy (CTE), which Plaintiff seeks compensation and such further relief as justice may require for, and for financial losses, pain and suffering, loss of consortium, loss of enjoyment of life, and intangible human losses suffered by Plaintiff as a result of WWE's willful, wanton, reckless, and grossly negligent conduct and omissions.

27. Additionally, Plaintiff believes Nelson Frazier was at a greater risk for developing long-term brain diseases such as depression, dementia, Alzheimer's disease, ALS, and CTE. Plaintiff believes Nelson Frazier was substantially more likely than the general population to develop such diseases during and after his career with WWE as a result of WWE's misconduct.

28. WWE has known for years that repeated concussive and sub-concussive impacts substantially increase the probability that a wrestler

10

such as Nelson Frazier would develop a permanent, degenerative brain disease. Instead of disclosing this information to wrestlers such as Nelson Frazier, WWE hid this necessary information and did so while preserving the huge profits of a brand built on a culture of unreasonably and unnecessary violent conduct.

29.     WWE took affirmative steps to mislead Nelson Frazier into wrestling while injured, resulting in the accumulation of concussive and sub-concussive impacts without sufficient recuperation time. The accumulation of head trauma is exponentially more dangerous than isolated blows, a fact WWE knew or should have known. Yet, WWE failed to take adequate steps to prevent, or even disclose the risk of, these successive injuries.

30.     WWE's representations, actions, and inactions have caused Nelson Frazier initially to suffer long-term debilitating injuries, lost income, premature retirement, medical expenses, and other losses as alleged herein, and ultimately caused Nelson Frazier to lose his life prematurely, further causing Plaintiff and Nelson Frazier's heirs to suffer pecuniary losses, mental anguish, loss of companionship and society, and loss of inheritance, and other losses as alleged herein.

31.     WWE failed to disclose in a timely manner the true risks of repeated head impacts in WWE wrestling, and failed to take appropriate steps to prevent and mitigate traumatic head impacts (including sub-concussive injuries and concussions) and latent brain injury. Indeed, by refusing to acknowledge the risks it was creating – and by attempting to

11

conceal those risks from its wrestlers, such as Nelson Frazier – WWE effectively guaranteed that Nelson Frazier would not seek the help he needed to avoid latent brain injury and the resulting dangers and impacts it would have on his life.

32.   When forced to acknowledge the risks to which it subjects its wrestlers – by script, on a daily basis – WWE took inadequate steps to correct the problem or to address its injurious conduct, the full consequences of which are still coming to light.  Indeed, WWE continues a course of conduct designed to mislead its wrestlers, and designed to mislead Nelson Frazier until his death, about the injuries they sustained while wrestling for WWE by failing to disclose pertinent facts or offering misleading truths.

33.   Nelson Frazier had a special relationship with WWE.  Not only did he rely on WWE to script and direct the wrestling performances in a safe manner, he also relied on WWE to communicate medical and safety information to him.   When WWE communicated medical and safety information to Nelson Frazier, WWE had superior information to Nelson Frazier about the long-term risks of repeated head trauma and had an ongoing duty to disclose accurate information to him.  According to Plaintiff, WWE breached its duty to disclose accurate information to its wrestlers, including Nelson Frazier, during and after their wrestling careers, specifically WWE breached its duty by negligently omitting material information regarding the link between the type of head injuries sustained in

12

WWE and cognition impairing conditions such as depression and anxiety. Nelson Frazier, with only a high school degree, justifiably and reasonably relied to his detriment on these negligent misrepresentations by omission.

34.     WWE's medical personnel are subject to the standards of the profession at the time that the medical care was provided.  Concussion research during the years Nelson Frazier wrestled for WWE was such that WWE had actual notice of the causal connection between head trauma suffered while wrestling for WWE and long-term neurological injury.  Nelson Frazier would not reasonably have been expected to research medical literature during his employment with WWE, nor would he have been expected to know the sophisticated medical jargon and language of the medical profession.   Plaintiff reasonably relied on WWE's superior knowledge and position of authority, evidenced by the special relationship between Nelson Frazier and WWE, which resulted in Nelson Frazier's reliance to his detriment on WWE's fraudulent concealment and omissions regarding his health and safety.

35.     Upon information and belief, Nelson Frazier had CTE. Further, his post-concussion symptoms, as well as the nature of his work as a wrestler, coupled with the massive body of medical studies and important statistical evidence of WWE wrestler deaths will prove the claims presented in this Complaint.

36.     Plaintiff, as spouse of the deceased Nelson Frazier, seeks a declaration of liability, injunctive relief, and financial compensation for the

SA-0148

loss of financial support, living, travel, medical, and funeral expenses, as well as the mental anguish resulting from Nelson Frazier's death and the loss of his positive benefits of love, comfort, companionship, and society, as well as lost income and lost inheritance.

## History of the WWE

37.    The history of the WWE dates from 1952 when Jess McMahon founded Capitol Wrestling Corporation. Through the years the organization went through several name changes including World Wrestling Federation (WWF), World Wrestling Entertainment (WWE), and its current simple title, WWE, though the legal entity is still World Wrestling Entertainment, Inc. (hereinafter, collectively, "WWE").    AT all times relevant to this case, Defendant WWE was the successor company to all previous named entities referenced in this Complaint.

38.    At the time of its creation in the 1950s, the WWE was one of many wrestling organizations in the United States and wrestlers around the country worked for dozens of promotion companies. The companies were largely regional with the WWE controlling wrestling in the Northeast. Wrestlers then and now were part of a subculture of entertainers that by virtue of their unique size, skills and individual performance abilities worked as independent talent, often without formal employment contracts.

39.    Under the control of Vince McMahon (hereinafter "McMahon"), now the world's most famous wrestling promoter, the WWE steadily consolidated its market share. In 1982, McMahon acquired the company from

14

his father. McMahon rapidly expanded his company by promoting in areas throughout the United States, displacing the smaller regional businesses. He took advantage of cable television, pay-per-view and vastly expanded the reach and popularity of the sport through innovative promotion and creative presentations.

40.    The 1980s saw wrestling surge in popularity largely due to this expanded reach on TV as well as the new approach that included developing storylines and promoting individual wrestlers on the national and international stage.

41.    Central to the success of the WWE under the leadership of McMahon was the development of the wrestler as an individual with a larger than life personality who adopts a stage name, which McMahon refers to as an 'alter ego'. The wrestler would often adopt a certain character, clothing or costume, and wrestling style to become a recognizable star.  Development of these characters was encouraged and directed by WWE, with participation by the wrestler.  A wrestler's persona usually develops into a heroic good guy, also called a 'face,' or alternatively the wrestler is cast as a villain or 'heel.' These roles are often more nuanced, however, and may be manipulated to enhance storylines and keep audiences entertained. Regardless of the storyline or character developed, Defendant WWE would develop and then exploit such characters for the purpose of creating entertainment draws to maximize audience, television market share, ticket sales for events, merchandise sales, and other profit-driven endeavors.

15

42.     Central to the history and success of the WWE are the characters of wrestlers who, like Hulk Hogan, were used to generate millions of viewers through their showmanship, charisma, name recognition and unique character. Hulk Hogan was hand-picked by Vince McMahon to be the WWE's star, a move that surely worked to popularize the WWE and make it a household name.

43.     The WWE competed with Ted Turner and Time Warner's World Champion Wrestling (WCW) for greater market share throughout the late 1980s and 1990s with the WWE eventually buying the WCW in 2001.

44.     Today the WWE is the largest professional wrestling company in the world, with no close competitors. It holds approximately 320 matches each year; it oversees a media empire showing its television programs to 36 million viewers in 150 countries; and it recently launched an online video streaming service branded the WWE Network. It is now a publicly traded company that is privately controlled by McMahon and his family. McMahon and his wife Linda control about 70% of the equity and 96% of the voting power. The WWE has reported annual revenues of over five hundred million dollars ($500,000,000.00).

## WWE Disregards Wrestlers' Safety

45.     Despite the massive cultural and commercial success of professional wrestling under the leadership of the WWE and Vince McMahon, the WWE has tragically failed to protect its wrestlers from harms orchestrated, perpetuated, encouraged, demanded, and otherwise created

16

by WWE. Through its years of development, growth, and success, despite the increase in revenues to WWE, and despite the development of medical knowledge and science concerning the dangers of head injuries, WWE consistently ignored and disregarded risks of harm to its wrestlers.

46. However, Defendant WWE consistently kept antiquated rules and traditions in place to maintain the "entertainment value" of its products, rather than concern itself with the wellbeing of the wrestlers. The result was that despite the years of abuse, injury, trauma, and impact suffered by WWE wrestlers, the wrestlers in turn received little to no healthcare or appropriate medical treatment from WWE.

47. Notably, the WWE utterly failed to protect its wrestlers from head injuries. Despite the fact that many, if not most, wrestling moves involve head trauma, the WWE took no steps to prevent these injuries for decades, and to this day, it still attempts to downplay their significance. Despite massive and irrefutable medical evidence that has linked concussions with long-term neurological problems and permanent brain damage, the WWE did not warn its wrestlers about concussions or head injuries, nor did the WWE educate wrestlers, including Mr. Frazier, about the associated risks.

48. Through the culture created by WWE, its actions toward the wrestlers, including Mr. Frazier, and through the positions and actions and inactions perpetuated by WWE, Defendant has, effectually, disavowed, concealed, and prevented any medical care for these head injuries from

17

being provided or allowed to wrestlers on a repetitive basis. The WWE, as organizer and purveyor of professional wrestling, in which head trauma is a regular and repeated occurrence, had a duty to take measures to protect its wrestlers. The WWE was aware, or should have been aware, of the risks of repeated head trauma and multiple concussive events, but nevertheless chose to deliberately ignore and conceal from the wrestlers and their families the risks of serious long-term health effects resulting from head injuries.

49.     The WWE also had a duty, both at law as well as a voluntary and assumed duty, to care for its wrestlers, by virtue of the extent to which WWE controlled and directed development of characters, orchestration of physical moves and spectacles at its events, and the extent to which WWE perpetrated placing its wrestlers at risk of harm and repetitive trauma. However, the WWE regularly failed to fulfill this duty, and many wrestlers, including Nelson Frazier, Jr., worked through serious illnesses and painful, debilitating, and permanent physical injuries.

50.     The WWE voluntarily assumed a duty to monitor and maintain its wrestlers' health through its announced health policies. Mr. Frazier in particular suffered from diabetes, an enlarged heart, and obesity. In one case, Mr. Frazier even wrestled while he was diagnosed with pneumonia, yet he was cleared by WWE medical staff and encouraged to risk his life by wrestling for the WWE. The WWE chose to actively deceive wrestlers such as Mr. Frazier and encourage them to continue to wrestle despite poor and

18

failing health. **The WWE encouraged them to wrestle prematurely after injuries and concussive events, thereby creating further risk of future harm, often in the face of actual knowledge of increased risk of harm to wrestlers, including Nelson Frazier, Jr.**

51. **Mr. Frazier, in turn, relied on the WWE's deceptive statements and efforts to conceal medical evidence, resulting in his misinformed belief that concussive events and wrestling with serious illnesses and injuries did not present serious life-threatening risks. Nelson Frazier, Jr. was in an inferior bargaining position to WWE, as well as an inferior position to know the scope of risks to which WWE insisted he participate. As a result, he regularly returned to wrestle prematurely, despite suffering injury from a previous match, without adequate time to heal. Subsequently, as Mr. Frazier's health further declined, the WWE did nothing to help him manage or treat his injuries and wrestling-related medical conditions.**

52. **The WWE's active and purposeful concealment and misrepresentation of the severe neurological risks of multiple concussive events exposed wrestlers, including Mr. Frazier, to dangers they could have avoided had the WWE provided them with truthful and accurate information. Mr. Frazier, before his untimely death, suffered symptoms of severe and permanent brain damage, including but not limited to, Chronic Traumatic Encephalopathy (CTE). Mr. Frazier suffered several other injuries while performing for the WWE which eventually led to permanent disability and**

19

contributed to his pain and suffering, death, and damages to self and his widow.

53.     The WWE's negligence, wrongful acts and omissions were the cause of these injuries and contributed to his death. The WWE actively, willfully, recklessly, and negligently concealed important medical information from its wrestlers, including Nelson Frazier, and deceived them concerning the effects of multiple head trauma and prematurely allowed them to return to wrestling matches even when injured; as a result, wrestlers, including Mr. Frazier, suffered serious permanent and debilitating injuries, damages, and in the case of Mr. Frazier, death.

### The WWE Record: Death, Drug Addiction, Suicide, Heart Attack
### What Really Goes on

54.     The WWE has for years ignored the growing list of wrestlers who have died during or after their work for the WWE. In an unmistakable pattern, WWE wrestlers have died at a staggering rate under the age of 50. WWE in fact perpetrates a culture of neglect and disregard of its wrestlers, despite subjecting them to significant and repetitive traumas, such that wrestlers often fall into patterns of behavior designed to cope with such traumas: namely, many wrestlers, faced with repeated injuries, pain, trauma, and need to physically recover to participate in the next match, turn to medication to aid their recovery; often times the use of pain and other medications leads to dependency, which leads to addiction; subsequently the addiction deepens as wrestlers continue to be required to perform, despite ongoing medical and psychological difficulties, all for the sake of

20

"entertainment;" dependency on these measures deepens, leading to long-term, sometimes permanent problems, including death. The pattern of a large number of these deaths is similar and involved drug abuse that began when the wrestler became dependent on pain killers to combat painful injuries sustained while working long hours in the ring with insufficient rest, poor or nonexistent safety rules, and no access to health care or health insurance provided by the WWE.

55.    Although the WWE has grown into a billion dollar business, it kept antiquated or non-existent safety rules for decades that failed to protect its wrestlers. Despite the billions of dollars earned by the WWE, it signs all new Talent to completely one-sided Independent Contractor agreements that attempt to disclaim all liability and provide no short term or long term care.

56.    The WWE coerces its wrestlers to work while they are injured by threatening to strip them of their position, character, public "stature" within the WWE story line, and other notoriety and opportunities within the organization if they refuse. If the wrestler's act is a popular one, the wrestler will be encouraged to work through injuries so as not to lose his spot on the various televised WWE programs. The more a wrestler performs on television, and the more dramatic the matches they work, the greater their notoriety becomes, whether being case as a hero or villain. WWE allows and deliberately encourages such events to continue, regardless of the harm caused to the wrestlers.

57.     Upon research, testimony, and information and belief, Nelson Frazier performed hundreds of times each year.  Unlike professional athletes in traditional sports leagues, WWE wrestlers have no off-season in which to rest and recover from their injuries.

58.     The WWE's obsessive focus on profit has created a corporate culture that enforces a code of silence on injuries. The WWE uses intimidation and economic coercion to discourage wrestlers from reporting injuries or seeking medical attention. The WWE adhered to a general policy that 'there was no getting injured' in the WWE, meaning wrestling in the organization meant enduring injuries and pain in order to keep one's job and livelihood. Wrestlers are universally encouraged to 'wrestle through the pain' in order to keep working to maximize profit for the WWE.

59.     Inevitably, many wrestlers turn to powerful pain medications and muscle relaxers that are routinely used and were often dispensed by WWE affiliated doctors or staff without a prescription. Many wrestlers use steroids in order to heal faster and increase their performance. In addition to painful injuries, the unseen head trauma from repeated blows to the head, day after day, takes its toll on the wrestlers who often exhibit symptoms of brain damage: memory loss, headaches and migraines, confusion, depression and violent personality changes. To ease the pain of injuries many turn to drug and alcohol abuse, which leads to addiction, drug overdoses, suicide and heart attacks. The disproportionately large number of these deaths is a direct result of the total failure by the WWE to maintain

22

a minimal standard of care to the thousands of wrestlers who performed under its banner.

60. WWE, despite undertaking a duty to care for and treat its wrestlers and to prevent the injuries that Mr. Frazier suffered from, failed through reckless disregard, negligence, and fraud. Had WWE accepted the overwhelming medical research indicating head trauma suffered during WWE performances would lead to long-term neurological injuries and poor physical health as well as the staggering death rate of WWE wrestlers, and had informed and warned its current and former wrestlers including Nelson Frazier of the dire health consequences resulting from WWE performances, then Nelson Frazier would likely still be alive today.

## JURISDICTION AND VENUE

61. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff, Decedent, and Decedent's heirs are residents of a different state from Defendant and because the value of the matter in controversy exceeds $75,000.

62. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

63. Plaintiff Cassandra Frazier, individually and as successor in interest to her deceased husband and on behalf of his Estate, is a citizen and a resident of Memphis, Tennessee, within Shelby County.

64. Defendant World Wrestling Entertainment, Inc. is a Delaware corporation doing business in the state of Tennessee. Defendant maintains

a principal business address of 1241 E. Main Street, Stamford, Connecticut 06902-3520. Defendant may be served with process through its registered agent, C.T. Corporation System, 800 S. Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

## FACTUAL ALLEGATIONS

### Deaths of Wrestlers in the WWE

65.    The number of wrestlers that have died who wrestled in the WWE at one time or another is simply astonishing and unprecedented in the history of athletics.[4]   A well-known journalist who follows the issue observed: "literally the dozens of wrestlers in their twenties, thirties, and forties have dropped dead in the last two decades- a staggering epidemiological trail hidden in plain sight, noticed by few, cared about by fewer still."[5]

66.    Vince McMahon, the owner of the WWE, was asked about the death rate in wrestling in an infamous interview with investigative reporter, Armen Keteyian in a TV program titled "Deaths in Pro Wrestling" that aired on June 24, 2003 on HBO Real Sports.  Keteyain asked Mr. McMahon, "Do you have a reason why these people would be dying under the age of 45?" and "If [the death rate] in any way shape or form falls on your shoulders?" Mr. McMahon replied, "I would accept no responsibility whatsoever for their untimely deaths, none whatsoever." Keteyain pressed: "But none whatsoever? I mean they wrestled for you, they were part of your

---

[4] Nearly all wrestlers have worked in other organizations during their career.
[5] Muchnick, Irvin, Wrestling Babylon, p. 136 (ECW Press 2007).

24

organization, they worked a couple hundred nights a year for you, they lived this lifestyle." Mr. McMahon becomes visibly agitated and flicked a folder at Mr. Keteyain. More than a decade after this interview, it is clear, based on the increasing rate of deaths of both former and current wrestlers, that little if anything has changed within the WWE.

67.    Below is an incomplete list of nearly forty of those wrestlers who worked with the WWE at one time or another and lost their lives prematurely. These men and women are no longer here to tell their tragic story: they nearly all either fell in the terrible cycle of drug addiction, suffered heart attacks, or in some cases, committed suicide, an unfortunately prevalent cause of mortality among WWE wrestlers.



68.    Andrew Martin, a WWE wrestler also known by his ring name "Test," died March 13, 2009 at the age of 34 of an apparent drug overdose. Mr. Martin's brain tissue was examined by a forensic pathologist who

diagnosed him with Chronic Traumatic Encephalopathy (CTE) caused by repeated concussions and head injuries.



69.     Lance Kurtis McNaught, a WWE wrestler also known by his ring name Lance Cade, died August 13, 2010 at the age of 29 of a heart attack that may have been drug-related.



SA-0161

70.    Sean Christopher Haire, a WWE wrestler also known by his ring name Sean O'Haire, died September 8, 2014 at the age of 43. It was reported that Mr. Haire committed suicide after battling depression and personality changes.



71.    Steve Bradley, a WWF wrestler, died December 4, 2008 at the age of 32.  He died of a possible drug overdose.

27



72.    Matt Osborne, a WWF wrestler known by his ring name Doink the Clown, died June 28, 2013 from heart disease at the age of 55. Osborne reportedly battled drug addiction for years prior.



73.    Chris Candido, a WWE wrestler, died on April 28, 2005 from wrestling related injuries at the age of 33.

28



74.     Tony Halme, a WWE Wrestler known by the ring name Ludvig Borga, died January 8, 2010 at the age of 47. Mr. Halme allegedly committed suicide with a handgun.



75.     Christopher Klucsarits, a WWF Wrestler known by the ring name Chris Kanyon, died on April 2, 2010 at the age of 40. Mr. Klucsarits allegedly committed suicide by overdosing on drugs.

29



76.     Edward Smith "Eddie" Fatu, a WWE wrestler known by the ring name Umaga, died on December 4, 2009 at the age of 36. He died of a heart attack which was reportedly related to drug use.



77.     Steve Doll, a WWF wrestler known by the ring name Steven Dunn, died on March 22, 2009 at the age of 48. Mr. Doll died of a blood clot due to long term injuries sustained while wrestling.

30



78. Brian Keith Adams, a WWF wrestler known by the ring name Crush died on August 13, 2007 at the age of 43. He died of an apparent drug overdose.



79. Mike Lee Alfonso, a WWF wrestler known by the ring name Mike Awesome, died on February 17, 2007 at the age of 42. He died of apparent suicide.



80.    Scott Charles Bigelow, a WWF Wrestler known by the ring name Bam Bam Bigelow died January 19, 2007 at the age of 45. He reportedly died of a drug overdose and heart disease.



81.    Eddie Guerrero, a many time WWE champion wrestler, died November 13, 2005 at the age of 38. Mr. Guerrero died of heart failure after battling drug addiction.

32



82.     Raymond Fernandez, a WWF wrestler known by the ring name
Hercules Hernandez, died March 6, 2004 at the age of 47. He died of a heart
attack.



83.     Michael John Lockwood, a WWF/WWE wrestler known by the
ring name Crash Holly, died November 6, 2003 at the age of 32. Mr.
Lockwood reportedly committed suicide by drug overdose.



84.     Michael Hegstrand, a WWF wrestler known by the ring name
Road Warrior Hawk, died October 19, 2003 at the age of 43. He died of a
heart attack.



34

85.     Terry Ray Gordy, a WWF wrestler known by the stage name the Executioner, died July 16, 2001 at the age of 40. He died of a heart attack.



86.     Anthony Durante, a WWF wrestler known by the ring name Pitbull #2, died September 25, 2003 at the age of 36. He allegedly died of a drug overdose.



87.     Curt Henning, a world champion WWE wrestler known by the ring name Mr. Perfect, died on February 10, 2003 at age 44. He died of a reported drug overdose.



88.     Raymond Traylor, Jr., a WWF wrestler known by the ring name
The Big Boss Man, died September 22, 2004 at age 41. He died of a heart
attack.



89.     Rodney Agatupu Anoa'I, a WWF wrestler known by the ring
name Yokozuna, died October 23, 2000 at age 34. He died of pulmonary
edema, weighing 580 pounds.

36



90.    Owen James Hart, a WWE world champion wrestler, died May
23, 1999 at age 34. He fell to his death while performing a stunt during a live
WWE event.



91.    Richard Erwin Rude, WWE wrestler, stage name Ravishing
Rick Rude died April 20, 1999 at age 40. He died of heart failure that was
reportedly related to drug abuse.

37



92.     Louis Mucciolo, Jr. WWF wrestler, stage name Rad Radford

died February 15, 1998 at age 27. He reportedly died of a drug overdose



93.     Brian William Pillman, WWF wrestler, died October 5, 1997 at

age 35. He died of heart failure.



94.     Kerry Von Erich, WWF wrestler, died February 18, 1993 at age
33. Mr. Von Erich reportedly committed suicide. Mr. Von Erich came from a
noted wresting family, and two of his brothers who wrestled professionally
also died by their own hand.



95.     Eddie Gilbert, a WWF wrestler known by the stage name "Hot
Stuff," died February 18, 1995 at age 33. He died of a heart attack that was
reported to be drug-related.



96.     Randy Savage, known by the stage name "Macho Man" was widely considered one of the best and most popular wrestlers of the modern era. He died May 20, 2011 at age 58 of heart failure.



97.     Elizabeth Ann Hulette, a WWF wrestler known by the stage name Miss Elizabeth, died May 1, 2003 at the age of 42. She died of a reported drug and alcohol overdose.



98.     **Warrior (formerly known as James Brian Hellwig), a WWF**

**wrestler known by the stage name Ultimate Warrior, died April 8, 2014 at**

**age 54. He died of a heart attack three days after being inducted into the**

**WWE Hall of Fame.**



99.     **Doug Furnas, a WWF wrestler, died March 2, 2012 at the age of**

**52. He died of a heart attack; he also suffered from Parkinson's disease.**

SA-0176



100.   Mike Shaw, a WWF wrestler known by the ring name Bastion

Booger, died September 11, 2010 at the age of 53. He died of a heart attack.



101.   Robert Bradley James, a WWE wrestler, died November 1,

2012 at the age of 51. He died of an apparent heart attack.

42



102. Shawn McGrath, a WWE wrestler with the ring name Shawn Osborne, died January 26, 2011 at the age of 34. He allegedly committed suicide.



103. Gertrude Elizabeth Vachon, a WWF wrestler known by the ring name Luna Vachon, died August 27, 2010 at the age of 48. She died of an apparent drug overdose.

43



104.    Rhonda Ann Sing, a WWF wrestler known by the stage name

Monster Ripper, died July 27, 2001 at the age of 40. She died of a heart attack.



105.    Sherri Schrull, a WWF Women's Champion wrestler, died June

15, 2007 at the age of 49. She died of an apparent drug overdose.

44



106.    David Boy Smith, a WWF wrestler known as Davey Boy Smith, died May 18, 2002 at the age of 39. He died of an apparent drug abuse related heart attack.



107.    Chris Benoit, WWE wrestler died June 24, 2007 at the age of 40. In one of the most infamous events in the WWE's tragic history, Mr. Benoit killed his wife and son before taking his own life. Mr. Benoit's brain was examined and he was found to have Chronic Traumatic Encephalopathy (CTE). The neurologist who studied the tissue reported that," Benoit's brain

45

was so severely damaged it resembled the brain of an 85-year-old Alzheimer's patient."

108.   The death rate among WWE wrestlers has yet to be subjected to statistical analysis by an expert qualified to conduct a such a study; however, upon information and belief, such an analysis would indicate that the death rate among wrestlers exceeds that of any similar athletic profession or any professional sport, as well as in excess of other segments of the U. S. population.

109.   The death of Nelson Frazier must be seen in the context of the health crisis in professional wrestling and not as a lone random death of a retired wrestler of a drug overdose. As evidenced by the long and growing list of dead WWE performers, the WWE has for decades been aware of this health crisis, ignored its causes, failed to warn and adequately treat its performers for long term post-concussion syndrome, drug abuse and depression.  As a direct result of WWE's failure to heed the warning signs and failure to adequately protect and warn its wrestlers and former wrestlers, Nelson Frazier along with a multitude of other deceased wrestlers died from the injuries sustained while performing for WWE and continued to sustain until their untimely death.

### Nature of WWE Professional Wrestling Performances

110.   Throughout their tenure at the WWE, wrestlers sustain numerous blows to their heads. The choreographed and visually dramatic signature wrestling moves that are enjoyed by many to watch have a hidden

side effect for the wrestlers that perform these dangerous stunts. The long-term effects of repeated falls, bumps and moves that result in hits to the head lead to long-term brain damage.

111. Pro wrestling of the type the WWE promotes features techniques that require significant skill and training. The WWE begins training Talent in facilities throughout the United States. The WWE employs trainers to advise wrestlers how to conduct various maneuvers that constitute the action.  In this way, WWE promotes and educates wrestlers, like Nelson Frazier, in the moves they will use during WWE matches, which will be incorporated into the "story lines" of the matches organized, choreographed, and orchestrated by WWE.

112.  The WWE undertakes a duty to the wrestlers in its sponsored matches because it has provided for their training with specialized trainers that the WWE employs specifically for the purpose of developing new Talent and launching careers through its developmental training programs. Additionally, more experienced WWE wrestlers, who are sometimes called mechanics, train younger wrestlers in the ring and teach them how to perform various moves.  These moves and training are designed to promote, develop, and perfect the visual aspect of such moves, irrespective of the trauma they cause the wrestlers.

113.  At matches themselves, trainers along with other WWE employees and bookers or booking agents organize and oversee the action that takes place in each performance.  WWE, through its agents and

employees, direct the structure and operation of each match, expecting the wrestlers chosen to perform the moves choreographed by WWE. Such choreography is planned, created, and directed for the purpose of maximizing the visual "entertainment" factor of each match, irrespective of the trauma or harm to which the wrestlers are to be subjected, and irrespective of the present physical status of any participating wrestler.

114.   The booking agent is an employee of the WWE. The booking agent's responsibilities include writing scripts for performances, determining the order of events on a wrestling card, setting up the matches, and advising the wrestlers on what techniques must be used in each performance. The booker makes the "call," that is, instructs wrestlers what is going to happen in a match.  Wrestlers, like Nelson Frazier, do not have a real option whether to perform the moves and actions created by WWE. Refusing to perform moves or subject themselves to bodily harm at the request of WWE is grounds for contract termination, and other financial and professional sanctions, all organized and crafted by WWE.

115.   Throughout the history of the WWE, the trainer, booker, and WWE staff have been jointly responsible for the safety of the wrestlers involved in each performance.

116.   Upon investigation, wrestlers report that the WWE booking agents and WWE staff routinely and systematically advise them to wrestle while injured, discourage appropriate medical treatment, and often

48

encourage dangerous maneuvers for which some wrestlers have had inadequate training.

117.   The concepts for the storylines are provided by the WWE, sometimes from Vince McMahon himself, or his creative staff. These ideas are in turn given to the booking agents to implement. The booking agent then explains to the wrestlers what they are expected to do.

118.   The most basic wrestling move is called a "bump." A bump involves falling to the matt backwards so the wrestler lands on his back. Wrestlers are taught to fall so that the top of their back hits the mat, and to avoid hitting their head. Inevitably however, depending on the speed at which they are taking the bump, they hit their head or neck resulting in head injury.

119.   Another defining professional wrestling move is called a "Body Slam." As the name implies, it involves lifting up an opponent and throwing him/her down. A body slam in all of its forms is the most popular action of a wrestling performance. A slam is a type of "power move," as it demonstrates the physical strength of the wrestler and is delivered with different amounts of force.

120.   There are a myriad of professional wrestling moves. The nature of most of the major moves involves throwing an opponent in a manner that results in some amount of head trauma. The most common "bump" means many repeated falls to the mat, which involves wrestlers falling on their backs, and sometimes their heads, at high impact.

49

121.   The various types of slams are delivered at various speeds and driving force depending on the relative size and strength of the wrestlers. In order to avoid injuries, both wrestlers need to be properly trained in the moves.  Even with proper training, wrestlers find if frequently impossible or impracticable to avoid suffering head injury during a match.

122.   Certain slam actions involve head drops in which an opponent is dropped on their head. An experienced wrestler learns to tuck their chin, keeping their head out of the impact zone to avoid serious injury, however all such moves result in some head trauma and involve serious inherent risks to spine, neck and head. Such moves are often 'botched' resulting in the head hitting the mat or other surface causing concussions.

123.   Some of the more dangerous slams involve acrobatic feats that involve lifting opponents more than six feet in the air.

124.   Some of the more dangerous of the dozens of slam or throw moves employed in WWE events include: the neckbreaker, DDT, pile driver, brainbuster, and suplex.

125.   The various neckbreaker moves involve slams that attack the opponent's neck, usually with a knee, shoulder or head.

126.   The DDT involves putting an opponent in a facelock or headlock then falling down or backwards to drive the wrestler's head into the mat. The acronym is said to stand for such colorful names as Demonic Death Tap, Damien's Death Touch, Drop Down Town or Drop Dead Twice. The move is

50

considered to be very dangerous as it can result in brain and spinal cord damage.

127.   A piledriver, a very popular WWE move, involves grabbing an opponent, turning him upside down and dropping him or driving him head first into the mat. A piledriver, even when performed properly, presents near risks to the head.

128.   A brainbuster and its variants are moves in which the opponent is put in a front facelock, hooked on the thigh, lifted vertically and driven into the matt on their head.

129.   A suplex has many variants that involve throwing opponents on their back or head. The most dangerous suplex moves involve those off the top rope.

### Nature of WWE Professional Wrestling Performances

130.   The WWE has assumed a duty to govern the conduct of its wrestler's performances by creating, perpetuating, and directing that wrestlers perform these various moves. Upon investigation, wrestlers report that the WWE has continually engaged in a pattern of behavior and practices deliberately designed to increase the injuries suffered by its wrestlers for the purposes of maximizing perceived "entertainment" value.

131.   Instead of making sure there are adequate training and safety protocols in place, including stopping matches when wrestlers have sustained head injuries, the WWE, along with its staff, trainers, booking

51

agents, doctors and medical professionals, have allowed wrestling events to continue, despite knowledge of the risks of harm to wrestlers.

132.   During and after wrestling events, medical professionals and associated staff employed by the WWE have negligently or purposefully failed to diagnose concussions. Despite having assumed a duty to monitor head injuries, the WWE does little, if anything at all, for unseen neurological injuries. It downplays their significance and forces wrestlers to return to the ring too soon after they sustain a head injury.

133.   Though the WWE publicly denies that it has any duty to its former wrestlers for long-term health care, the WWE has undertaken such a duty through the implementation of its "Talent Wellness Program" to monitor the health and safety of the wrestlers.

134.   The WWE voluntarily assumed a duty on behalf of the wrestlers to acquire and provide guidance and scientific research on the link between brain injuries sustained by WWE wrestlers. WWE voluntarily placed itself in the position of controlling and/or directing information to and from wrestlers, including medical information and knowledge, and despite creating such a position for itself, failed to adequately communicate, educate, train, or instruct wrestlers in matters concerning medical matters and head injuries. Despite working to control the structure, information, and control of operations, and despite knowledge available, WWE took no action to reduce the number or severity of concussions or other head injuries among its wrestlers.

SA-0187

135.  Additionally WWE has voluntarily assumed a duty to its former wrestlers through its creation of a Professional Development Program and a Substance Abuse and Alcohol Program, both of which are offered to retired wrestlers who are no longer have any affiliation with the WWE.

**Facts Concerning Named Plaintiff's Decedent: Nelson Lee Frazier, Jr.**

136.  Plaintiff's Decedent, Nelson Lee Frazier, Jr. was a WWE superstar, beginning his career with the organization at the age of 21 in 1993. He is among one of the WWE's most prolific performers, on a popular wrestling fan site he is listed as number 89 on a list of wrestlers with the most WWF total appearances.[6]

137.  Nelson Frazier wrestled with the WWE for over fifteen years. He appeared regularly on most of the major WWE television programs. He wrestled during the main so-called eras of the WWE: the new generation era, the attitude era, and the ruthless aggression era, with transformation of his character figuring prominently into the storylines of the WWE in each era. His successful career led to various accomplishments within the WWE including Mr. Frazier being named World Tag Team champion, Hardcore Champion, and King of the Ring.

138.  Mr. Frazier was a charismatic performer with millions of fans who grew up in North Carolina (although the WWE would bill him from Harlem, New York). His highest level of education was high school.

---

[6] "Wrestlers with the Most WWWF/WWF/WWE Total Appearances In The Database", ProFightDB, http://www.profightdb.com/wrestlers-with-most-wwwf-wwf-wwe-total-appearances.html, *last visited* November 23, 2015.

139.    Frazier's numerous characters were featured at all levels of the WWEs branding and marketing machine including use of his likeness for action figures, violent video games, DVDs and now on the WWE network- an innovative on demand streaming video service with over one million subscribers launched in February 2014 a few days after his death.



140.    Mr. Frazier was known for his overwhelming size. His height and weight were variously billed as being 6' 9" tall and approximately 500 pounds. His current biography on the official WWE website explains: "this 487 pound monster was always one of the most intimidating Superstars in the WWE."[7]

141.    Pro wrestling of the type the WWE promotes is obsessed with the size of the wrestlers. Being a "giant" is not only part of the act, it is a selling point to attract audiences and deliver profits for the WWE.

---

[7] *See*, WWE.com, http://www.wwe.com/superstars/bigdaddyv, *last accessed* February 12, 2015.

54

142.    In a 2009 interview, Frazier confirmed that Vince McMahon had "a big man fetish." (*See* "Nelson Frazier Shoot Interview", Highspots DVD: Pro Wrestling Diary LLC & Crystal Clear Productions Inc., Charlotte, NC (2009))

143.    A 2009 guide to a WWE released video game explains: "Who's Your Daddy? They don't come any bigger or badder than Big Daddy V. This quarter-ton monster uses his massive bulk to steamroll over opponents and there aren't many superstars who can withstand him….With very, very few exceptions, all of his moves target the head or body of his opponent…. His KO ability can allow him to pick up a quick victory by knocking his opponent out cold."[8]

144.    His large size was a feature and selling point of his various characters gimmicks and storylines that were created for him by the WWE CEO. The action figure below is one of many produced, Weight is listed at 502 lbs.

---

[8] Smackdown Vs Raw 2009 Featuring ECW- Brady Games (Playstation) Signature Series Guide by Byron Stratton 2009 p. 144-146.

55



145. From 1993 to 1996, Frazier took the name Mabel and wrestled as part of a hip-hop themed tag team called Men on a Mission, abbreviated M.O.M, which also stood for the names of the team members: Mabel (Frazier) and a rapper manager named Oscar (Greg Girard), along with another wrestler named Mo (Robert Lawrence Horne). The act took advantage of the 1990s popularity of rap music with the wrestlers dressed in shiny purple suits and tights. Their mission was to 'make a difference' in inner cities and they conveyed positive upbeat attitudes.

56

146.    As the act evolved, Frazier was recast as a thug or heel in 1995. This transformation resulted in Oscar leaving the WWE. He later told the media he objected to the negative recast of the team as being gangsters.[9]

147.    The transformation was in part due to the fact that the new WWE hero, Diesel (Kevin Nash) needed a formidable opponent. This conflict eventually led Frazier to becoming the top villain in the WWE. In 1995 he won King of The Ring and became known as King Mabel.

148.    During an event known as SummerSlam!, Frazier injured his back. But he was returned to wrestle, one journalist observed, "McMahon was determined to get everything he could out of his investments in Mabel and moved him into a feud with the Undertaker."[10]  The Undertaker, who was to become one of the most storied wrestlers in the history WWE, was injured in the match. In 1998 Frazier wrestled Ken Shamrock to compete for the king of the ring title again and lost.

149.    In 1999 Frazier returned to the WWE's very popular Monday night Raw, during the so-called Attitude Era, reintroduced as Viscera. The new character was part of a storyline of evil characters referred to as the Ministry of Darkness. Led by The Undertaker, the Ministry of Darkness included quasi-Satanic themed storylines that involved rituals, spells and

---

[9] See, PWInsider.com, http://pwinsider.com/article/41503/oscar-reveals-why-he-was-kicked-out-of-men-on-a-mission-why-pn-news-failed-details-on-the-mom-reunion-and-more-in-his-first-ever-shoot-interview.html?p=1, last accessed February 13, 2015.
[10] See, Edmonton Journal, http://blogs.edmontonjournal.com/2014/02/19/rip-nelson-frazier-jr-a-k-a-mabel-king-mabel-viscera-big-daddy-v/#__federated=1, last accessed February 13, 2015.

sacrifices. The storyline had Mabel abducted by the Satanic Undertaker, who named him Viscera.

150.   Viscera adopted a gothic costume that included white contact lenses that made him look like a zombie with a bleached Mohawk, black lipstick and a leather clad black bodysuit. Frazier wrestled as an enforcer of the Dark cult, in this leather costume.

151.   Once the Ministry Act ceased, Frazier participated in so-called 'hardcore' wrestling. Hardcore Wrestling is a form of wrestling where 'hardcore rules apply.' These are rules are characterized by the absence of rules: disqualifications, count outs and the regular rules do not apply. The matches take place in unusual environments using ladders, chairs, tables, thumbtacks, barbed wire, shovel, baseball bats, golf clubs, hammers, axes, chains and other improvised weapons. The WWE Hardcore Championship Title was briefly held by Frazier in April of 2000 in a confused match with the title changing hands many times.

152.   After a hiatus, Frazier returned to the WWE from 2004-2008 and assumed yet another identity, "The World's Largest Love Machine." These matches broadcast on the WWE Raw and Heat Television brands, featuring Frazier wrestling in Silk Pajamas and making overt sexual gestures in the ring. The storylines involved him attempting to seduce the Ring announcer Lillian Garcia, who he eventually won over. Garcia proposed to him in the ring, but another character, known as the Godfather, arrived with his "prostitutes" to show Viscera what he would be leaving behind if he

58

accepted Garcia's proposal. Viscera decided to forsake marriage after all and left Garcia crying in the ring. Afterwards, Viscera then teamed with wrestler named Val Venis to form V-Squared, where he performed for about a year on the WWE Heat Television program.



153.    In his final year at the WWE, Frazier was recast a final time as Big Daddy V on another WWE Television series called ECW that broadcast on the Sci Fi Network.  In these matches Frazier wrestled bare chested, showing his enormous weight and sporting numerous tattoos on his chest. He was asked by the WWE Magazine about the meaning of the Tattoos.  He explained, "It's the sun and the crescent moon with the North Star. Just to make it simple, it's a sign of my spirituality and my belief in our universe. I'll

59

leave it at that."[11] Frazier wrestled his last match on March 11, 2008, losing to CM Punk.

154. Phil Brooks, known as CM Punk who wrestled last with Frazier in the WWE, is a well-known star and considered the longest reigning Champion of the modern era. CM Punk made headlines in November of 2014 in a noisy exit from the WWE, telling the media that he was cleared to wrestle after sustaining severe injuries.

155. CM Punk has commented on the WWE's concussion policy, saying the test is "bullshit" and that he passed the concussion test after getting hurt in November 2013, when he clearly should have failed. He explained that he only chose to continue to perform because he was WWE champion at the time.

156. As described in more detail above, Nelson Frazier, Jr. had an extremely long career performing under the direction of the WWE, including performing in many hardcore matches. He was first cast as Mabel, the loveable giant Hip-Hop with Men on a Mission; then King Mabel, a sort of "gangster rap" villain; then Viscera, the evil minion of the Satanic Undertaker; then the World's Largest Love Machine; and finally as Big Daddy V. He performed these roles in these storylines, all of which were created by the WWE, at the direction of the WWE. The exploitive nature of many of these performances including roles that often cast him in an unflattering light, illustrate the nature of the WWE. The WWE uses people like Mr. Frazier who

---

[11] *See,* WWE.com, http://www.wwe.com/inside/wwe-magazine-nelson-frazier-interview-26182788, *last accessed* February 13, 2015.

60

SA-0195

over his long tenure used his body to perform dangerous stunts, even though he had a complicated medical history, weight issues and heart conditions. As a direct result of these performances, he sustained countless head injuries, concussions, and numerous other physical injuries all without appropriate warnings about his long-term health or intervention and treatment by the WWE or its medical staff.

157.    Mr. Frazier bore visible, physical signs of this long career. Mr. Frazier had large knots on his head, as the scar tissue on his skull formed into permanent lumps. He also evidenced indentations in his skull.

158.    Before his untimely death, Frazier exhibited severe symptoms of neurological injuries, and other physical trauma. He suffered from confusion and disorientation: he often did not know 'whether he was coming or going.' Frazier had lost most of his short-term memory, could not remember discussions from moments or days before, and had difficulty performing basic tasks due to his inability to recall events or appointments. Frazier suffered from severe migraines for which he sought medical attention. Frazier suffered severe depression for which he sought medical attention. Frazier had sustained serious long-term brain damage from his WWE career.

159.    Frazier's broken spirit and body left him virtually penniless and he was forced to pay cash for medical services in the months before his death.

SA-0196

160.   Nelson Frazier, Jr., in ailing health, collapsed after taking a shower in his home on February 18, 2014, his wife by his side. He had a massive heart attack and died at age 43.

**Nelson Frazier Wrestled Thousands of Times for the WWE
Putting His Body in Harm's Way**

161.   Throughout Nelson Frazier, Jr.'s WWE career he sustained numerous head injuries and wrestled on a rigorous schedule for the WWE throughout the United States and the world. He appeared in Tag Team, Singles and Championship events on televised and pay-per-view events including but not limited to: WWF Superstars of Wrestling, Monday Night Raw, WWF Wrestling Challenge, Wrestlemania, SummerSlam, WWF Action Zone, Royal Rumble, WWF Shotgun Saturday Night, WWF In Your House, WWF No Mercy, WWF Smackdown!, WWF Jakked, WWF Survivor Series, WWE Backlash, WWF No Way Out, King of The Ring, WWE Cyber Sunday, WWE Armageddon, WWE New Year's Revolution, WWE Saturday Night's Main Event, Over The Edge, Sunday Night Heat, Heat, and ECW.

162.   Nelson Frazier, Jr., like most wrestlers under contract with the WWE maintained a rigorous travel schedule of upwards of 250 to 300 nights a year. The WWE has two weekly televised programs and many monthly Pay-Per-View events. The weekly schedule also typically requires performances in as many as six or more unaired "house" shows, that leave little or no time for injuries to fully heal or performers to adequately rest.

163.   In a 2008 interview, Frazier explains on camera: "When Vince McMahon put that straddle on you and you are wrestling 280-300 days a

62

year…not so fun anymore…. course dealing with injuries" (*See* "Nelson Frazier Shoot Interview", Highspots DVD Pro Wrestling Diary LLC & Crystal Clear Productions Inc. Charlotte, NC (2009)).

164.    By way of contrast this travel schedule was downplayed by Stephanie McMahon in her testimony to Congressional investigators in 2007. During Stephanie McMahon's Congressional testimony, a Congressional investigator asked about typical wrestler's schedules. Ms. McMahon's answer was "it is all looked at to make sure no one works too much. For example, John Cena, our top superstar, *who is booked the majority out of anybody*, last year worked 161 days. So when you look at that in the grand scheme of things, it doesn't seem like too hard of a schedule. But it definitely is, you know a tough schedule." Congressional Testimony, pp. 29-30.  When asked about informal or formal guidelines "on how many days talent can work in a month or a year", WWE's answer was: "informally, some talent they have dates that they cannot work more than. But we always look at that, and we never really hit that barometer". *Id.* at 30.

165.    A December 2013 interview with a current star performer, Daniel Bryan (who has been sidelined with injuries including a reported concussion) asked him what the life of a wrestler was like:

> We're on the road 250 days a year. Last year I ended up doing 219 shows. We don't have an offseason, so week in and week out, we fly out on Friday, we'll do a show Friday night, Saturday night, Sunday night, all of which are untelevised unless we're doing a pay-per-view on a Sunday. Then we do a live *Raw* on Monday, we film *SmackDown* and *Main Event* on Tuesday, and then we fly home on Wednesday. So we have half of Wednesday and

Thursday to get our stuff repacked, and then we fly back out
on Friday. And that's when we don't have international
tours. If we do, we fly straight out from *SmackDown* and do
an international trip. It's pretty grueling.

*See* Shoemaker, David, "Daniel Bryan: Q&A With a Reluctant Hero",
Grantland,             http://grantland.com/features/masked-man-does-qa-wwe-
superstar-daniel-bryan/ (December 27, 2013).

166.    Nelson Frazier, Jr. was injured in the numerous WWE matches
he performed in and suffered from poor health from the in-ring injuries,
including head trauma, he sustained. During this time, Frazier reasonably
relied upon the WWE to provide safe working conditions, including total
control over all aspects of his performance and the set-up and safety of the
ring.

167.    Frazier was what in wrestler parlance is called a "worker"
meaning he did as he was told, was very reliable and loyal to the "company."
He tells a 2009 interviewer repeatedly "I'm a WWE guy." In the interview,
Frazier was asked about the gimmicks he was asked to perform: "Did any of
the racial elements bother you?" He replied: "I thought the gimmick was
stereotypical… I was just so happy to have opportunity to do it…. It was a
hell of an opportunity and we took it." (*See* "Nelson Frazier Shoot Interview",
Highspots DVD Pro Wrestling Diary LLC & Crystal Clear Productions Inc.
Charlotte, NC (2009)). The same company would not reciprocate that loyalty
by offering medical care to him after he was forced to retire after being one
of the most prolific WWE performers in the company's history.

168.   Upon information and belief the WWE may even have released him because he was injured. In a December 2008 interview with 'Big Daddy V', Nelson Frazier stated:

> Interviewer: "It was health issues when you got released?"
>
> Frazier: "Basically, my doctor and basically all doctors think that wrestlers are idiots for what we do for a living. He just basically shared his opinion on me and wrestling and WWE was forced to release me.

*See* Strum, Phil, "Interview with Big Daddy V", Under the Ring, http://blogs.poughkeepsiejournal.com/underthering/2008/12/07/interview-with-big-daddy-v/ (December 7, 2008).

169.   Discovery will be required to learn the exact circumstances of his release by WWE.

170.   In his 2009 "Shoot Interview" he explains that he was on the road with pneumonia and "didn't know it." That as a wrestler "you walk you wrestle." He explains that his "wife begged him to see a doctor," which he did and upon telling the WWE about his medical situation he was released, explaining "my doctor got me fired from WWE." ("Nelson Frazier Shoot Interview", Highspots DVD Pro Wrestling Diary LLC & Crystal Clear Productions Inc. Charlotte, NC (2009)). In other words, a doctor evaluated Frazier and concluded his medical condition necessitated rest, and the treatment prevented him from returning to WWE to wrestle.

171.   In the interview, Nelson explains: "Back then we didn't have trainers taping us up and sewing us up. You had what you had in your bag and that's it… we had to take care of ourselves… it was a man's sport back

65

then, if you got hurt you didn't get paid." ("Nelson Frazier Shoot Interview",
Highspots DVD Pro Wrestling Diary LLC & Crystal Clear Productions Inc.
Charlotte, NC (2009)).

172. Thus, the WWE had a 500 lb performer on the road up to 280-
300 nights, performing dangerous athletic moves night after night with no
medical protocols, screening, medical treatment or long term care plan.

173. The WWE had another star performer similarly sized at 600 lbs
named Yokozuna (Rodney Anoa'i), who was a friend and contemporary of
Frazier. Yokozuna died in 2000, Frazier was asked about his friend saying
"back then we didn't have a wellness program…"("Nelson Frazier Shoot
Interview", Highspots DVD Pro Wrestling Diary LLC & Crystal Clear
Productions Inc. Charlotte, NC (2009)).

174. The WWE classifies workers like Frazier as Independent
contractors leaving with zero protections or benefits under a host of Federal
laws designed for worker protection and safety.

175. Despite this the WWE has repeated and publicly stated it has a
duty to them:

- WWE Spokesman: "This is a company that's not going to hide behind
a contract," Zimmerman said. "If someone is injured we have the
option of terminating them, but it's never been done." *See* Stannard,
Ed, "McMahon Slammed In Deaths of Wrestlers", New Haven Register,
http://www.nhregister.com/general-news/20100905/mcmahon-
slammed-in-deaths-of-wrestlers-blumenthal-others-say-her-firm-is-
at-fault-document                (September        5,        2010).

- WWE Employed Doctor: "One of the most important things [in
medicine] is continuity of care and knowing the patients," says
Amman. "[H]aving a full-time physician who knows these guys and
can follow them on a continual basis made more sense." *See* Deitch,

Charlie, "Heavyweight Champions", Pittsburgh City Paper, http://www.pghcitypaper.com/pittsburgh/heavyweight-champions/Content?oid=1380633 (December 2, 2010).

- **WWE Spokesman Zimmerman:** "If you're hurt in the ring WWE pays for all of your treatment and rehab, which is essentially what worker's comp is." *See* Deitch, Charlie, "Heavyweight Champions", Pittsburgh City Paper, http://www.pghcitypaper.com/pittsburgh/heavyweight-champions/Content?oid=1380633 (December 2, 2010).

- **WWE Spokesman Jerry McDevitt:** "Eddie's death [A superstar that died of a heart attack in 2005] was a shock to everyone," McDevitt says. "It was the catalyst to the program that we now have in place." That program "checks for drugs, we monitor head injuries and we monitor cardiac health. We are doing everything we possibly can to make sure these men and women are healthy." *See* Deitch, Charlie, "Heavyweight Champions", Pittsburgh City Paper, http://www.pghcitypaper.com/pittsburgh/heavyweight-champions/Content?oid=1380633 (December 2, 2010).

176. WWE was asked by Congressional Investigators in 2007, "And to the extent that this is a chronic injury that has occurred, a wrestler develops arthritis, or because of repeated contact or that kind of injury, does WWE cover the cost of any treatment for those kinds of chronic injuries that have occurred in the ring?". WWE responded, "There hasn't been any chronic treatment like that…. But I can't think of any major injury that someone has had that was chronic and required outside rehabilitation that we were unable to provide." (*See* Congressional Testimony p. 132).

177. In 2007, the weight of wrestlers was apparently the subject of an internal WWE study. As WWE spokesman McMahon stated to Congressional Investigators "We did do a study which is the average weight of the roster right now…" (*Id.* at 57) This study will be requested during discovery.

178.   The "weight study", in addition to data collection from WWE talent, also collected data from the NFL implying that weights for athletes was being evaluated with science from sports medicine. When asked by Congressional Investigators about the reasons such a study was conducted, who conducted it, and its' methodology, the record reflects "hard data" was accessed and put together. "We, you know, took everybody's weight." "We always do take everybody's weight, but we took it again to get the most accurate weight, and we pretty much update annually, anyway maybe biennially." (*Id*. at 59).

179.   The reasons stated for this weight study strongly imply the WWE is undertaking some sort of duty to its wrestlers. "A lot of this came about as a result of Chris Benoit [the wrestler diagnosed with CTE who murdered his family before hanging himself, which prompted Congress to hold the hearings] Chris is such a tragedy, but he did force us to look at our business in a different way. You know, our talent; you know, what are talent doing? How many of them have health insurance? How many of them have financial planning? We really want to engage our talent and to be doing the best that we can for our talent." (*Id.* at 58).

180.   These examples of WWE's public statements about its' assumed duties for wrestler health include, *inter alia*: 1) WWE does not release people for health reasons by hiding behind contracts; 2) WWE Doctors know the patients and follow them on a continual basis; 3) WWE benefits are essentially the same as workers' compensation; 4) WWE

68

monitors cardiac health and does 'everything we possibly can' to make sure the wrestlers are healthy; 5)  WWE is unaware of any chronic injuries that WWE has been unable to help a wrestler with; 6) WWE conducted an internal weight study to be 'doing the best we can for talent'.

181.    Contrast the above statements with WWE Spokesman Jerry McDevitt on responding to this case based on the 43 year old Frazier's untimely passing:

> "It's an embarrassment to be a lawyer sometimes," McDevitt stated. "It's ridiculous that someone can … try to blame someone because a gentleman with a weight problem died of a heart attack in the shower eight years after he last performed. It's ridiculous to try and blame someone for that."

*See* McGovern, Bob, "Full Court Press: WWE, Mass. Lawyer in Legal Cage Match", http://www.bostonherald.com/news_opinion/columnists/2015/03/full_court_press_wwe_mass_lawyer_in_legal_cage_match (March 15, 2015).

182.    Indeed, the public response from WWE neglects the overwhelming statistical evidence of WWE wrestler deaths.  Nelson Frazier's death, far from being an isolated incident, was an apex of the ongoing fraudulent, reckless, and negligent behavior of WWE to conceal and omit all information regarding the health safety concerns prevalent in WWE and which cause long-term neurological and health injuries to its wrestlers.  A storied performer who was exploited as a 500 pound monster for WWE promotion has suddenly been transformed into some random person with a "weight problem" by Mr. McDevitt, further evidencing WWE's failure to accept the responsibility they have undertaken to its wrestlers, both current and former, and representing WWE's manipulation of facts for its benefit.

69

183.   As documented throughout this Complaint, not only was WWE aware of the health crisis in its performers, it undertook half measures, implemented a Wellness Policy that extended duties to retired wrestlers, and conducted internal weight studies that failed to help Nelson Frazier, Jr.  As his health declined from injuries directly linked to his in-ring performances for 15 years, the WWE's preferred course of action was to release him leaving him with no income, no employee benefits, or medical care plan.

184.   On November 24, 1993, Thanksgiving Eve Frazier performed as Mabel in the WWF Survivor Series, a live pay-per-view event in the Boston Garden. A quick look at the participants in this match reveals that an almost inconceivable number of wrestlers that participated in this event are now deceased. The dead performers at this single event alone deliver a stark message: Nelson Frazier, Jr. (Mabel) dead at age 43; Scott Charles Bigelow (Bam Bam Bigelow) dead at age of 45; Gertrude Elizabeth Vachon (Luna Vachon) dead at age 48; Tony Halme (Ludvig Borga) dead at the age of 47; Owen Hart dead at age 34; Brian Keith Adams (Crush) dead at the age of 43; Rodney Agatupu Anoa'I, (Yokozuna) dead at age 34; Mike Shaw (Bastion Booger) dead at age 53 and Randy 'Macho Man' Savage one of the all time WWE stars dead at age 58. The dead are the main stars of the event and based on a count of the card, appear to represent more than one-quarter of the named participants. Upon information and belief Nelson Frazier, Jr. sustained head and other long-term injuries by participating in this event and hundreds of others conducted by the WWE that he performed in.

70



185. By way of example only, August 27, 1995 Frazier performed as King Mabel in a match opposing Diesel on SummerSlam in Pittsburg, Pennsylvania. As evidenced by this screen shot the nearly 500 pound Frazier landed on his head. Upon information and belief he sustained head and other long-term injuries by participating in this event.

SA-0206



186.    On December 17, 1995 Frazier performed as King Mabel in a match opposing The Undertaker in WWF on Your House 5: Seasons Beatings in Hershey, Pennsylvania. Above screen shot shows a typical bump with Frazier being thrown on his back. Upon information and belief he sustained head and other long-term injuries by participating in this event.

SA-0207

Case 3:15-cv-01074-VLB Document 98 Filed 11/23/15 Page 73 of 112



187.    By way of example only, on October 5, 1999 Frazier performed as Viscera with Mideon in a match with Kane and X-Pac on WWF Smackdown in Uniondale, New York. Upon information and belief he sustained head and other long-term injuries by participating in this event.



188.   By way of example only, on January 17, 2005, Frazier performed as Viscera in a match with Batista on WWE Monday Night Raw in Toronto, Ontario. Above screen shot shows the nearly 500 pound Frazier being thrown on the mat. Upon information and belief he sustained head and other long-term injuries by participating in this event.



189.    By way of example only, on August 7, 2006, Frazier performed as Viscera with John Cena on WWE Monday Night Raw in Memphis Tennessee. In the above screenshot, Frazier is being thrown on his head/back/neck by John Cena. Upon information and belief he sustained head and other long-term injuries by participating in this event.

SA-0210



190. On March 11, 2008 Frazier performed as Big Daddy V for the final time with CM Punk on WWE ECW at an event in Chicago. Upon information and belief he sustained head and other long-term injuries by participating in this event.[12]

### What The WWE Knew About Concussions

191. Every blow to the head is dangerous. Both repeated concussions and sub-concussions cause permanent brain damage. During WWE practice as well as the documented match list in the foregoing paragraphs, WWE wrestlers such as Nelson Frazier, Jr. sustained thousands of hits to the head even without any documented concussion. Such repeated blows result in permanently impaired brain function.

---

[12] Information compiled about Nelson Frazier, Jr.'s matches from "The Internet Wrestling Database" at profightdb.com.

SA-0211

192.   For decades, scientific evidence has linked head trauma to long-term neurological problems. The WWE knew or should have known of this growing body of scientific evidence and its compelling conclusion that persons who sustain repetitive concussive events, sub-concussive events and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities whether during their Wrestling careers or, especially, later in life.

193.   Although the WWE knew or should have known about this scientific evidence concerning concussions, sub-concussive impacts and brain injuries, the WWE never told, and in effect, hid information from Nelson Frazier, Jr. about the dangers of repeated brain trauma. This was a failure of its assumed duty since Nelson Frazier, Jr. was not in the same position as the WWE to have access to the evidence and knowledge to understand the impact their careers had on their risk of long-term injury and illness.

194.   Scientists and doctors have published scores of peer-reviewed articles in well-established medical and scientific journals conclusively establishing the link between brain injuries and sub-concussive/concussive blows suffered by, among others, football, boxers, and hockey players. These studies date back to at least 85 years ago when pathologist Harrison Martland's seminal study was published in the Journal of the American Medical Association linking sub-concussive blows suffered by boxers to injuries ranging from mild concussions to degenerative brain disease.

195.   The WWE assumed a duty as a guardian against head-trauma in

77

wrestlers. The WWE decided to create its own program to minimize the brain injury risk to its wrestlers. Specifically, it created a Wellness program in 2006 (the "Wellness Program"). Defendant, however, failed to discharge and fulfil its assumed duty. In the end, the Wellness Program served as a false assurance that the WWE was providing wrestlers with accurate risk analysis.

196. Despite having assumed a duty to wrestlers, the WWE merely assumed this duty in an effort to insulate itself from liability for its total failure to address concussions in the decades preceding the introduction of the Policy. Additionally, the WWE hired doctors whose purpose was to downplay and conceal the long-term risks of head injuries from wrestlers, rather than ,as wrestlers believed, protect them from harm. In this additional way, WWE deceived wrestlers like Nelson Frazier, Jr.

197. The WWE policy was reportedly introduced in 2006 and concussion baseline testing began in 2008. By way of contrast, the NFL created the Mild Traumatic Brain Injury Committee in 1994. The National Hockey League (NHL) introduced a Concussion Policy in 1997 and required NHL team doctors to document all concussions and collected the data on standardized injury report forms. In 1997, the NHL began baseline testing for its players and required team doctors and trainers to maintain records of all players believed to have concussions. Upon information and belief, the WWE waited nearly a decade before following suit with even a policy and has yet to collect or release data about the frequency of concussions or document wrestlers with long-term head trauma.

78

198. In the ensuring decade between the time major sports leagues adopted concussion policies and the WWE created its policy, science continued to build that repeated head injuries were resulting in an unseen epidemic of brain damaged athletes.

199. The NFL engaged in a protracted debate about the mounting evidence, at first attempting to discredit the research of doctors examining brain tissue of deceased NFL players. In the face of overwhelming scientific evidence the NFL finally decided to strongly warn its players in July of 2010 with a notice that concussions: "may lead to problems with memory and communication, personality changes, as well as depression and the early onset of dementia. Concussions and conditions resulting from repeated brain injury can change your life and your family's life forever." Upon information and belief, the WWE has never so warned its wrestlers, including Nelson Frazier, Jr.  Entering 2015, the NFL is awaiting final approval of a $765 million dollar settlement of an MDL to compensate players for concussions sustained over decades. The argument in that case of course is very similar to the arguments made on behalf of Nelson Frazier, Jr. in this Complaint - namely the concealment, failure to warn, and failure to prevent head injuries over the decade-plus career of Mr. Frazier should impose liability on the WWE.

200. Dr. Bennett Omalu who pioneered the research into classifying CTE as a new disease entity studied the brain tissue of a deceased NFL player named Mike Webster and published his findings in Neurosurgery in

79

SA-0214

July 2005. A month previously, Terry Long, a 45 year old Pittsburg Steelers player committed suicide. Dr Omalu opined that the cause may have been brain damage in line with his studies.

201.   NFL Pittsburg Steelers team doctor for twenty-five years, Dr. Joseph Maroon attacked this conclusion. Dr. Maroon reportedly told the Pittsburg Post-Gazette that Dr. Omalu's conclusion that NFL Player Terry Long's suicide may have been the result of depression caused by head injuries during his career in football was "fallacious reasoning." Dr. Maroon: 'To go back and say that he was depressed from playing in the NFL and that led to his death 14 years later, I think is purely speculative," Maroon continued: " He could have had a head injury that wasn't reported before football. He could have had a fight, he could have had a head injury…. And that's why I'm saying it's so speculative."

202.   In November of 2006, Dr. Omalu published a second paper after finding CTE in the brain of former Steelers' player Terry Long. He links Webster and Long's career to the brain damage: "Our first and second cases both had long careers without multiple recorded concussions. Both manifested Major Depressive Disorder after retirement."

203.   In June of 2007, WWE superstar Chris Benoit committed suicide after murdering his wife and child.

204.   Dr. Omalu studied Chris Benoit's brain tissue and concluded that he had CTE.

80

205.   The WWE hired Dr. Joseph Maroon, to be its chief medical director in 2008. This is the same doctor previously employed by the Pittsburg Steelers that had attempted to discredit Omalu's NFL findings.

206.   In March 2008, it was reported by The Sports Legacy Institute (SLI) that "anonymous wrestlers" had said the WWE had commenced concussion testing for active wrestlers. SLI reported: "WWE management has instituted a concussion management program. At a mandatory meeting for all performers in early March [2008] WWE performers took a computerized neuropsychological testing protocol, which evaluates such things as memory, cognition skills, and reaction time. They will be re-tested aggressively every six months to look for long term health issues, as well as re-tested after suspected concussions to help determine when it is safe to return to in-ring action." Thus, the WWE has finally adopted some duty, but it of course comes too late.

207.   On March 11, 2008, Nelson Frazier, Jr. performed his last match for the WWE.

208.   In March of 2009, Andrew "Test" Martin, a WWE superstar committed suicide.  In December of 2009, his brain tissue was examined by Dr. Omalu who concluded Martin had CTE. Dr. Julian Bailes, Omalu's co-director at the Brain Institute and the chairmen of the Department of Neurosurgery at the West Virginia University School of Medicine, and who studied the Benoit issue, commented to ESPN: "People wondered if Mike Webster was an isolated event",… "and then came Terry Long and Andre

81

Waters. When we announced our findings about Chris [Benoit], some in the media said it was 'roid rage. We said at the time the real finding was that repeated head trauma was the cause. With Andrew Martin as the second case, the WWE and the sport in general have to ask themselves, 'Is this a trend?' The science tells us that jumping off 10-foot ladders and slamming people with tables and chairs is simply bad for the brain."[13]

209. In a pattern that echoes that of the NFL's original response to this science, the WWE responded on ESPN: "While this is a new emerging science, the WWE is unaware of the veracity of any of these tests, be it for Chris Benoit or Andrew Martin. Dr. Omalu claims that Mr. Benoit had a brain that resembled an 85-year-old with Alzheimer's, which would lead one to ponder how Mr. Benoit would have found his way to an airport, let alone been able to remember all the moves and information that is required to perform in the ring…WWE has been asking to see the research and tests results in the case of Mr. Benoit for years and has not been supplied with them."[14]

210. Dr. Omalu responded to the WWE statement as follows: "Dr. Maroon was there with us and he was shown all our research information, slides, and specimens- on Chris Benoit and all the athletes' brains we studied."[15]

---

[13] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, *last accessed* February 13, 2015.
[14] *See* ESPN.com, http://sports.espn.go.com/espn/otl/news/story?id=4724912, *last accessed* February 13, 2015.
[15] Irwin, Muchnick, <u>Concussion, Inc.</u>, p. 67 (ECW Press, 2015).

211. Dedicated to wrestling, the vast majority of wrestlers naturally rely on the WWE with its highly educated managerial, legal and medical personnel to disclose important medical risks.

212. The WWE had access to the boxing, football and other concussion studies described herein. With the WWE's resources and highly-educated managerial, legal and medical staff, it was uniquely positioned to inform Nelson Frazier, Jr. of the increased risks that those NFL and other concussion studies had already clearly demonstrated. But the WWE never informed Nelson Frazier, Jr. or other wrestlers that these and other studies demonstrate an increased risk for wrestlers, or that the study results had any implications for WWE wrestlers. Knowing that the WWE had far greater information, and was much more advantageously positioned to obtain information about the causes, prevention and treatment of concussions and other head injuries, Nelson Frazier, Jr. reasonably relied on the WWE to inform him fully and promptly about material information. In refusing for decades to properly diagnose and treat concussions suffered by its wrestlers, the WWE misled Plaintiff's Decedent and others into believing that returning quickly to wrestle, often in the same match in which they were concussed or otherwise "had your bell rung," was safe, posing neither short-term nor long-term dangers of brain injury and neuro-cognitive impairment.

213. The WWE culture imposes a code of silence on injuries; further, the WWE understands the inherent coerciveness that made Nelson Frazier, Jr. and others particularly susceptible to rely on the WWE's silence about

83

the concussion and head injury risks they faced. The WWE knows that the world is filled with wrestlers desperately eager to perform in the WWE. Indeed Nelson Frazier, Jr. was repeatedly dropped from the card and then returned to the WWE during his career. Nearly all wrestlers investigated report that that 'everyone is afraid of losing their job' at all times unless they are at the very top of the organization.

214.   The WWE also knows full well that upon reaching the WWE, which is generally regarded as the ultimate goal for any pro-wrestler, a wrestler wants to remain there. The WWE failed to inform these wrestlers (who are highly competitive individuals to begin with) that they risked serious and possibly permanent and disabling brain injuries or cognitive problems if they suffered concussions or continued to wrestle after suffering a head hit. The WWE knew, or surely should have known, that Nelson Frazier, Jr. would understand that silence as affirmation that WWE wrestlers not only could, but should, perform in a violent manner and continue to wrestle after a head injury and that doing so posed no danger to their health. At no time, including during the fifteen year career of Nelson Frazier, Jr., did the WWE implement a Concussion Program. At no time in the years following his career did the WWE take any action to inform him about the long-term effects of concussions, sub-concussive impacts and other head injuries that frequently are latent, developing, and only manifest themselves after a wrestler's WWE career has ended.

215.    In addition to its neglect at every level regarding head injuries, the WWE has failed to care for and monitor the cardiac health of its wrestlers including Nelson Frazier, Jr.

216.    The WWE Wellness policy advises; "WWE implemented its Talent Wellness Program on February 27, 2006…. Since it implementation the Wellness Program has been refined and expanded to cover: Comprehensive Medical and Wellness Staffing, Cardiovascular Testing and Monitoring, ImPACT testing, Substance Abuse and Drug Testing, Annual Physicals, Health Care Referrals."[16]

217.    The Policy further reads:

**Cardiovascular Testing and Monitoring Program**

> All WWE talent undergo an extensive cardiovascular stress test before they are offered a contract by WWE, and subsequently tested at least biennially while under contract (more frequently as and when circumstances warrant). Dr. Bryan Donohue, Division Chief of Cardiology at University of Pittsburgh Medical Center Shadyside Hospital, and Senior Partner at Donohue Cardiology Associates, administers WWE's cardiovascular testing and monitoring program.

**Referrals to Consulting Health Care Providers On An As Needed Basis**

> WWE offers all WWE talent the opportunity for referral to qualified health care professionals who can help them with issues that may arise from time to time. Under the supervision of Dr. Maroon, WWE has established relationships with renowned specialists in psychiatry, orthopedics and endocrinology.

---

[16] *See* Corporate WWE.com, http://corporate.wwe.com/wellness/talent-wellness-summary, *last accessed* February 13, 2015.

SA-0220

218.    The WWE has clearly assumed and voluntarily undertaken a duty to its wrestlers, including Nelson Frazier, Jr. That duty did not end when he was shown the door. With the pronouncements on the WWE's website about its cardiovascular knowledge it is obvious that Nelson Frazier, Jr., the '487 pound monster' and 'World's Largest Love Machine' may have required long term cardiac care. Upon information and belief Nelson Frazier, Jr. was not tested or screened during his wrestling career for the WWE, and if he was so tested, it was negligently administered.

**THE STATUTE OF LIMITATIONS IS TOLLED**
**WWE'S Duty to Nelson Frazier, Jr. Underscores Propriety of Equitable Tolling**

219.    The WWE undertook a duty of care to Plaintiff's Decedent. The WWE's fortunes depended on Nelson Frazier, Jr.'s performance abilities, his technical skills, his physical strength and abilities; his dedication; his ability to, fill arenas with fans, his ability to generate licensing revenue through consumer products bearing his names and likenesses, and driving the ever-increasing WWE revenues from TV contracts the WWE negotiated. Wrestlers like Mr. Frazier, and their enormous popularity, are the WWE's primary asset. The WWE had vastly greater resources than Nelson Frazier to obtain, analyze and disseminate information about the dangers of concussions and head hits. Knowing that the WWE's fortunes depended on their ability to perform, Nelson Frazier reasonably relied on the WWE to inform him about safety and health information. Nelson Frazier, Jr. reasonably relied on what the WWE said and did not say regarding his health and safety.

220.    Plaintiff reasonably acted on what the WWE omitted – that

86

concussions and sub-concussive hits are serious and result in permanent disability and brain trauma, and that returning to wrestle before being properly evaluated, treated and cleared to wrestle could result in enormous risks of permanent damage, especially in returning to wrestle immediately after taking brutal hits to the head. The WWE had a duty toward its wrestlers, including Nelson Frazier, Jr., based upon its special relationship with its wrestlers, assumed duty of care toward its wrestlers, voluntary undertaking of the Wellness Program, and superior knowledge about the causes, frequency, severity and proper treatment of concussions, mild traumatic brain injuries and other sub-concussive injuries and head trauma. Plaintiff Nelson Frazier, Jr. appropriately placed his trust and confidence in the WWE. In light of the WWE's duty of care toward the Plaintiff, the WWE's silence about the dangers of concussions, TBI and other head injuries suffices to toll any limitations or repose periods. Beyond mere silence, the WWE affirmatively concealed facts to this day that were required to put Plaintiff on notice of his claims.

221. WWE was under, but breached, a continuing duty to disclose the true character, quality, and nature of the after-effects of concussive events, sub-concussive events and/or brain injuries. Because Defendant concealed the true character, quality and nature of these injuries, it is estopped from relying on any statute of limitations defense. The applicable statute of limitations is tolled because Defendants' fraudulent concealment of the dangers and adverse effects of head injuries prevented Plaintiff

Nelson Frazier, Jr. from learning of or properly appreciating the hazards to his health.

222. Further, WWE was and is aware of the significant injuries its performances cause its wrestlers. The donation of 1.2 million dollars to CTE research and the statements made by Triple H indicate that WWE is aware its wrestlers suffer from concussions and that they have undertaken a duty to prevent them. The specific moves and actions which WWE has begun to phase out of its performances were exactly and specifically the moves and actions engaged in by Nelson Frazier during his WWE performances, and which caused him severe injuries including head trauma, concussions, sub-concussive injuries, and long-term neurological injuries and poor health, which directly and proximately led to his untimely death. Nelson Frazier's death could have been prevented had WWE accepted the overwhelming statistical evidence of wrestler death rates, the resounding medical evidence, and had not fraudulently, negligently, and recklessly concealed these facts from Nelson Frazier, preventing him from taking appropriate action and receiving the necessary medical treatment. This fraudulent concealment continued until Matthew Osborne's death and should toll any Statute of Limitations period.

## CAUSES OF ACTION

### COUNT I
### Negligence

223. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

88

SA-0223

224.    The WWE has historically and voluntarily assumed an independent tort duty of reasonable care regarding WWE Talent safety and head trauma.  The WWE has stated:

> "WWE's top priority is the health and wellness of our Superstars and Divas.  WWE performers are the company's greatest asset – without our performers, WWE would not exist."[17]

225.    Yet, as previously outlined throughout this Complaint, the WWE has failed to discharge this duty non-negligently.  As a direct and proximate result, WWE Talent such as Nelson Frazier, Jr. suffered serious, life-threatening injuries, which ultimately resulted in his untimely death.

226.    Since the founding of Titan Sports in 1980, the company that would become the WWE, the organization has assumed the common law duty to ensure the safety of the WWE Talent participating in the WWE performances and to inform the WWE Talent of necessary safety including training, techniques, medical advice, prescription requirements, and medical monitoring and diagnosing of injuries such as concussions and sub-concussions during performances, in part as a result of the following:

a.      The WWE is the purveyor of all rules and regulations for each performance, and is personally responsible for the order of events and wrestling cards which set up the matches and provide the list of techniques to be used by each wrestler throughout the event.  In fact, the WWE proudly touts that even Vince McMahon, the CEO of the

---

[17] *See* Corporate WWE.com, Talent Wellness Program Summary, http://corporate.wwe.com/wellness/talent-wellness-summary, *last accessed* February 13, 2015.

89

WWE, participates in the choreographing and storyline of the WWE performances.

b.      The WWE maintains medical and wellness staffing "ringside" including physicians and athletic trainers, as well as drug testing accommodations.  These physicians and athletic trainers, supervised by Dr. Chris Amann, alongside the other WWE staff such as the bookers and trainers, are and have been responsible for the safety of each performance.

c.      The WWE established the "Talent Wellness Program" in 2006 and is supervised by Dr. Joseph Maroon. The Talent Wellness Program, according to the WWE corporate website, "includes cardiovascular testing, medical and wellness staffing, annual physicals and health care referrals, and ImPACT testing, where every one of its talent undergoes baseline neurocognitive testing."  The WWE also runs a "Substance Abuse and Drug Testing" program.

d.      The WWE has established a "Professional Development" program where they assert that "life skills, education, wellness and career success" are emphasized through seminars which include seminars on living a healthy lifestyle and injury and illness prevention.

e.      WWE employees, servants, or actual or apparent agents were responsible for, and were under the direction of the WWE in the roll-out and production of the "Talent Wellness Program", the "Professional Development" program, all pre-ring, in-ring, and post-

90

ring medical care and treatment, and all testing of the WWE Talent. The WWE staff were responsible for observing, monitoring, testing, and providing medical care and treatment throughout the WWE performance process, and were acting within the scope of their employment and/or agency with the WWE when engaging in the medical monitoring, care and treatment of the WWE Talent, as well as informing and omitting to inform the WWE Talent regarding necessary and pertinent health information.

227.   The WWE undertook the duty to provide proper and necessary medical care and treatment of the WWE Talent by providing and offering to provide medical monitoring, care, and treatment before, during, and after the WWE performances.  WWE undertook efforts to direct wrestlers, including Nelson Frazier, Jr., to trust and rely on WWE to provide knowledge, information, and medical oversight for their well-being, under the guise that WWE would clear wrestlers for matches before allowing them to step into the ring safely, and to monitor wrestlers for signs of true injury or harm. However, such action was perpetrated for the purpose of coaxing wrestlers to perform event after event, without proper treatment, in order to maximize "entertainment" for spectators, irrespective of the harm caused to wrestlers, including but not limited to Nelson Frazier, Jr.

228.   The WWE has known the risks of concussive and sub-concussive injury in wrestling.  On information and belief, the WWE has paid medical science consultants to advise it regarding health risks associated

91

with wrestling for the WWE, including the health risks associated with repetitive concussive and sub-concussive injuries.

229.   Such ongoing medical advice and information gave the WWE continuing superior knowledge to the WWE Talent, including Decedent. When taken with the WWE's unilateral power to set rules and determine policies throughout its performances, the WWE was at all relevant times situated to direct and control how the performance would be played out and to determine the risks to which WWE Talent would be exposed.

230.   As a result, the WWE unilaterally assumed a duty to act in the best interests of the health and safety of the WWE Talent, to provide truthful information to the WWE Talent regarding risks to their health, and to take all reasonable steps necessary to ensure the safety of the WWE Talent.

231.   As part of this duty of reasonable care, the WWE was required to keep the WWE Talent informed of neurological risks of head injuries suffered while wrestling in WWE performances, and not to omit material information about the risks of negative long term effects or permanent neurological damage that can occur from head injuries sustained while wrestling.

232.   The WWE breached this duty of reasonable care to its Talent, including Nelson Frazier, Jr., by:

(a)   Creating, fostering, and promoting a culture of extreme violence, including head hits with metal folding chairs, techniques causing severe trauma to the spine, neck, and head with accurate

92

names such as the "Brain Buster", and violence from fighting, where head trauma to the WWE Talent was a natural and common corollary;

(b)     Failing to inform the WWE Talent about the scientific research on the negative health effects of head trauma and about anecdotal evidence from the negative health effects of head trauma from its own WWE Talent;

(c)     Failing to warn the WWE Talent of the potential negative effects of head injuries suffered while wrestling for the WWE, including but not limited to, that they might be developing CTE and should be checked for symptoms to ensure that they understood that continued wrestling for the WWE might expose them to irreversible brain damage and neuro-cognitive impairment;

(d)     Failing to adequately address the continuing health risks associated with concussive events, sub-concussive events and/or brain injuries that the WWE Talent sustained;

(e)     Failing to make any statements or substance about concussions, MTBI, CTE and/or other head injuries;

(f)     Failing to provide competent information to the WWE Talent with respect to the significance of head injuries and/or concussions, their symptoms and the necessary and/or proper treatment of the same;

(g)     Refusing to recognize the risks to players of repetitive sub-concussive and concussive head impacts;

(h)     Avoiding any proper study of concussion and other head injuries;

(i)     Willfully, wantonly, recklessly, and/or negligently inducing Nelson Frazier to wrestle and/or continue wrestling having sustained serious injuries including, but not limited to, concussions, sub-concussions, and CTE without being properly treated and rehabilitated for the sole purpose of increasing corporate profit; and

(j)     Failing to address cardiovascular and other health-related issues in an appropriate manner, if at all.

233.   As a direct and proximate result of the Defendants' negligent acts and omissions as previously stated, Nelson Frazier suffered traumatic brain damage from sustained concussions, sub-concussions, and CTE, an increased risk of further concussions and sub-concussions, an increased severity of concussions and sub-concussions, disfiguring scarring and physical injury, loss of mental acuity and acumen, loss of short-term memory, loss of awareness, depression, loss of a healthier state of being, as well as other symptoms and disorders resulting from his severe injuries.

234.   As a direct and proximate result of the Defendants' negligent acts and omissions as previously stated, Nelson Frazier experienced pain and suffering, loss of enjoyment of life, and other non-economic damages, in that he suffered serious injury, including but not limited to long-term neurological damage and CTE, and the serious symptoms and disorders resulting from that damage, which further resulted in lost and/or reduced

94

income during his life, and ultimately caused or contributed to his untimely death.

235.   As a direct and proximate result of Defendants' conduct, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

236.   As a direct and proximate result of Defendants' negligent acts and omissions, Plaintiff suffered and will continue to suffer in the future the loss of Nelson Frazier, Jr.'s love, companionship, comfort, affection, society, moral support, and solace related to Nelson Frazier Jr.'s injuries during his life and related to his untimely death.

237.   As a direct and proximate result of Defendants' conduct, Plaintiff will, in the future, incur loss of financial support of Nelson Frazier Jr.'s earning capacity in an amount to be determined at trial.

238.   Wherefore, Cassandra Frazier and the Estate of Nelson Frazier assert the WWE is liable to Plaintiff for the WWE's negligent conduct and therefore Plaintiffs hereby seek the full measure of damages allowed under applicable law.

## COUNT II
## Negligent Misrepresentation

239.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

240.   The WWE materially misrepresented the risks faced by Nelson Frazier Jr. related to head, back, and spine injuries through misleading public statements, promoting a culture requiring players to fight through the

95

pain, and criticizing the legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

241.    As detailed previously in this Complaint, a special relationship exists between the WWE and the WWE Talent sufficient to impose a duty on the WWE to disclose accurate information to the WWE Talent such as Nelson Frazier, Jr.    This duty arose because the WWE had superior special knowledge of material medical information that the WWE Talent did not have access to, nor was readily available to them, and the WWE communicated with the WWE Talent and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for the WWE, resulting in incomplete, partial, or ambiguous statements regarding safety and head injuries.

242.    Despite its knowledge of such material facts, and generally speaking about concussion and head injuries, the WWE negligently omitted to disclose material information to its WWE Talent regarding the link between head injuries suffered while wrestling for the WWE and the resulting negative effects and cognition-impairing conditions.

243.    The WWE actively omitted true information at a time when they knew, or should have known, because of their superior position of knowledge, that Nelson Frazier, Jr. faced serious health problems if he returned to the ring too soon after sustaining a concussion.

SA-0231

244.   The persons who made the misrepresentations as agents of the WWE and/or the WWE's "Talent Wellness Program" had no reasonable ground for believing them to be true.

245.   The WWE intended to induce Nelson Frazier, Jr.'s reliance on these misrepresentations.

246.   Nelson Frazier, Jr. justifiably and reasonably relied on the WWE's negligent misrepresentations to his detriment when wrestling for the WWE, relying on what the WWE said and failed to say to the WWE Talent about concussions and other head injuries.

247.   Nelson Frazier, Jr.'s reliance on the WWE's negligent misrepresentations by omission were reasonable given the WWE's superior and unique vantage point on these issues.

248.   Had Nelson Frazier, Jr. been aware of such information, he would not have agreed to jeopardize his health and he would have ensured that he received appropriate medical care, treatment, and rehabilitation to ensure he was completely healed before returning to wrestle for the WWE.

249.   The WWE failed to act with reasonable care by negligently omitting to disclose material information to Nelson Frazier regarding the link between concussions and brain injury and the resulting negative effects and cognition-impairing conditions.

250.   As a direct and proximate result of the WWE's negligent misrepresentation by omission, Nelson Frazier, Jr. experienced pain and suffering and suffered serious permanent and debilitating injuries, including

97

but not limited to neurological damage and CTE, which resulted in his untimely death.

251. The WWE's misrepresentations proximately caused Nelson Frazier, Jr.'s death.

252. As a direct and proximate result of the WWE's misrepresentations, Plaintiff incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined at trial.

253. As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier has suffered and will continue to suffer in the future the loss of Nelson Frazier's love, companionship, comfort, affection, society, moral support, and solace related to Nelson Frazier's injuries during his life and related to his untimely death.

254. As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier will in the future incur loss of financial support of Nelson Frazier's earning capacity in an amount to be determined at time of trial.

255. Wherefore, Plaintiff, individually, as successor in interest and as the personal representative of the Estate of Nelson Frazier, seeks and is entitled to recover the full amount of damages allowed under applicable law from the WWE on behalf of and for herself and the Estate.

## COUNT III
### Intentional Misrepresentation

256. Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

98

257.    The WWE materially misrepresented the risks faced by Nelson Frazier related to head injuries. The WWE, through misleading and deceptive public statements and published articles downplayed known long-term health risks of concussions to the WWE Talent.

258.    Material misrepresentations were made by WWE staff, including the corporate office. The material misrepresentations include but are not limited to remarks that the WWE Talent were not at an increased risk of head injury if they returned too soon to the ring or training session after suffering a head injury.

259.    The WWE's material misrepresentations included criticism of legitimate scientific studies which illustrated the dangers and risks of head injuries and the long-term effects of concussions.

260.    The WWE made these misrepresentations and actively concealed adverse information at a time when they knew, or should have known, that Plaintiff's decedent faced serious health problems if he was forced to return to the ring too soon after suffering brain trauma.

261.    The persons who made these misrepresentations as agents of the WWE and its "Talent Health and Wellness Program" had knowledge of their falsity and knowledge of the detrimental effect of concealment of material facts.

262.    The WWE intended to induce Nelson Frazier's reliance on the misrepresentations and to induce him to alter his position to his injury and risk.

99

263.   Nelson Frazier, Jr. justifiably and reasonably relied on these misrepresentations when wrestling for the WWE.  Had he known the true risks to his health, he would not have agreed to jeopardize his health.

264.   The WWE's misrepresentations proximately caused and/or contributed to Nelson Frazier Jr.'s injuries and death.

265.   As a direct and proximate result of the WWE's misrepresentations, Nelson Frazier, Jr. experienced pain and suffering and suffered serious permanent and debilitating injuries, including but not limited to neurological damage and CTE, which caused and/or contributed to his untimely death, as well as emotional distress, pain and suffering, and economic and non-economic damages.

266.   As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier incurred expenses for funeral, burial, medical treatment, and other related costs in an amount to be determined by proof at trial.

267.   As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier suffered and will continue to suffer in the future the loss of Nelson Frazier Jr.'s love, companionship, comfort, affection, society, moral support, and solace related to Nelson Frazier's injuries during his life and related to his untimely death.

268.   As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier will in the future incur loss of

100

financial support of Nelson Frazier Jr.'s earning capacity in an amount to be determined at trial.

269.   Wherefore, Plaintiff, individually, as successor in interest, and as personal representative of the Estate of Nelson Frazier, seeks and is entitled to recover the full measure of damages allowed under applicable law from the WWE on behalf of herself and the Estate.

### COUNT IV
### Fraudulent Concealment

270.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

271.   As previously set forth, the WWE was aware prior to Nelson Frazier contracting with the WWE as a WWE Talent in 1993 that repetitive head impacts in wrestling and training sessions created a risk of harm to the WWE Talent.

272.   Prior to 1993, the WWE was aware of and understood the significance of the published medical literature demonstrating the serious risk of both short-term and long-term adverse consequences from the kind of multiple concussions and repetitive sub-concussive traumatic brain injuries to which the WWE Talent were exposed.

273.   The WWE knowingly and fraudulently concealed from the WWE Talent and former WWE Talent the risks of head injuries, in particular the heightened risk created by returning to the ring before making a proper recovery from their head injuries.

SA-0236

274.    From the time Nelson Frazier contracted with the WWE as a WWE Talent in 1993 to his untimely death on February 18, 2014, the WWE voluntarily and repeatedly made material representations to its WWE Talent, former WWE Talent, and the public at large that there was no evidence linking, or insufficient evidence linking multiple concussions and repetitive sub-concussive traumatic brain injuries to latent cognitive/brain injury, including CTE and its related symptoms.

275.    The WWE concealed material facts and information with the intent to deceive and defraud.  The WWE's conduct delayed Plaintiff's Decedent who fought as a WWE Talent, and retired without the necessary knowledge to make an informed decision  to plan for the future of himself and his family and to seek appropriate treatment for his latent neurodegenerative condition during his life.

276.    The WWE knew that Nelson Frazier would rely on the inaccurate information provided by the WWE.

277.    Nelson Frazier relied on this inaccurate information during and after his career with the WWE.

278.    As a direct and proximate result of the WWE's willful concealment, Nelson Frazier suffered substantial injuries, including but not limited to brain damage and CTE, which caused and/or contributed to his untimely death, as well as emotional distress, pain and suffering, and economic and non-economic damages.

102

279.  As a direct and proximate result of the WWE's misrepresentations, Cassandra Frazier will in the future incur the loss of financial support of Nelson Frazier's earning capacity in an amount to be determined at trial.

280.  Wherefore, Plaintiff, individually, as successor in interest, and as personal representative of the Estate of Nelson Frazier, seeks and is entitled to recover the full measure of damages allowed under applicable law from the WWE on behalf of herself and the Estate.

### COUNT V
### Fraud by Omission / Failure to Warn

281.  Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

282.  The WWE had a duty to promptly disclose and speak the full truth regarding the health risks caused by concussion and sub-concussive blows to the head.  This duty arose because the WWE had superior special knowledge of material medical information that the WWE Talent did not have access to, nor was readily available to them, and the WWE communicated with the WWE Talent and the public, not only completely omitting material information about the true risks of head trauma regarding participation in WWE wrestling, but specifically stating that WWE wrestlers with diagnosed brain trauma did not receive these injuries as a result of wrestling for the WWE, resulting in incomplete, partial, or ambiguous statements regarding safety and head injuries.

103

283.    The WWE breached that duty by fraudulently failing to disclose material information to Nelson Frazier regarding the risks of head injuries suffered while wrestling as a WWE Talent, including, but not limited to, the link between concussions and brain injury and resulting negative effects and cognition-impairing conditions, and the risks that he might be developing CTE and should be checked for symptoms to ensure that he understood that continued wrestling might expose him to irreversible brain damage and neuro-cognitive impairment.

284.    Specifically, the WWE concealed material facts and information with the intent to evade the truth, which caused Nelson Frazier to become exposed to the harm referenced above.

285.    Nelson Frazier justifiably relied on the WWE's fraudulent omissions to his detriment.

286.    Given the WWE's superior and special knowledge and resources, Nelson Frazier reasonably relied upon the WWE for guidance on head injuries and concussions, and reasonably relied upon the WWE's fraudulent omissions of material fact, which concealed and minimized the perceived risks of repetitive brain impacts that WWE Talent suffered while wrestling for the WWE.

287.    Had Nelson Frazier been aware of such information he would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and his brain had completely healed before returning to the ring.

104

288.   As a direct and proximate result of the WWE's fraud by omission and failure to warn, Nelson Frazier suffered serious injuries, including but not limited to long-term neurological damage, and the serious symptoms and disorders resulting from that damage.

289.   Wherefore, Plaintiff, individually, as successor in interest, and as personal representative of the Estate of Nelson Frazier, seeks and is entitled to recover the full measure of damages allowed under applicable law from the WWE on behalf of herself and the Estate.

### COUNT VI
### Vicarious Liability

290.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

291.   Defendant WWE employs agents and employees to carry out its various business functions, including all functions related to contact with wrestlers, including but not limited to Nelson Frazier, Jr.

292.   At all times relevant to this case, employees and agents of WWE acted with the actual, implied, or apparent authority of Defendant WWE.

293.   At all times relevant to this case, employees and/or agents of WWE, in their dealings with Nelson Frazier, Jr., acted within the course and scope of their employment or authority with WWE.

294.   At all times relevant to this case, WWE is vicariously liable for negligent, reckless, willful, wanton, or other actions and/or omissions perpetrated by employees and/or agents of WWE, for all harms caused to Plaintiff and Nelson Frazier, Jr.

105

## COUNT VII
## Wrongful Death

295.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

296.   Cassandra Frazier was the wife of Nelson Frazier at the time of his death at the age of 43.

297.   Nelson Frazier's untimely death on or about February 18, 2014 was a direct and proximate result of having suffered multiple past traumatic brain injuries while wrestling for the WWE as a WWE Talent from 1993 to 2008.

298.   The WWE knew for decades of the potential harmful effects on a wrestler's brain of multiple concussions and head trauma; however the WWE has concealed these facts from the WWE Talent, including Nelson Frazier and the public, with negligent disregard for Nelson Frazier's safety and life.  Nelson Frazier's death was a direct and proximate result of the WWE's negligence.

299.   The WWE knew and understood that persons who sustained repetitive concussive events, sub-concussive events, and/or other brain injuries are at significantly greater risk for chronic neuro-cognitive illness and disabilities, including potentially life-threatening illnesses, disabilities, and complications, whether during their wrestling careers or, especially, later in life.

300.   The WWE and the WWE Medical Staff were obsessed with the size of Nelson Frazier's characters and repeatedly glorified and utilized

Nelson Frazier's weight against sound medical advice for the sole purpose of corporate profit and greed. The WWE Medical Staff, instead of providing appropriate medical care, diagnosis, treatment, and advice, routinely upheld the WWE's corporate agendas over their licensed medical duties.

301.    As a direct and proximate result of the WWE's wanton, reckless, and negligent actions, Nelson Frazier suffered severe symptoms from concussions, sub-concussions, and CTE, including disfiguring scar tissue, head trauma, confusion, disorientation, short-term memory loss, difficulty performing basic tasks, severe migraines, and severe depression, along with other serious complications resulting from the injuries sustained as a result of the Defendants' negligence, including Nelson Frazier's untimely death.

302.    As a direct and proximate result of the WWE's negligence, Nelson Frazier was put in a worse-off state of well-being as evidenced by the above complications, which to a reasonable degree of medical certainty, more likely than not attributed to Nelson Frazier's heart attack and his inability to survive the heart attack.

303.    As a direct and proximate result of the WWE's actions, Cassandra Frazier suffered and will continue to suffer in the future the loss of Nelson Frazier's love, companionship, comfort, affection, society, moral support, and solace related to Nelson Frazier's untimely death, and have been caused great mental shock and suffering. Cassandra Frazier has and will forever be caused grief and sorrow by the loss of her husband Nelson Frazier's society and companionship. Cassandra Frazier has been deprived

of his future guidance, experience, and judgment.  She has incurred and suffered the following actual and consequential damages:

(a)     Mental and physical suffering;

(b)     Loss of time;

(c)     Funeral and burial expenses; and

(d)     The pecuniary value of life of Nelson Frazier, including loss of consortium.

304.   Plaintiff brings suit for all claims of Nelson Frazier, Jr., and all damages and relief awardable, pursuant to Tenn. Code Ann. § 20-5-101 et seq., for the wrongful death of Nelson Frazier, Jr., seeking compensation for the harms caused Nelson Frazier, Jr. by WWE prior to his death, as well as the pecuniary value of his life.

305.   As a further result and because of the reckless, willful, negligent, and grossly negligent conduct (more particularly set out in other paragraphs of the Complaint) of the Defendants, the Plaintiff is entitled to actual, consequential, and punitive damages in an amount to be determined by the jury in accordance with the law and evidence in this case.

306.   Wherefore, Plaintiff, as the wife, successor in interest, and/or personal representative of the Estate of Nelson Frazier, is entitled to recover actual, consequential, and punitive damages, together with costs of this action, and for such other relief as this Court may deem fit, just, and proper.

## COUNT VIII
## Punitive Damages

307.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

308.   The WWE's conduct evidences an intentional, willful, wanton and/or reckless disregard for the safety, well-being, and condition of Nelson Frazier, Jr., in order to profit from the entertainment value of their business by repeatedly and consistently choosing to emphasize corporate profit and greed over the health, safety, and well-being of the WWE Talent by developing a culture where wrestlers were required to fight through the pain and sustain severe head trauma all while the WWE continued to disregard medical science and the scientific evidence regarding concussions and sub-concussions.

309.   The WWE's callous disregard for safety resulted in the serious, permanent, physical and emotional injuries and Nelson Frazier's death and has put other WWE Talent at great risk.

310.   Under the laws of Tennessee, and by reason of the foregoing, Plaintiff is entitled to recover punitive damages and other damages allowable by law, in an amount to be determined by a jury including, in addition to other damages asserted herein.

## COUNT IX
## Loss of Consortium Suffered by Cassandra Frazier

311.   Plaintiff re-alleges and incorporates by reference the foregoing paragraphs as if specifically pled herein.

109

SA-0244

312. As the wife of Nelson Frazier, Plaintiff is entitled to bring this action pursuant to applicable law.

313. Prior to his death, Nelson Frazier experienced years of headaches, severe migraine headaches, loss of memory, memory lapses and deficiency, confusion, disorientation, sleeping problems, cervical spine arthritis, dizziness, impulse control problems, suicidal thoughts, severe depression, bi-polar mood symptoms, anxiety and panic disorder, extreme fatigue and apathy, blurred vision, slurred speech, extreme sensitivity to light and/or irritability.

314. As a direct and proximate result of the WWE's negligence, negligent misrepresentations, fraud, and intentional, willful, reckless and/or wanton conduct, Cassandra Frazier suffered the loss of Nelson Frazier's consortium, love, companionship, comfort, affection, society, moral support, and solace caused by Nelson Frazier's injuries during his life.

315. Under the laws of Tennessee, Cassandra Frazier, individually, is entitled to recover damages for the loss of her husband's consortium during his life.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, as follows:

1. For compensatory and general damages according to proof;

2. For special and incidental damages according to proof;

3. For punitive damages according to proof;

110

4.    For costs and disbursements in the action, including

reasonable attorney's fees, to the extent permitted by law;

5.    For trial by jury; and

6.    For all such other, general and further relief as the Court

deems just and equitable.

Dated: November 23, 2015

/s/ Konstantine Kyros
Konstantine W. Kyros
KYROS LAW OFFICES
17 Miles Rd.
Hingham, MA 02043
Telephone: (800) 934-2921
Facsimile: 617-583-1905
kon@kyroslaw.com

William M. Bloss
Federal Bar No: CT01008
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
Telephone: 203-336-4421
Facsimile: 203-368-3244

Erica Mirabella
CT Fed. Bar #: phv07432
MIRABELLA LAW LLC
132 Boylston Street, 5th Floor
Boston, MA 02116
Telephone: 617-580-8270
Facsimile: 617-593-1905
Erica@mirabellaLLC.com

R. Christopher Gilreath
GILREATH & ASSOCIATES, PLLC
200 Jefferson Avenue, Suite 711
Memphis, TN 38103
Telephone: (901) 527-0511
Facsimile: (901) 527-0514
chrisgil@sidgilreath.com

111

Dr. Shezad A. Malik
TX Bar No. 24053337
**DR. SHEZAD MALIK LAW FIRM**
4925 Greenville Avenue #320
Dallas, Texas 75206
Telephone: (214) 390-3189
Facsimile: (888) 210-9693
DrMalik@ShezadMalik.com

*Attorneys for Plaintiffs*

SA-0247

| | |
|---|---|
| **From:** | CMECF@ctd.uscourts.gov |
| **Sent:** | Thursday, May 19, 2016 2:19 PM |
| **To:** | CMECF@ctd.uscourts.gov |
| **Subject:** | Activity in Case 3:15-cv-01074-VLB Russ McCullough et al v. World Wrestling Entertainment Inc Order on Motion to Compel |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

### United States District Court for the District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 5/19/2016 at 2:19 PM EDT and filed on 5/19/2016

| | |
|---|---|
| **Case Name:** | Russ McCullough et al v. World Wrestling Entertainment Inc |
| **Case Number:** | 3:15-cv-01074-VLB |
| **Filer:** | |
| **Document Number:** | 144(No document attached) |

**Docket Text:**
**ORDER granting in part and denying in part [122] Motion to Compel Responses by Plaintiffs to Defendant's Interrogatories and Requests for Production. Plaintiffs are Ordered to produce a privilege log to the extent they have not done so already and to update that privilege log whenever privilege is asserted in any new discovery responses consistent with professional practice in federal court. The Court's ruling is categorized pursuant to Sections A and B of Defendant's Memorandum in support of the Motion to Compel and the numbered subsections to Sections A and B. As delineated below, documents must be produced that are relevant to the question of Plaintiffs' knowledge of TBI. However, document requests going to the issue of damages, and not liability, are beyond the scope of this Court's Discovery Order. The Motion is granted in part and denied in part as follows:**
**A-1: Granted; A-2: Granted; A-3: Denied as Plaintiff has answered the interrogatory; A-4: Granted; A-5: Granted; A-6: Granted. Where Plaintiff is unable to identify a statement or speaker in response to an interrogatory, Plaintiff must state that fact.**
**A-7: Denied as Defendant is already entitled to appropriate expert disclosure under the Federal Rules of Civil Procedure.**
**A-8: Denied; A-9: Denied; A-10: Denied. All three interrogatories concern damages issues and not liability.**
**A-11: Denied; A-12: Granted; A-13: Denied.**
**B-1 through B-4: Granted to the extent Plaintiffs possess documents in these categories which reflect their knowledge of TBI and the effects of TBI.**

1

**B-5: Granted; B-6: Granted.**
**B-7 and B-8: Denied as beyond the scope of the current discovery order.**
**B-9: Denied in as much as WWE seeks to impose a duty upon either Plaintiff to conduct research or investigation in order to discover responsive documents. Plaintiff has otherwise answered the interrogatory.**
**B-10: Granted.**
**Signed by Judge Vanessa L. Bryant on 5/19/16. (Shechter, N.)**

**3:15-cv-01074-VLB Notice has been electronically mailed to:**

William M. Bloss     bbloss@koskoff.com, gparrilla@koskoff.com, lgrossberg@koskoff.com, voneill@koskoff.com

Thomas D. Goldberg     tdgoldberg@daypitney.com, astrada@daypitney.com, managingclerk@daypitney.com

Jonathan B. Tropp     jbtropp@daypitney.com, sprice@daypitney.com

Jerry S. McDevitt     jerry.mcdevitt@klgates.com, klgateservice@klgates.com, luanne.wee@klgates.com, rachael.sobolak@klgates.com

Terry Budd     terry.budd@klgates.com

Curtis B. Krasik     curtis.krasik@klgates.com, klgateservice@klgates.com

Jeffrey Mueller     jpmueller@daypitney.com, kboardway@daypitney.com

Harris L. Pogust     hpogust@pbmattorneys.com, asciolla@pbmattorneys.com, asciortino@pbmattorneys.com

Stefanie M. Lacy     stefanie.lacy@klgates.com

Charles LaDuca     charles@cuneolaw.com

Konstantine Kyros     kon@kyroslaw.com

Erica Mirabella     Erica@mirabellaLLC.com

Robert K. Shelquist     rkshelquist@locklaw.com, bgilles@locklaw.com, kjleroy@locklaw.com

Kevin Michael O'Brien     kobrien@pbmattorneys.com

Michael A. McShane     mmcshane@audetlaw.com

Jonas P. Mann     jmann@audetlaw.com

Scott A. Moriarity     samoriarity@locklaw.com

Erica C. Mirabella     erica@mirabellaLLC.com

Steve D. Larson     slarson@stollberne.com

Joshua L. Ross       jross@stollberne.com

Taylor Asen       tasen@cuneolaw.com

B. John Casey       john.casey@klgates.com

Brendan Thompson       brendant@cuneolaw.com

Eugene J. Podesta, Jr       gpodesta@bakerdonelson.com

R. Christopher Gilreath       chrisgil@sidgilreath.com, hhill@sidgilreath.com, sjacome@sidgilreath.com

Paul R. Genender       paul.genender@klgates.com

Shezad Malik       malik2law@yahoo.com

Michael J. Flannery       mflannery@cuneolaw.com

Katherine Van Dyck       kvandyck@cuneolaw.com, marie@cuneolaw.com

Christopher M. Verdini       Christopher.Verdini@KLGates.com

**3:15-cv-01074-VLB Notice has been delivered by other means to:**

Konstantine William Kyros
KYROS LAW
17 Miles Rd.
Hingham, MA 02043

SA-0250